## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

STEPHEN M. GRUVER and RAE ANN GRUVER,
individually and on behalf of
MAXWELL R. GRUVER, deceased,

      Plaintiffs,

v.                                                              Civil Action No.

STATE OF LOUISIANA THROUGH THE BOARD OF
SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL AND
MECHANICAL COLLEGE; PHI DELTA THETA
FRATERNITY, an Ohio Non-Profit Corporation;
LOUISIANA BETA CHAPTER OF PHI DELTA
THETA FRATERNITY, an unincorporated association;
LOUSIANA BETA HOUSE CORPORATION, a
Louisiana Non-Profit Corporation; MATTHEW A.
NAQUIN, individually and as an agent of Phi Delta
Theta Fraternity and Louisiana Beta Chapter of Phi Delta
Theta Fraternity; RYAN M. ISTO, individually and as an
agent of Phi Delta Theta Fraternity and Louisiana Beta
Chapter of Phi Delta Theta Fraternity; SEAN PAUL
GOTT, individually and as an agent of Phi Delta Theta
Fraternity and Louisiana Beta Chapter of Phi Delta Theta
Fraternity; ZACHARY A. CASTILLO, individually and
as an agent of Phi Delta Theta Fraternity and Louisiana
Beta Chapter of Phi Delta Theta Fraternity; ELLIOTT D.
EATON, individually and as an agent of Phi Delta Theta
Fraternity and Louisiana Beta Chapter of Phi Delta Theta
Fraternity; PATRICK A. FORDE, individually and as an
agent of Phi Delta Theta Fraternity and Louisiana Beta
Chapter of Phi Delta Theta Fraternity; ZACHARY T.
HALL, individually and as an agent of Phi Delta Theta
Fraternity and Louisiana Beta Chapter of Phi Delta Theta
Fraternity; HUDSON B. KIRKPATRICK, individually
and as an agent of Phi Delta Theta Fraternity and
Louisiana Beta Chapter of Phi Delta Theta Fraternity;
and JOHN DOES 1-10, individually and as agents of Phi
Delta Theta Fraternity and Louisiana Beta
Chapter of Phi Delta Theta Fraternity,

      Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiffs, STEPHEN M. GRUVER and RAE ANN GRUVER, individually and on behalf of MAXWELL R. GRUVER, deceased, through their attorneys, The Fierberg National Law Group, PLLC and Cazayoux Ewing Law Firm, for their Complaint against Defendants state:

## INTRODUCTION

1.     On August 21, 2017, a self-described "Concerned Parent" emailed the Office of Greek Life at Louisiana State University ("LSU") to report:

> The Sigma Nu pledge class was made to drink alcohol at the Sigma Nu house until each pledge member vomited. This occurred on boys bid night, August 20th, 2017. I was made aware of this yesterday, when a mother of a pledge (who has dropped out because of this) shared this information with me. As a parent of a pledge of another fraternity, I am very angry that this has occurred and I know that it will likely continue. I do not want to hear that someone's son is dead due to alcohol poisoning, and I expect someone to investigate this incident ASAP and put an end to hazing at LSU.

2.     LSU's Greek Accountability team "decided there was not enough information to investigate the case," and closed its file on the incident. LSU's failure to even investigate this parent's ominous warning reflects its long-standing deliberate indifference to the hazing of male students in its fraternities, despite the severe, pervasive risks of serious injuries and death those students face when they seek educational benefits and opportunities through LSU Greek Life.

3.     Less than ten days after LSU closed its file on the incident, 18-year-old LSU freshman and fraternity pledge Maxwell Gruver ("Max") died from alcohol poisoning as a result of being hazed by his LSU-recognized fraternity. Max was the beloved oldest son of Stephen and Rae Ann Gruver and older brother to Alex and Lily Kate.

4.     On the night of September 13, 2017, Max and other fraternity pledges were summoned to the local fraternity house of Phi Delta Theta Fraternity ("Phi Delt"). Fraternity

members confiscated the pledges' cell phones, marched them single file up the stairs, covered them with mustard and hot sauce, and quizzed them during a hazing ritual known as "Bible Study." When pledges answered questions incorrectly, fraternity members ordered them to take a "pull" (a three to five second chug) from a bottle of Diesel, 190-proof liquor.

5.     Max was singled out for particularly harsh treatment by the fraternity members. While most pledges were compelled to take three or four pulls during Bible Study, Max was ordered to take at least 10 to 12 pulls.

6.     By 11:30 p.m., Max was incapacitated and in visible need of emergency medical or other responsible care. Yet, fraternity members left Max, unconscious, on a couch. Hours passed. At around 9:00 a.m. on September 14, 2017, fraternity members found Max unresponsive. Again, emergency assistance was not called, and any other responsible care was withheld. Fraternity members summoned fraternity pledges to the fraternity house and told the pledges to take Max to the hospital and to lie and tell hospital staff they had found Max in his dorm room. Max was pronounced dead at the hospital. His blood alcohol content was 0.495 when measured at his autopsy one-and-a-half days later.

7.     LSU has a long tradition of recognizing and expending significant resources to promote Greek Life as a valuable educational opportunity and benefit to its students. In pages and pages of written materials and multiple web-based communications provided to students and their families, LSU states as fact only positive, promotional information about Greek life, such as: "Greek Life can foster the education of the whole person: intellectually, socially and spiritually." LSU chooses not to publicize, report, or otherwise disclose numerous documented incidents of dangerous hazing and misconduct of fraternities at LSU, rendering its extolling representations about LSU Greek Life for male students false and misleading.

8.     LSU chooses to leave its prospective and current male students, as well as the university community as a whole, ignorant of the specific risks Greek Life uniquely poses to male students when they are rushing, pledging, or participating as active members of LSU fraternities.  LSU goes so far as to dissuade male students from considering the real risks known to LSU and its staff, deceptively stating:  "Hazing and inappropriate behavior are not tolerated by LSU, and today's college student may experience Greek life for the reasons intended, not the stereotypical organizations portrayed on television."

9.     In fact, the reality at LSU is that male students like Max face the risk of serious injury and death when they seek educational benefits and opportunities offered through LSU's Greek letter fraternity system, and the risk to male students at LSU is likely far worse than the television portrayals LSU references.  Before Max's death, male students pledging LSU-recognized fraternities have died, been hospitalized on an emergency basis for dangerous alcohol consumption, and suffered broken ribs, cigarette burns and other serious physical injuries.

10.     Of the 27 fraternities on LSU's campus, which restrict membership to male students, only four were without risk-management violations in the five years preceding Max's death.  That statistic likely underreports the actual risk-management violations occurring at LSU-recognized fraternities because LSU permits its fraternities to investigate themselves when potential violations are reported to LSU.  Nonetheless, during those five years, there were at least 24 formal hazing investigations involving fraternities, 20 of which led to findings of policy violations.

11.     Unlike LSU fraternities, LSU sororities, which restrict membership to female students, do not have a culture or long-documented history of dangerous hazing and misconduct. Upon information and belief, when LSU has received reports of hazing at its sororities, the

sanctions LSU has imposed on the sororities have been significantly greater in length and degree than sanctions LSU generally imposes on fraternities for comparable misconduct.

12.     Upon information and belief, LSU responds aggressively to allegations of hazing at sororities, yet with deliberate indifference to allegations of hazing at fraternities, because of long-held and outdated gender stereotypes about young men, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX").  Upon information and belief, because of those stereotypes, although LSU treats the hazing of females as unacceptable, it minimizes the hazing of males as "boys being boys" engaging in masculine rites of passage.

13.     As a result of LSU's policy and practice of responding differently to the hazing of male students than the hazing of female students, hazing of female students seeking valuable educational opportunities and benefits through LSU Greek Life is virtually nonexistent, while the hazing of male students seeking those same opportunities and benefits is rampant.

14.     LSU has refused to timely and accurately report information about these long-known risks and dangers, leaving male students like Max seeking educational opportunities and benefits through LSU Greek Life uniquely vulnerable to hazing, and it has refused to make material changes to its policies and practices to significantly lessen those risks.

15.     Further, through its policy and practice of treating hazing of male students less seriously than hazing of female students, LSU has unlawfully persisted in a systematic, intentional, differential treatment of, and therefore discrimination against, male students seeking the educational opportunities and benefits of LSU Greek Life touted by LSU.

16.     Phi Delt, for its part, also has a long history of dangerous misconduct at universities across the country, which it chooses to omit from the promotional materials it uses to encourage students to join, including Max, and its chapter at LSU was no exception.

17.     In the years preceding Max's death, LSU received so many credible complaints of hazing and dangerous compelled consumption of alcohol against Phi Delt's LSU chapter that, in 2016, the Director of LSU's Office of Greek Life "begged for assistance" from Phi Delt's national headquarters in addressing the misconduct.

18.     Despite this plea, time and time again, Phi Delt failed to effectively intervene to address credible allegations of hazing and other misconduct at its LSU chapter.

19.     LSU knew that Phi Delt's national headquarters was not responding appropriately to allegations of hazing and other misconduct at the local chapter, yet it continued to allow the chapter to investigate itself for alleged hazing violations and permitted Phi Delt, up until Max's death, to continue recruiting male students to join their fraternity, which enjoyed official recognition by LSU.

20.     LSU also decided against publicly conveying information about credible complaints of hazing and compelled alcohol consumption at Phi Delt in the years prior to Max's death as part of the glowing promotional package and information LSU gave to students and their families to encourage them to join Greek Life as part of LSU's educational opportunities and benefits.  Max and his family attended incoming student orientation at LSU, and they researched and relied on the information made available by LSU about LSU Greek Life before Max chose to pledge Phi Delt because of its purported values.

21.     Had LSU or Phi Delt acted reasonably to address the ongoing hazing at Phi Delt's LSU chapter, or had Max and his family been fully and fairly advised of the severe and pervasive risks of serious injuries and death faced by male students seeking educational benefits and opportunities through LSU Greek Life and/or the long history of dangerous misconduct at Phi

Delt chapters across the country, including Phi Delt's LSU chapter, Max would not have pledged Phi Delt or been subjected to the hazing which caused his death.

22. This action seeks to hold LSU accountable for the real and dangerous consequences of discriminating against male students seeking educational opportunities and benefits through LSU Greek Life, in violation of Title IX, and to hold all Defendants responsible for the tortious and negligent misconduct which harmed Max and caused his wrongful death.

## PARTIES

23. Plaintiffs Stephen M. Gruver and Rae Ann Gruver are of full age of majority, are domiciled in Fulton County, Georgia, and are citizens of the State of Georgia.

24. Plaintiffs are the natural father and mother, respectively, of Maxwell Gruver, deceased.

25. Max, born on January 27, 1999, was never married, and he did not have any children, natural or adopted. He has two younger siblings, Alex and Lily Kate Gruver. He was a 2017 graduate of Blessed Trinity Catholic High School in Roswell, Georgia, where he excelled academically and was a published journalist, planning to pursue a career in political journalism.

26. Max was an 18-year-old freshman at LSU when he died from the negligence, fault, other wrongful conduct, offenses, and/or quasi-offenses sued upon herein.

27. As the surviving parents of Max, Plaintiffs have the right to bring survival claims for injuries caused to Max, as described herein, pursuant to LA. Civ. Code art. 2315.1 and federal common law, and wrongful death claims to recover damages sustained as a result of Max's death, pursuant to LA. Civ. Code art. 2315.2 and federal common law.

28. Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board," "Defendant Board" or "LSU") is a public constitutional

corporation organized and existing under the laws of the State of Louisiana to operate, manage, and control the LSU public university system, including its campus in Baton Rouge, with its principal place of business located at 3810 West Lakeshore Drive, Baton Rouge, Louisiana 70808. LSU is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a).

29. Defendant Phi Delt is a non-profit foreign corporation which is incorporated under the laws of Ohio. Phi Delt maintains its headquarters and principal place of business at 2 South Campus Avenue, Oxford, Ohio 45056-1801. Phi Delt is the principal of Defendant Louisiana Beta Chapter of Phi Delta Theta and Defendant Louisiana Beta House Corporation. Since November 19, 1889, and at all relevant times, Phi Delt has regularly transacted business in the State of Louisiana, directly and through its chapters, including the one it established and controlled at LSU, Louisiana Beta Chapter, and through its numerous active and alumni members who have been initiated pursuant to its policies and rituals and who live in the State. Phi Delt, despite reaping significant financial revenue from students at and alumni of Louisiana universities, is not registered to do business in Louisiana as required by law.

30. Defendant Louisiana Beta Chapter of Phi Delta Theta (hereinafter, "Louisiana Beta" or "Chapter") is a Louisiana unincorporated association which is chartered, governed, managed, and controlled by policies, charter, and recognition of and by Defendants Phi Delt and LSU. Louisiana Beta is an agent of and acts for, under the direction of, and on behalf of Phi Delt. Because Phi Delt may participate in the selection of persons authorized to manage the affairs of Louisiana Beta or in the development of the policies of Louisiana Beta, under the rules and practices of Louisiana Beta, Phi Delt is a member of Louisiana Beta.

31. Defendant Louisiana Beta House Corporation (hereinafter, "Beta House Corporation") is a non-profit corporation registered under the laws of Louisiana, but not

currently in good standing with the State of Louisiana, with its last known domicile address in New Orleans, Louisiana. Beta House Corporation owns the Phi Delt fraternity house at LSU, which is located at 23 Dalrymple Drive, Baton Rouge, Louisiana 70802, on property owned by LSU and leased to Beta House Corporation. Upon information and belief, at all relevant times, Beta House Corporation, for the mutual benefit of Phi Delt and Louisiana Beta, exercised care and control over the operations and activities inside the fraternity house. This control included deciding who was permitted to be a tenant in the fraternity house and what activities were permitted at the fraternity house. Beta House Corporation is managed by a board of directors comprised of members of Phi Delt and alumni members of Louisiana Beta. Beta House Corporation is an agent of, and acts for, under the direction of, and on behalf of Phi Delt.

32. Defendant Matthew A. Naquin is of full age and majority and, at all relevant times, was a citizen of the State of Texas, domiciled in Comal County, Texas, and residing in East Baton Rouge Parish, Louisiana. Defendant Naquin at all relevant times was a student of LSU and a member of Phi Delt and Louisiana Beta. Defendant Naquin at all relevant times was acting individually and also as an agent of and within the scope of his agency with the Defendants Phi Delt and Louisiana Beta.

33. Defendant Ryan M. Isto is of full age and majority and, upon information and belief, was a citizen of the State of Montana residing, at all relevant times, in East Baton Rouge Parish, Louisiana. Defendant Isto at all relevant times was a student of LSU and a member of Phi Delt and Louisiana Beta. Defendant Isto at all relevant times was acting individually and also as an agent of and within the scope of his agency with the Defendants Phi Delt and Louisiana Beta.

34.     Defendant Sean Paul Gott is of full age and majority and, at all relevant times, was a citizen of the State of Louisiana, domiciled in Lafayette Parish, Louisiana, and residing in East Baton Rouge Parish, Louisiana.  Defendant Gott at all relevant times was a student of LSU and a member of Phi Delt and Louisiana Beta.  Defendant Gott at all relevant times was acting individually and also as an agent of and within the scope of his agency with the Defendants Phi Delt and Louisiana Beta.

35.     Defendant Zachary A. Castillo is of full age and majority and, at all relevant times, was a citizen of the State of Louisiana, domiciled in Jefferson Parish, Louisiana, and residing in East Baton Rouge Parish, Louisiana.  Defendant Castillo at all relevant times was a student of LSU and a member of Phi Delt and Louisiana Beta.  Defendant Castillo at all relevant times was acting individually and also as an agent of and within the scope of his agency with the Defendants Phi Delt and Louisiana Beta.

36.     Defendant Elliott D. Eaton is of full age and majority and, at all relevant times, was a citizen of the State of Louisiana, domiciled in Orleans Parish, Louisiana, and residing in East Baton Rouge Parish, Louisiana.  Defendant Easton at all relevant times was a student of LSU and a member of Phi Delt and Louisiana Beta.  Defendant Eaton at all relevant times was acting individually and also as an agent of and within the scope of his agency with the Defendants Phi Delt and Louisiana Beta.

37.     Defendant Patrick A. Forde is of full age and majority and, at all relevant times, was a citizen of the Commonwealth of Massachusetts, domiciled in Norfolk County, Massachusetts, and residing in East Baton Rouge Parish, Louisiana.  Defendant Forde at all relevant times was a student and/or former student of LSU and a member and/or alumnus member of Phi Delt and Louisiana Beta.  Defendant Forde at all relevant times was acting

individually and also as an agent of and within the scope of his agency with the Defendants Phi Delt and Louisiana Beta.

38.     Defendant Zachary T. Hall is of full age and majority and, at all relevant times, was a citizen of the State of North Carolina, domiciled in Mecklenburg County, North Carolina, and residing in East Baton Rouge Parish, Louisiana.  Defendant Hall at all relevant times was a student of LSU and a member of Phi Delt and Louisiana Beta.  Defendant Hall at all relevant times was acting individually and also as an agent of and within the scope of his agency with the Defendants Phi Delt and Louisiana Beta.

39.     Defendant Hudson B. Kirkpatrick is of full age and majority and, at all relevant times, was a citizen of the State of Louisiana, and was domiciled and residing in East Baton Rouge Parish, Louisiana.  Defendant Kirkpatrick at all relevant times was a student of LSU and a member of Phi Delt and Louisiana Beta.  Defendant Kirkpatrick at all relevant times was acting individually and also as an agent of and within the scope of his agency with the Defendants Phi Delt and Louisiana Beta.

40.     Defendants John Doe 1-10 were at all relevant time students at LSU and members of Phi Delt and Louisiana Beta.  Defendants Doe were present for and participated in, gave material support to, knew or should have known, authorized, encouraged, and/or permitted the hazing and misconduct described herein that harmed and imperiled Max, and they failed to obtain or provide the assistance that would have saved Max's life.  Defendants Doe at all relevant times each were acting individually and also as agents of and within the scope of their agency with the Defendants Phi Delt and Louisiana Beta.  At all relevant times, Defendants Doe knew or should have known that participating in, giving material support to, authorizing, encouraging, and/or permitting the hazing and misconduct that harmed and imperiled Max, as

well as their failure to obtain or provide the assistance that would have saved Max's life, created an unreasonable and reasonably foreseeable risk of harm, damage and injury to Max. Despite such knowledge, Defendant Does did not alter their behavior to avoid the unreasonable and reasonably foreseeable risk of harm, damage, and injury to Max.

41.     Defendants Naquin, Isto, Gott, Castillo, Eaton, Forde, Hall, Kirkpatrick, and Doe are collectively referred to herein as "Individual Defendants."

## JURISDICTION AND VENUE

42.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this litigation involves claims arising under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, *et seq*.

43.     This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367, as they are so related to Plaintiffs' claims made under Title IX, 20 U.S.C. § 1681, *et seq.*, that they form part of the same case or controversy under Article III of the United States Constitution.

44.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to this case and the damages sustained by Plaintiffs occurred in East Baton Rouge Parish, Louisiana, which is part of the United States District Court for the Middle District of Louisiana.

## FACTUAL ALLEGATIONS

### *Maxwell Gruver's Tragically Short-Lived Attendance at LSU*

45.     Max applied to LSU in the fall of 2016. LSU extended Max an offer of admission shortly after he applied, and in February 2017, he formally accepted the offer to enroll in LSU.

46.     In or around the summer of 2017, Max, like all other incoming LSU students, was sent a 72-page color book, *Greek Tiger*, by LSU in which LSU "encourage[s] [new students] to consider participating in fraternity or sorority recruitment."

47.     The second paragraph of the *Greek Tiger* provides:  "Hazing and inappropriate behavior are not tolerated by LSU, and today's college student may experience Greek life for the reasons intended, not the stereotypical organizations portrayed on television."  According to LSU, "[a]s Greek life prepares young adults for life, membership is an investment in [their] future."

48.     LSU promotes Phi Delt in the *Greek Tiger* by stating, *inter alia*, "Phi Delta Theta allows each of its members to 'become the greatest version of himself.'"

49.     Nowhere in the *Greek Tiger*, web communications, or personal presentations to students and parents by LSU staff does LSU provide male students or their families with timely, accurate, and meaningful information about known risks to male students from hazing, self-governance, illegal drug use, alcohol abuse, and other dangerous conduct within LSU-recognized fraternities, including within Phi Delt.

50.     After significant research of materials provided and made available online by LSU and Phi Delt, and discussion with his parents who reviewed the materials, Max sought to join a fraternity with his parents' blessing, and specifically sought to join Phi Delt.  Upon arriving at LSU in late August 2017, Max rushed and accepted a bid to pledge Phi Delt.

51.     Phi Delt recruited new undergraduate members, specifically and exclusively male students, at LSU through its local authorized chapter, Louisiana Beta; pledges and members paid dues and fees to Phi Delt and conveyed other valuable benefits to Phi Delt.

52.     Phi Delt, like other national fraternities, knowingly permitted its name,

trademarks, traditions, lore, and reputation to be advertised on LSU's website, which promotes

the fraternity, fraternity membership, and associated Greek Life as valuable educational

opportunities and benefits at LSU.  LSU does this without identifying known incidents of hazing,

injury, death, and risk-management violations that have occurred at Phi Delt's chapter at LSU or

its chapters at other universities.

53.     On the night of September 13, 2017, Max and his fellow Phi Delt pledges were

summoned to the Phi Delt fraternity house.  Defendant Gott called and sent out a GroupMe

message to the pledges telling them to be at the house at 9:30 for "Bible Study @ 10:00."

54.     The Bible Study ritual, like many other fraternity rituals, involved the provision

and compelled excessive consumption of alcohol by pledges, all of whom were under the lawful

drinking age in the State of Louisiana.

55.     When the 20 or so pledges arrived at the Phi Delt fraternity house on September

13, 2017, fraternity members confiscated their cell phones, and the pledges each were instructed

to get a cup of lemonade, which they would later learn was to be used as a chaser for almost pure

alcohol.

56.     Defendants Naquin, Gott, and Isto came down from the second floor of the

fraternity house to greet the pledges.  Defendant Naquin yelled, "Are you ready for Bible Study?

Y'all better do well; I'm already fucked up."

57.     Defendants Naquin, Isto, Gott, and Forde then shepherded the pledges up the

stairs of the two-story Phi Delt fraternity house in a single file line as Defendant Gott covered the

pledges in mustard and hot sauce.

58.     Once upstairs, the fraternity members told the pledges to stand in the hallway with

their noses and toes against the wall.  There was loud music blaring and the only light was a

pulsating strobe light.

59.     Although security cameras were installed inside and outside the Phi Delt

fraternity house at the direction of Beta House Corporation, the security cameras were not

properly maintained and were purportedly not operational on the evening of September 13, 2017.

60.     "Bible Study" was a test of the pledges' knowledge of fraternity history and the

Greek alphabet.  Pledges were singled out to answer questions, and if they answered incorrectly,

they were compelled to take a pull – a three to five second chug – directly from a bottle of

Diesel, 190-proof alcohol.

61.     Upon information and belief, Defendant Gott brought the bottle of Diesel to Bible

Study to use in the hazing ritual.

62.     During Bible Study, fraternity members targeted Max because, upon information

and belief, he had previously arrived late to pledge activities and/or because he had complained

to the pledge master of his pledge class about a hazing incident in which Defendant Kirkpatrick

made Max use a friend's car to pick up Defendant Kirkpatrick and two friends, who Max was led

by Defendant Kirkpatrick to believe were Phi Delt members, and to then buy them

approximately $60 worth of cigarettes.

63.     The week prior to Bible Study, Defendant Naquin had suggested to the fraternity

members that they cut Max from the pledging process altogether.

64.     On September 11, 2017, two days before Bible Study, the Executive Board of

Louisiana Beta met to discuss how Defendant Naquin's ongoing actions with the pledges were

extreme and dangerous.  The Executive Board members agreed to address the issue at a

Louisiana Beta chapter meeting later that day and discussed imposing penalties on Defendant

Naquin if his conduct and actions toward the pledges continued, including possible suspension,

fines, or expulsion from the fraternity.

65.     Later on September 11, 2017, during the Louisiana Beta chapter meeting, the Executive Board of Louisiana Beta warned Defendant Naquin that his ongoing actions with the pledges were extreme and dangerous.  After the meeting, the Pledge Educator of Louisiana Beta addressed Defendant Naquin individually about his conduct with the pledges.

66.     The fraternity members were also on notice that Defendant Gott's conduct with the pledges was dangerous.  Upon information and belief, five days before the September 11, 2017, meeting, on or around September 6, 2017, Defendants Naquin and Gott, among other fraternity members, had summoned the pledges to the Phi Delt fraternity house and ordered them to clean and to take pulls from a 1.75-liter bottle of alcohol.  As a result of this compelled, excessive alcohol consumption, which was primarily instigated by Defendant Gott, at least one pledge lost consciousness and had to be monitored throughout the night.

67.     Despite knowing that Defendant Naquin's ongoing actions with the pledges were extreme and dangerous, the fraternity members, including Defendants Isto, Gott, Castillo, Eaton, Forde, Hall, Kirkpatrick, and Doe, knowingly and recklessly permitted Defendant Naquin to participate in and direct a significant portion of Bible Study on September 13, 2017.

68.     Similarly, despite knowing that Defendant Gott's ongoing actions with the pledges were dangerous, the fraternity members, including Defendants Naquin, Isto, Castillo, Eaton, Forde, Hall, Kirkpatrick, and Doe, knowingly and recklessly permitted Defendant Gott to participate in and direct a significant portion of Bible Study on September 13, 2017.

69.     On September 13, 2017, fraternity members hazed the pledges during Bible Study, yelling at them and making them do extreme calisthenics, which included holding wall sits as members walked across their knees.  Upon information and belief, Defendants Naquin and

Gott were two of the most aggressive participants in hazing Max and his fellow pledges during Bible Study.

70.    At least two fraternity members became uncomfortable with the hazing and tried, unsuccessfully to get Defendants Naquin and Gott to "cut it out" or "slow it down."

71.    During Bible Study, Defendant Naquin, among other fraternity members and Individual Defendants herein, ordered Max to take a pull from a bottle of Diesel whenever Max answered questions about the fraternity or the Greek alphabet incorrectly.

72.    While most of the pledges were compelled by fraternity members to take three or four pulls during Bible Study, Max was compelled to take at least 10 to 12 pulls.

73.    Bible Study ended around 11:30 pm. By that time, Max was incapacitated and in visible need of emergency medical or other responsible care.

74.    Defendants Naquin, Isto, Gott, Castillo, Eaton, Forde, Hall, Kirkpatrick, and Doe, who were present for the hazing and misconduct that harmed and imperiled Max, each:

    a.    participated in, gave material support to, authorized, encouraged, and permitted the hazing and misconduct that harmed and imperiled Max;

    b.    knew or should have known that Max had been forced to consume dangerous amounts of alcohol as a result of the Bible Study hazing ritual;

    c.    knew or should have known that Max had become incapacitated, imperiled, and was unable to walk or take care of himself as a result of the compelled consumption of alcohol;

    d.    undertook to make and control decisions regarding Max's care, as well as whether reasonable care would be summoned or provided for him, after the hazing

activities they engaged in had put Max in a position of peril and in need of immediate medical care; and

e.      failed obtain the medical help for Max, which was obviously required under the circumstances, or otherwise act reasonably in monitoring or providing care to Max while he was incapacitated, imperiled, and unable to walk or take care of himself.

75.      Sometime around midnight, Max was placed unconscious on a couch.  Due to his incapacitation, Max was unable to protect himself and fraternity members were sufficiently concerned about his condition that they placed a bucket beside him to catch vomit and kept watch over him for a few hours.

76.      Despite their initial concern, the fraternity members eventually abandoned Max, alone and unconscious, on the couch.  Hours passed.

77.      Sometime after 9:00 a.m. on September 14, 2017, fraternity members summoned some of Max's pledge brothers to the fraternity house.

78.      The pledges found Max unresponsive on the couch.  They were not sure he was breathing.

79.      Max's pledge brothers wanted to immediately call 911, but they were told not to call by some of the fraternity members.

80.      Instead, the fraternity members told two of Max's pledge brothers to take Max to the hospital and to lie to the hospital staff by telling them they had found Max in his dorm room, not at the fraternity house.

81.      Upon information and belief, the further unreasonable delay occasioned by the fraternity members' summoning of the pledges and refusal to call 911 gave the fraternity members time to clean the fraternity house and alter the scene which would later be investigated

by police.

82.     Max arrived at the emergency room around 11:00 a.m. on September 14, 2017, where he was pronounced dead.  His blood alcohol content was 0.495 when it was measured during his autopsy one-and-a-half days later.  A coroner later determined that Max died from acute alcohol intoxication with aspiration.

83.     Had Max received reasonable and proper care when he lost consciousness on the evening of September 13, 2017, and/or during the hours before he was taken to the hospital in the late morning of September 14, 2017, an extended period of time during which he was suffering and slowly succumbing to alcohol poisoning, he would have survived.

84.     Plaintiffs' claims against Defendants Naquin, Isto, Gott, Castillo, Eaton, Forde, Hall, Kirkpatrick, and Doe are based solely on each of their negligence in acting, or failing to act, which constituted a legal cause of Max's injuries and death.

85.     At all relevant times, Defendants Naquin, Isto, Gott, Castillo, Eaton, Forde, Hall, Kirkpatrick, and Doe each knew or should have known that participating in, giving material support to, authorizing, encouraging, and/or permitting the hazing and misconduct that harmed and imperiled Max, as well as the failure of each of them to obtain or provide the assistance which would have saved Max's life, created an unreasonable and reasonably foreseeable risk of harm, damage and injury to Max.

86.     Defendants Isto, Gott, Castillo, Eaton, Forde, Hall, Kirkpatrick, and Doe each knew or should have known that permitting Defendant Naquin to participate in and/or direct the Bible Study ritual, when they knew Defendant Naquin's actions with the pledges during the pledge process had been extreme and dangerous, created an unreasonable and reasonably foreseeable risk of harm, damage and injury to Max and the other pledges.

87.     Similarly, Defendants Naquin, Isto, Castillo, Eaton, Forde, Hall, Kirkpatrick, and Doe each knew or should have known that permitting Defendant Gott to participate in and/or direct the Bible Study ritual, when they knew Defendant Gott's actions with the pledges during the pledge process had been dangerous, created an unreasonable and reasonably foreseeable risk of harm, damage and injury to Max and the other pledges.

88.     Despite such knowledge, those Defendants did not alter their behavior to avoid the unreasonable and reasonably foreseeable risk of harm, damage, and injury to Max, and those Defendants knowingly and recklessly permitted Defendant Naquin and Defendant Gott to participate in and run a significant portion of Bible Study.

### *LSU's Partnership with and Control of Greek Life*

89.     LSU requires fraternities to register as official student organizations at LSU and to cooperate with LSU to support the improvement of education in ways that do not interfere with the administration of the University.

90.     LSU exercises substantial control over Greek Life by promoting, supporting, and undertaking other obligations to register and monitor the fraternities, including through an office of Greek Life utilizing paid staff and volunteers.

91.     As part of the substantial control LSU exercises over its registered fraternities, LSU has the ability and authority to establish rules regarding the recruitment, rush, pledge, and initiation processes of each of its registered fraternities, including which LSU students are eligible to pledge a registered fraternity, the permitted length of time for the pledge process for registered fraternities, and whether registered fraternities are permitted to require prospective members to complete a pledge process as a prerequisite for admission into the fraternities.

92.     LSU undertook and exercises direct and ultimate control over the activities and operations of Phi Delt at LSU under the terms of a ninety-nine year lease agreement with the fraternity concerning the property on LSU's campus where Phi Delt's fraternity house is located.

93.     The lease gives LSU "the power and authority at all times to make such rules and regulations and requirements as it may see fit relative to the conduct and activities of people in [the fraternity house] on the leased premises and to change or alter such rules, regulations and requirements as it may see fit; and the failure on the part of the Fraternity to conform to said rules and regulations shall cause this lease to immediately terminate, and in such event the University shall have the right … to remove any buildings on said leased premises, and the University shall be the sole judge of the rules and their interpretation and of the conformity or non-conformity therewith by the Fraternity."

94.     Despite such control, LSU disregards the dangerous and deadly activities by Phi Delt and, year after year, essentially gives this valuable property to the fraternity to support is operations and their partnership in exchange for a lease payment of $10 per year.

95.     Upon information and belief, LSU has entered into similar lease agreements with the other LSU-recognized fraternities that have houses on LSU's campus.  Upon information and belief, those leases give LSU similar direct and ultimate control over the activities and operations of those fraternities in their fraternity houses.

96.     LSU promotes registered fraternities, and the educational benefits and opportunities they provide, on the LSU website and in written publications provided to students, prospective students, and parents.

97.     Among other promotional statements by LSU regarding Greek Life, LSU states:

a. "Greek Life transforms lives by supporting and facilitating opportunities and experiences within the Greek community to discover, engage, and learn while fostering an environment for peer accountability based on fraternal values."

b. "Greek Organizations offer the most successful leadership development program for college students, as well as the largest network of volunteers in the US, performing millions of hours of volunteer services a year."

c. "LSU Greeks are known for their commitment to philanthropy and community service."

d. "With all of the influence, leadership, and power in the following statistics, only 2% of the US population are members of Greek organizations. Greeks have held key positions in US government and industry including: 85% of US Supreme Court Justices, 76% of Senators, 85% of Fortune 500 executives, all but two US Presidents since 1825, … 68% of physicians, 72% of lawyers, 70% of US Congressmen."

e. "College can be so much more than just classes and homework, it is a time for growth and development. Greek life can foster the education of the whole person: intellectually, socially and spiritually."

98. In promoting the educational program and benefits of fraternity membership, which are only available to male students, LSU states as fact only positive, promotional information to encourage male student participation.

99. Upon information and belief, LSU made a conscious decision to withhold from current, incoming, and prospective male students, and their families, information about severe, pervasive, and objectively offensive incidents of dangerous hazing and harm, including coerced, excessive consumption of alcohol, within LSU-recognized fraternities.

100.     LSU had actual knowledge that Phi Delt had engaged in severe, pervasive, and objectively offensive hazing, yet it acted with deliberate indifference by excluding this truthful, accurate information from its promotional materials on Greek Life to leave current, incoming, and prospective male students and their families ignorant of the known risks.

101.     Upon information and belief, as a result of long-held, outdated, and archaic gender stereotypes about men, LSU has a policy and practice of responding with deliberate indifference to allegations of hazing of male students and aggressively and appropriately to allegations of hazing of female students in LSU Greek Life.

102.     As a result of LSU's policy and practice of responding differently to reports of hazing involving male students than hazing involving female students, male students seeking educational opportunities and benefits through LSU Greek Life face a risk of serious injury and death as a result of hazing not faced by female students seeking those same educational opportunities and benefits.

103.     The serious risk of injury and death facing male students seeking educational opportunities and benefits through LSU Greek Life interferes with male students' ability to benefit from and fully participate in the educational programs, activities, and services of LSU Greek Life as a result of their gender.

104.     LSU's policies concerning hazing and alcohol are established by Defendant Board.  Defendant Board defines hazing as follows:

> any intentional, knowing, or reckless act, occurring on or off campus, by one person alone or acting with others, that subjects a student to an unreasonable risk of physical, mental, emotional or academic harm for reasons related to that student's status at the University or for the purpose of pledging, being initiated into, affiliating with, holding office in, or maintaining membership in any organization whose members are or include students at the University. Hazing includes, but is not limited to, any type of physical assault or restraint; placement of an undesirable substance on or in the body; any type of physical activity, such

as sleep deprivation, exposure to the elements, confinement in a small space, calisthenics, or other activity that subjects the student to an unreasonable risk of harm or that adversely affects the mental or physical health or safety of the student; any activity or expectation which is so time consuming as to significantly interfere with class work or study time; any activity involving consumption of food, liquid, alcoholic beverage, drug, or other substance that subjects the student to an unreasonable risk of harm or that is unpleasant; any activity that would subject a reasonable person to intimidation, shame, belittlement, humiliation, embarrassment or undue mental stress, including, but not limited to personal servitude, pranks, assigning or endorsing the wearing of apparel that is conspicuous and not normally in good taste, line-ups and verbal abuse; or any activity that induces, encourages, causes, or requires the student to engage in an activity that involves a violation of law or University policy.

105.     Defendant Board's policies provide specific examples of hazing, including "[a]ctivities or events that facilitate rapid drinking, drinking games, intoxication or impairment" and "lineups, interrogation or verbal abuse."

106.     At all relevant times, LSU developed and administered a Greek Organization Accountability Process, under which LSU-recognized fraternities, including Phi Delt, and sororities could elect to participate in a "Partnership Process" with LSU.

107.     As part of the "Partnership Process" between LSU and Greek letter organizations, when LSU is notified of an incident involving a fraternity or sorority, or fraternity or sorority member(s), the allegations are subject to a "chapter internal investigation" conducted of and by the very fraternity or sorority chapter and fraternity or sorority members alleged to have committed the misconduct.

108.     Apart from Greek letter organizations, LSU does not empower or permit other students or recognized student organizations to investigate themselves following allegations of dangerous and illegal misconduct or violations of LSU rules, policies, or codes of conduct.

109.     Under the "Partnership Process," following its internal investigation, the chapter provides a written report to LSU's Office of Greek Life and Student Advocacy & Accountability ("SAA").

24

110.     The chapter, empowered by LSU to investigate itself and its members and to author the initial report, controls what information is reported to LSU's Office of Greek Life and SAA regarding the alleged incident(s) at issue, including the nature of the incident(s), when and where the incident(s) occurred, who was involved, how the incident(s) occurred, and why the incident(s) occurred.  If the chapter accepts responsibility for the incident(s), no further investigation is required or undertaken by LSU.

111.     Through the "Partnership Process," as matter of policy and practice, Greek letter organizations are empowered to set and determine the nature and scope of discipline for themselves and their members for violations of LSU rules, policies, or codes of conduct, including violations involving hazing and other dangerous and illegal misconduct, and to police their own compliance with the discipline they decide to impose on themselves and their members.

112.     At all relevant times, LSU had actual knowledge that the only way the "Partnership Process" would function as intended by LSU was if Greek letter organizations and their members were willing to come forth and provide LSU with all of the relevant information they discovered during their internal investigations.

113.     At all relevant times, LSU also had actual knowledge that the "Partnership Process" was dependent on a transparent process between the Greek letter organizations and LSU, with full reports from the Greek letter organizations regarding the alleged incident(s) at issue, including the who, what, when, where, and why of each alleged incident.

114.     At all relevant times, LSU had actual knowledge that LSU-recognized sororities tended to be more compliant and agreeable to the "Partnership Process" rules than LSU-recognized fraternities.

115.    At all relevant times, LSU had actual knowledge that LSU-recognized fraternities frequently lied to LSU administrators about the information they discovered during internal investigations pursuant to the "Partnership Process," and that LSU administrators regularly had to push for more information from the LSU-recognized fraternities empowered by LSU to investigate themselves.

116.    Despite this actual knowledge, at all relevant times LSU equally trusted and relied upon fraternities and sororities to report and provide accurate and thorough information to LSU regarding alleged hazing violations.

117.    Under the "Partnership Process," after the chapter provides its written report to LSU's Office of Greek Life and SAA, the chapter's officers and advisor meet with SAA and members of LSU's Office of Greek Life to discuss the information the chapter purportedly discovered through its internal investigation.

118.    If the chapter accepts responsibility for the allegations, it prepares a draft Enhancement Plan which sets forth the actions the chapter has taken or plans to take to address the incident(s) at issue.  There are no consequences for chapters declining to accept responsibility.  Instead, those chapters are simply required to go through the due process proceedings required for every other LSU-recognized student organization accused of violating Board and LSU policies.

### Known, Pervasive Risks and Culture of Hazing in Fraternities

119.    Statistics, insurance claims analysis, studies and reports, and incidents of catastrophic injury and death widely known by the fraternity industry, including Phi Delt, institutions of higher education, including LSU, and their insurance carriers, have demonstrated

the foreseeable risk of dangerous injury and death from the excessive consumption of alcohol during pledge and other initiation rituals for decades.

120.     In the late 1980s, the Fraternity Insurance Purchasing Group ("FIPG"), a consortium of Greek letter organizations assembled to coordinate risk management strategies and assist each other in the purchase of insurance, widely published that "fraternities . . . were ranked by the National Association of Insurance Commissioners as the sixth worst risk for insurance companies – just behind hazardous waste disposal companies and asbestos contractors."

121.     In 1997, the National Interfraternity Council ("NIC"), then comprised of 66 Greek letter organizations with 5500 chapters on 800 campuses throughout the United States and Canada, analyzed certain risks associated with Greek letter organizations and housing and concluded that improper fraternity oversight of alcohol was "frighteningly pervasive."  The NIC passed a Resolution encouraging "its member fraternities to pursue alcohol-free chapter facilities."

122.     LSU is a partner with United Educators ("UE") in the prevention and protection against risk.  UE "extensively studies claims trends, legislative issues, and the education environment to address evolving liability and risk management issues" and provides its members comprehensive risk management resources which address the safety, compliance, and liability risks at schools and on campuses which can lead to claims.

123.     Upon information and belief, UE has concluded and counsels its members, including LSU, that hazing is a "problem which jeopardizes the learning environment and poses serious safety risks to students."

124.     As part of its extensive studies, UE analyzed hazing claims from 2003 to 2012 and found:

a.      more than 80% of the study's hazing claims involved male perpetrators and male victims;

b.      a parallel 81% of the hazing claims involved acts of violence, most commonly forced consumption of alcohol or physical violence; and

c.      nearly all hazing claims from female students involved non-violent, harassment-type hazing, like verbal abuse, forced wearing of humiliating clothing, constant monitoring of whereabouts, and personal servitude.

### *Known, Pervasive, and Disregarded Risks to Male Students at LSU Fraternities*

125.    In the five years preceding Max's death, only four of the 27 fraternities on LSU's campus were without violations of the Board's and LSU's rules, policies, and codes of conduct.

126.    In the five years preceding Max's death, there were at least 24 fraternity hazing investigations by LSU, with 20 findings of policy violations.  None of those fraternities had their charters permanently revoked by LSU; three were suspended for a period of three years.

127.    During that time period, there were at least six investigations involving fraternities for forced, excessive consumption of alcohol.  None of the fraternities investigated for allegations that their members forced pledges to consume alcohol had their chapters permanently revoked by LSU.  Sanctions for these violations imposed by LSU mostly are a letter of reprimand with no loss of privileges or placement on probationary status.  Even on probationary status, fraternities are not required to give up all social events or alcohol.

128.    In addition to the death of Max, incidents of dangerous hazing, forced consumption of alcohol, deaths and fraternity injuries involving male fraternity pledges and members at LSU include:

a. 2017:  Delta Chi Fraternity; hazing activities in the spring of 2017 including requiring pledges to participate in a "capture game" where pledges capture active members, transport them to an undisclosed location, and drop them off, forcing them make their way back to school on foot.

b. 2016:  Kappa Sigma Fraternity; hazing of pledges including forced consumption of alcohol, sleep deprivation, forced calisthenics, branding, paddling, and personal servitude.

c. 2016:  Omega Phi Psi Fraternity; hazing of pledges including an "underground" pledging process that LSU found "resulted in the endangering the safety and well-being of LSU Students."

d. 2015-2016:  Lambda Chi Alpha Fraternity; hazing of pledges including sleep deprivation, forced consumption of alcohol, personal servitude, and sit-ups and push-ups on trash and broken glass (2015).  After another report of hazing a year later, LSU disallowed recruitment and living in the fraternity house for a year (2016).

e. 2015:  Beta Kappa Gamma Fraternity; LSU student Praneet Karki died following an evening of hazing involving extreme exercise required of fraternity pledges.

f. 2015:  Sigma Chi Fraternity; after LSU student Sawyer Reed died from a drug overdose, the investigation revealed likely hazing of pledges and "rampant" drug use.

g. 2014:  Acacia Fraternity; hazing of pledges including forced alcohol consumption, personal servitude, acts of physical violence and forced physical activities, and being forced to eat dog food and rotten substances.

h. 2014:  Lambda Chi Alpha Fraternity; alcohol-related medical transport of

pledge in conjunction with chapter's bid-day event.

i.      2014:  Sigma Phi Epsilon Fraternity; hazing of pledges including pledges being driven off campus, forced to consume alcohol, and then the intoxicated pledges were taken to the Mississippi River levee, dropped off, and told to make their way back to school on foot in the night.  After one fraternity event in August of 2014 where alcohol was provided to underage pledges, a pledge was found unresponsive in an LSU residence hall and transported to the hospital.

j.      2013:  Pi Kappa Phi Fraternity; hazing of pledges including quizzes pledges with consequences for incorrect answers, confining pledges in a small room with no light and little air, forcing pledges to kneel on broken silverware, personal servitude, and underage and excessive alcohol consumption.

k.      2011-2012:  Sigma Alpha Epsilon Fraternity; an investigation revealed hazing and endangering pledges, including hazing that involved forcing pledges to perform physical activities, military style workouts and calisthenics, such as bows and tows and wall sits, throughout the night.

l.      2012:  Sigma Chi Fraternity; hazing of pledges including cigarette burns and forced wrestling of one another resulting in broken ribs.

m.      2012:  Acacia Fraternity; violations of LSU's rules and alcohol policies arising from an incident in which three kegs of beer were provided for all active members and pledges of the fraternity.

n.      2011:  Pi Kappa Phi Fraternity; in the fall of 2011, fraternity placed on probation by LSU and fraternity's national headquarters for what the fraternity later acknowledged were "serious incidents of hazing."

o.    2011:  Sigma Alpha Epsilon; hazing of pledges including forced physical activities and personal servitude.

p.    2006:  Phi Gamma Delta Fraternity; pledge burned at fraternity event after falling in bonfire.

q.    1997:  Sigma Alpha Epsilon Fraternity; hazing which involved forced, excessive consumption of alcohol resulted in the death of fraternity pledge Benjamin Wynn, whose blood alcohol content was measured at .588%, almost 6 times the legal limit, and the hospitalization of fraternity pledge Donald Hunt.

r.    1979:  Theta Chi Fraternity; a car struck and killed a fraternity pledge who was blindfolded and participating in a ritual march along a roadside.

129.    Upon information and belief, there are additional incidents of dangerous hazing, resulting in injuries and deaths to male students seeking educational benefits and opportunities through Greek Life, which are known to LSU but neither publicly disclosed nor made part of the Greek Life information LSU produces and provides current, incoming, and prospective male students and their families.

130.    Upon information and belief, sororities at LSU do not have a culture or documented history of dangerous hazing and misconduct, and female students seeking similar, valuable educational benefits through membership in LSU-recognized sororities do not face serious risks of injury or death by hazing or other misconduct.

131.    Upon information and belief, since 2012, LSU has received only one report of alleged hazing of female students seeking membership in an LSU-recognized sorority.

132.    Upon information and belief, the single alleged hazing incident since 2012 at an LSU-recognized sorority did not involve dangerous or potentially life-threatening activities or

behavior. Instead, upon information and belief, prospective sorority members were required to recite information about their sorority and its history, act out skits, sing songs, recite poems taught to them by sorority members and alumnae members in attendance, and perform calisthenics, including squat holds, sit-ups and lunges, and had whipped cream, syrup and eggs put in their hair.

133. Despite the non-life-threatening conduct at issue in the alleged hazing at the sorority, LSU punished the sorority with significantly greater severity than, as a matter of policy and practice, LSU typically punished LSU-recognized fraternities for hazing of male students involving the risk of severe injury or death.

134. Specifically, LSU put the sorority on "Total Probation" – the most severe sanction LSU can impose upon a student organization, short of rescinding University recognition – for approximately 10 months, and then "University Probation" for approximately one-year following the "Total Probation" period. Upon information and belief, LSU also prohibited the sorority from recruiting and inducting new members for two academic years.

135. Upon and information and belief, despite the non-life-threatening conduct at issue in the alleged hazing at the sorority, the sorority was the only Greek letter organization in the five years preceding Max's death that was sanctioned with "Total Probation."

136. Upon information and belief, the severity with which LSU responded to the report of alleged hazing of female students at the sorority was the result of long-held, outdated gender stereotypes about men which have fostered a policy and practice at LSU of treating the hazing of male students differently than the hazing of female students. In particular, under LSU's long-standing policy and practice, the hazing of females is appropriately treated as unacceptable,

while the hazing of males is minimized as "boys being boys" engaged in masculine rites of passage.

137.    Upon information and belief, as a result of these long-held gender stereotypes, LSU, as a matter of policy and practice, has responded to and punished allegations of dangerous and life-threatening hazing of male students in Greek letter organizations significantly less seriously and severely than it has responded and punished non-life-threatening hazing of female students.

138.    Further, year after year, LSU has remained deliberately indifferent to the serious and substantial risks male students face in seeking the educational opportunities and benefits of LSU Greek Life, and has refused and failed to make any material changes to the manner in which it recognizes, promotes, regulates, manages, and sanctions fraternities on campus, leaving them unsafe and imposing serious and substantial risk to male students seeking the educational benefits and opportunities touted by LSU.

139.    Year after year, LSU has remained deliberately indifferent to the serious and substantial risks male students face in seeking the educational opportunities and benefits of LSU Greek Life, and has decided against advising current, incoming, and prospective male students and their families of these serious and substantial risks as a means of reforming fraternities or providing male students with the information necessary to understand the serious and substantial risks and protect themselves.

140.    Year after year, LSU has refused and failed to take necessary and effective corrective action to address the serious and substantial risks faced by male students seeking educational benefits and opportunities through Greek Life, thereby permitting a hostile

educational environment for male students seeking the educational benefits and opportunities of Greek Life to exist and persist.

141.     Year after year, LSU, through its official policy and practice of treating hazing of male students substantially less seriously and harshly than hazing of female students, has discriminated against male students seeking the educational opportunities and benefits of Greek Life touted by LSU, in violation of Title IX.

### ***Known, Pervasive, and Disregarded Risks and Culture of Hazing in Phi Delt***

142.     Hazing and drinking alcohol in excessive and dangerous amounts have been part of Phi Delt's initiation rituals for many years, including at LSU.

143.     That such dangerous traditions, misconduct, and hazing continue in Phi Delt unabated, year after year, is the result of Phi Delt's negligent and wrongful oversight, regulation, and mismanagement of its chapters, its members' activities, and the means by which it promotes its national fraternity and obtains its principal revenue.

144.     In 2000, Phi Delt implemented alcohol-free housing and has touted (globally, on the internet, and in paper-form) statistics and extensive information regarding the purported resultant success in reducing injuries and death.

145.     In 2010, the then-General Council President of Phi Delt, Scott Mietchen, wrote about his own "journey from being hazed, to being an enthusiastic hazer" beginning in fall 1980. Mietchen suggests he helped end the hazing in his chapter after he, as an undergraduate member, found a pledge in a non-responsive catatonic state after enduring sleep deprivation and emotional stress.

146.     Notwithstanding the implementation of an alcohol-free housing policy, Phi Delt chapters have continued traditions of alcohol abuse and hazing with alcohol – with little to no

meaningful management and oversight by Phi Delt – despite the direct knowledge of the dangers of hazing by the fraternity's General Council President.

147.    Though Phi Delt does not publish its infractions and incidents of hazing, injuries, and death, publicly available information identifies at least the following instances which occurred in the few years preceding Max's death, after Phi Delt publicly purported to ban alcohol in fraternity housing:

      a.    2017:  hazing including use of alcohol at University of Southern Indiana; out of control party with alcohol at Massachusetts Institute of Technology; hazing at University of Central Florida; assault and choking resulting in death of a Phi Delt member by another during a drunken fight at Indiana University of Pennsylvania;

      b.    2016:  hazing including use of illegal drugs at Middle Tennessee State University; hazing, alcohol, and allegations of two students being drugged at a party at Washington State University; alcohol violations and sexual assault of a woman who was unconscious at a chapter party at Baylor University;

      c.    2015:  hazing at Loyola Marymount University; repeated alcohol violations at Oregon State University; hazing including use of alcohol at University of Chicago; hazing including use of alcohol at Auburn University;

      d.    2014:  hazing including use of alcohol at Oklahoma State University; and

      e.    2013:  hazing including use of alcohol at Emory University; hazing at Northwestern University.

### ***Phi Delt and LSU Each Empower and Permit Undergraduate Males to Control the Initiation and Membership Processes at Phi Delt***

148.    Defendants Phi Delt and LSU both establish and otherwise control the processes and procedures whereby male students become fraternity members through recruitment,

35

pledging, and initiation, and empower chapter officers to conduct and oversee these processes and procedures.

149.    Phi Delt establishes and controls whether its local chapters, including Louisiana Beta, will be in chapter housing and, in the case of Louisiana Beta, together with LSU and Beta Housing Corporation, establishes and controls how and by whom that housing and the chapter are managed.

150.    In managing and controlling Louisiana Beta and its other chapters and members, Phi Delt, *inter alia*, promulgates risk management policies which are applicable to all chapters and members, and which purportedly prohibit hazing, alcohol in the chapter house, and underage alcohol consumption.

151.    Phi Delt and LSU each had, at all times relevant hereto, access to and specialized knowledge of information, research, campus judiciary proceedings, and other credible information confirming a staggering number of serious risk management violations, injuries, and deaths from fraternity, not sorority, activities.

152.    Fraternity members, many of whom are entirely untrained, often intoxicated, and influenced by traditions and rituals passed down by fraternity brothers, are empowered, trusted, and principally relied upon by Phi Delt and LSU to implement their risk-management and anti-hazing rules and policies, promote the national fraternity and Greek Life at LSU, recruit new members and revenue for Phi Delt, and make life and death decisions.

153.    Time and time again, these Defendants have remained deliberately indifferent to the serious and substantial risks to male students seeking the educational opportunities and benefits of Greek Life touted by LSU and Phi Delt, and they have failed to act reasonably to protect life and make recruitment, pledging, initiation, and other fraternity activities safe for male

students. Time and time again, the management structures created and sanctioned by Phi Delt and LSU have proven ineffective and dangerous for male students.

154.    Despite such knowledge, Phi Delt and LSU each decided against making any material changes to the way fraternity activities, recruitment, and pledging at LSU, and at Louisiana Beta specifically, are conducted in order to render recruitment, pledging, and fraternity membership safe for male students. Instead, Phi Delt and LSU each continued to promote and condone a structure of self-management by undergraduate fraternity members, including a policy self-investigation of alleged dangerous and illegal behavior, and to tolerate dangerous misconduct despite the long history demonstrating the dangers of these management models and the need for change.

### *Hazing and Misconduct at Louisiana Beta in the Years Prior to the Fall of 2017*

155.    LSU received multiple credible complaints of hazing and forced consumption of alcohol against Louisiana Beta in the years preceding Max's death, including in the fall of 2016, just one year before Max died.

156.    On September 21, 2013, during a judicial pre-hearing held by LSU's Interfraternity Council ("IFC"), it was confirmed that Louisiana Beta's Recruitment Chairman had provided alcohol to underage potential new members during summer recruitment. As a result of that finding, IFC placed Louisiana Beta on probation through Bid Day of fall 2014.

157.    Just over a week later, on or around September 29, 2013, the Director of LSU's Office of Greek Life notified Louisiana Beta that LSU had received a complaint of hazing in Louisiana Beta's new member program. In particular, LSU received information that Louisiana Beta members were kidnapping pledges, requiring other pledges to rescue them, and compelling the kidnapped pledges to drink alcohol before they were released. LSU later learned this

"Capture Game" had been in existence since Louisiana Beta was founded, and that the purported purpose of the hazing activity was to bring about brotherhood through competition.

158.    In response to this complaint, and despite Louisiana Beta already being on notice of probation and pursuant to its policy of self-investigation under the "Partnership Process," LSU permitted Louisiana Beta to conduct an internal investigation and report back on its findings.

159.    In its report to LSU, Louisiana Beta admitted that the chapter carried out an activity during pledging referred to as the "Capture Game," which included various incidents of compelling underage pledges to consume alcohol, yet blamed any violations of Louisiana Beta's rules arising out of the "Capture Game" on a few "rogue members."

160.    Louisiana Beta, LSU's Office of Greek Life, and SAA then developed a Chapter Enhancement Plan, pursuant to which Louisiana Beta agreed to discontinue the "Capture Game." LSU did not otherwise sanction Louisiana Beta.

161.    The following semester, in or around March 2014, while Louisiana Beta was still on probation, LSU received another report of possible violations of LSU's and Phi Delt's hazing policies, including allegations of forced servitude, compelled physical exercise, verbal abuse, scavenger hunts, forced consumption of alcohol by the underage pledges, and coaching pledges on interactions with the staff of Phi Delt's national headquarters.

162.    LSU notified Louisiana Beta and Phi Delt's national headquarters, including Phi Delt's Executive Vice President, of these new hazing allegations and again permitted Louisiana Beta, through its chapter advisory committee, to investigate itself.  It became evident through the investigation that hazing had continued at Louisiana Beta, including hazing directed by the chapter's committee responsible for overseeing Louisiana Beta's pledge program, and that Louisiana Beta had not upheld the provision of its Fall 2013 Enhancement Plan requiring the

Chapter to discontinue the "Capture Game." Louisiana Beta also admitted to LSU that fraternity members had told pledges not to tell anyone about the hazing.

163. As part of a resulting Chapter Enhancement Plan agreed to among Louisiana Beta, the Chapter's advisory board, LSU's Office of Greek Life, and SAA, Louisiana Beta was placed on probation through May 31, 2015 and required, *inter alia*, to:

    a.    appoint a new, permanent advisor directly responsible for oversight of the Chapter's new member – or "pledge" – education program;

    b.    restructure its new member program; and

    c.    have at least one member of its Chapter Advisory Board at all new member events through the Spring 2015 semester.

164. Upon information and belief, Louisiana Beta, without consequence from LSU, did not comply with or fulfill all of these corrective requirements.

165. The hazing and other misconduct and mistreatment of male student pledges by Louisiana Beta continued.

166. In or around January 2016, a "concerned parent" reported to LSU that since LSU had been back in session, she had witnessed everyday some members of Louisiana Beta smoking marijuana in and around the house. Upon information and belief, LSU took no action on the report.

167. On October 14, 2016, the Director of LSU's Office of Greek Life notified Louisiana Beta of new possible risk management violations based on a report that pledges were: required to buy chewing tobacco and cigarettes to have to give to fraternity members upon request; required to be at the Phi Delt fraternity house at LSU every day at 6:00 a.m. and at tailgates starting at 1:00 a.m. the night before; required to be available to the fraternity members

at any time of the day, except when they were in class, were 24 hours from a test, or had their parents in town; and called to deliver food and pick up brothers from bars at 3:00 am. According to the report LSU had received, as a result of these requirements and compelled activities, the pledges were exhausted all of the time.

168.    Despite the nature of the allegations, and Louisiana Beta's history of hazing and other misconduct and mistreatment of pledges, LSU once again permitted Louisiana Beta to investigate itself.

169.    After its internal investigation, Louisiana Beta informed LSU that hazing had, in fact, occurred at the Chapter in the fall of 2016 but blamed the hazing on four active members of Louisiana Beta and one alumnus member. Louisiana Beta advised LSU that the four active members would be placed on social probation. According to the Chapter, it did not have authority to discipline the alumnus member involved in the hazing.

170.    While Louisiana Beta was investigating itself in response to the October 14, 2016, report, LSU learned that the hazing and other misconduct and mistreatment of pledges at Louisiana Beta might be ongoing, notwithstanding the ongoing investigation and Louisiana Beta's notice of the October 14, 2016, report.

171.    On October 27, 2016, LSU received a report from a "concerned student who has been witnessing Phi delta theta [sic] hazing during their tailgates to them continuing to harass them back their house after the tailgate." The "concerned student" informed LSU that "[m]ost of the time these young boys are completely intoxicated with obvious signs that they've puked themselves many times. They're getting initiated tonight as I have heard from them at tailgates and that they need to 'get them good' before they're initiated. I feel bad for these boys most of these things are cerntainly [sic] cruel I understand 'right of passage' but this is just pure abuse."

172.     The Director of LSU's Office of Greek Life and another Greek Life staff member met with Louisiana Beta's Chapter Advisor concerning this new report, but again allowed the Chapter to conduct an internal investigation into the allegations.

173.     On November 4, 2016, one day after meeting with Louisiana Beta's Chapter Advisor, LSU received yet another report of alleged hazing at Louisiana Beta.

174.     A parent of an LSU student and alumna of LSU's Greek Life system wrote to LSU officials to report disturbing behavior she had witnessed as a Phi Delt tailgate.  The parent wrote, *inter alia*:

> While at the tailgate the one next to us which I later found out to be the phi delta theta tailgate was a complete disgrace to this university.  As my husband and I are bout LSU Greek alumni I found the acts by these boys degrading to the LSU name.  We saw their pledges sleeping in their own puke behind the bar while people were pouring beer and snorting cocaine.  I was so applauded [sic] by this I asked my son to show me their house and unfortunately as we were walking there I saw that the phi delta theta house was right next to his.  After the tour of his house I was cooled down and on the way back we passed a group of men talking about and quote "Let's go mess with that passed out bitch." [P]lease LSU as I love this school and everything here I do not love this.  I will be at the game this Saturday and I really do hope to see action taken against these so called "men"[.]  I know you've had issues/complaints about them before as my son and his friends have told me but it obviously just keeps getting worse.  Please do something.

175.     Upon information and belief, LSU did not take any formal action on the November 4, 2016, report.

176.     On November 15, 2016, LSU placed Louisiana Beta on interim suspension as a result of the alleged activities on October 27, 2016.

177.     On November 18, 2016, the Director of LSU's Office of Greek Life and another Greek Life staff member had a conference call with Phi Delt's Director of Chapter Services and Phi Delt's consultant to Louisiana Beta.

178.    During that conference call, the Director of LSU's Office of Greek Life discussed the pattern of similar misconduct at Louisiana Beta over the previous six years, offered to provide Phi Delt all of the details LSU had regarding that misconduct, and "begged for assistance" from Phi Delt.

179.    Upon information and belief, on and after November 18, 2016, LSU knew or should have known that Phi Delt was not and would not be providing effective oversight or control over Louisiana Beta and that the hazing and other misconduct would continue without effective and immediate intervention by LSU.

180.    Despite this, on December 21, 2016, LSU notified Louisiana Beta and Phi Delt that the interim suspension LSU had imposed Louisiana Beta had been removed and that Louisiana Beta could "conduct business and resume normal activities."

181.    Further, although LSU had the power and authority under its lease with Beta House Corporation to establish rules, regulations, and requirements relative to the conduct and activities of people in Phi Delt's fraternity house at LSU, and to immediately terminate the lease for violations by Phi Delt of those rules, regulations, and requirements, LSU continued to permit Phi Delt and its members to possess and operate out of the Phi Delt fraternity house despite their ongoing misconduct in the years preceding Max's death.

182.    LSU also decided against publicly conveying the information about credible complaints of hazing and forced alcohol consumption against Phi Delt in the fall of 2016 or prior years as part of the glowing promotional package and information it gave to students and families, including Max and his family who attended orientation and researched and relied on all of the information made available by LSU about the Greek letter fraternity system before he chose to pledge Phi Delt because of its purported values.

*__The Beta House Corporation Knew or Should Have Known Pledges Would Be Hazed and Compelled to Consume Alcohol at the Phi Delt Fraternity House in the Fall of 2017__*

183.    At all relevant times, Beta House Corporation was governed by a board of directors comprised of individuals who were Phi Delt members, alumni of LSU, and alumni members of Louisiana Beta who, upon information and belief, had themselves been subjected to and engaged in hazing as pledges and members of the fraternity at the Phi Delt fraternity house at LSU.

184.    At all relevant times, the members of the board of directors of Beta House Corporation also had specialized knowledge of violations of Phi Delt's, Louisiana Beta's, and the Beta House Corporation's risk and house management policies, state laws, and Board and LSU rules, policies, and codes of conduct prohibiting underage drinking and hazing at the Phi Delt fraternity house at LSU.

185.    At all relevant times, Beta House Corporation also had available to it, independently and through Phi Delt, possessed, or in the absence of recklessness, should have itself performed or commissioned, information and analyses about the risks of hazing and student-housing management, particularly regarding bid, pledge, and initiation-related activities.

186.    At all relevant times, as a result of their specialized knowledge and their experiences as fraternity members and pledges, the members of the board of directors of Beta House Corporation knew or should have known that Beta House Corporation's risk management and student-housing management policies were not working, and that it was reasonably foreseeable that hazing, including hazing which involved compelling underage male students to consume dangerous amounts of alcohol, would take place at the Phi Delt fraternity house at LSU in the fall of 2017 unless meaningful changes were made to those policies.

187.     Upon information and belief, Beta House Corporation did not make any meaningful changes to its risk management or student-housing management policies in the fall of 2017 or in the years preceding Max's death.

188.     Upon information and belief, as a result of their specialized knowledge and their experiences as fraternity members and pledges, in at least certain years before Max's death the Beta House Corporation undertook to employ "House Directors" who, in exchange for a modest annual salary and free lodging in the Phi Delt fraternity house at LSU, together with Louisiana Beta and members of Louisiana Beta, would be responsible for enforcing the risk management policies of Defendants Phi Delt, Louisiana Beta, and Beta House Corporation within the Phi Delt fraternity house at LSU, and for reporting risk management and policy violations to those Defendants.  Upon information and belief, "House Directors" employed by the Beta House Corporation were not trained or were inadequately trained on the risk management policies they were made responsible to enforce.

189.     In addition, Beta House Corporation knew or should have known that LSU required student organizations that provided student housing for its members each to employ a "House Director," that Louisiana Beta would make representations to LSU regarding the employment and presence of "House Directors" at the Phi Delt fraternity house at LSU, and that LSU would rely upon those representations in deciding whether to recognize Louisiana Beta as a registered student organization at LSU, even if it were not reasonable for LSU to do so.

190.     Upon information and belief, as a result of their specialized knowledge and their experiences as fraternity members and pledges, members of the board of directors of Beta House Corporation knew or should have known that the employment of adequately trained live-in "House Directors" at the Phi Delt fraternity house at LSU was necessary for the protection of

fraternity pledges, like Max, during pledging activities and rituals at the Phi Delt fraternity house at LSU.

191.    Upon information and belief, despite such knowledge, Beta House Corporation failed to exercise reasonable care and employ an adequately trained "House Director" for the fall of 2017, when Max was pledging Phi Delt and Louisiana Beta, or otherwise ensure that an adequately trained "House Director" would be living in the Phi Delt fraternity house at LSU in the fall of 2017 to help to enforce the risk management policies of Defendants Phi Delt, Louisiana Beta, and Beta House Corporation, to report risk management and policy violations to those Defendants in the fall of 2017, or to come to the aid of pledges at the fraternity house at LSU who, like Max, had become incapacitated, imperiled, and were unable to take care of themselves as a result of the compelled consumption of alcohol.

**COUNT I**
**Violation of Title IX, 20 U.S.C. § 1681, *et seq.***
**(Defendant Board)**

192.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

193.    At all relevant times, LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, including the Office of the Dean of Students of LSU which oversees the Division of Student Affairs and Office of Greek Life, exercised substantial control over its registered fraternities in the Greek letter fraternity system, including Phi Delt, and the recruitment, pledging, and initiation activities of its registered fraternities.

194.    For many years, LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, had actual knowledge of serious and substantial risks facing male students seeking to access the educational opportunities and benefits

LSU provided through Greek Life, as a result of dangerous, repeated misconduct, including hazing involving, among other things, compelled, excessive alcohol consumption, within and exclusive to the Greek letter fraternity system, prior to Max pledging Phi Delt, the hazing of Max, and his death.

195.    LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, had actual knowledge of dangerous, repeated misconduct, including hazing of male students involving, among other things, compelled, excessive alcohol consumption, by Phi Delt and its members prior to Max pledging Phi Delt, the hazing of Max, and his death.

196.    Upon information and belief, LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, responds with deliberate indifference to allegations of hazing of male students seeking educational benefits and opportunities through LSU Greek Life, including male students pledging Phi Delt, because of long-held and outdated gender stereotypes about young men.

197.    Upon information and belief, because of those long-held and outdated gender stereotypes about young men, LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, has a policy and practice of treating the hazing of male students significantly less seriously than the hazing of female students, minimizing the hazing of males as "boys being boys" engaged in masculine rites of passage.

198.    Through its policy and practice, LSU has persisted in a systematic, intentional, differential treatment of male students seeking educational opportunities and benefits through LSU Greek Life and, therefore, has discriminated against male students in violation of Title IX.

199.    As a result of LSU's policy and practice of treating the hazing of male students significantly less seriously than the hazing of female students, male students seeking to access the educational opportunities and benefits LSU provided through Greek Life face serious and substantial risks of injury and death as a result of hazing involving, among other things, compelled, excessive alcohol consumption, while female students seeking similar educational benefits and opportunities did not face the same serious or substantial risks.

200.    Further, LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, permitted, supported, promoted and provided funding for a Greek letter fraternity system that, without proper oversight, encouraged young men to engage in hazing, harassment and violence against male students seeking educational opportunities and benefits through Greek Life.

201.    LSU failed to provide adequate training or guidance to its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, even though LSU was on actual notice that such training and guidance were necessary to implement proper controls over the Greek Life fraternity system and to prevent and discourage hazing against male students seeking educational opportunities and benefits through LSU Greek Life.

202.    By its discriminatory policy and practice of treating hazing of male students significantly less seriously than hazing of female students, and its deliberate indifference, through conscious and reckless actions and inactions, LSU created a discriminatory, hostile environment in which hazing against male students seeking educational opportunities and benefits through LSU Greek Life was pervasive and posed serious risks of injury and death to those male students, including Max.

203.     LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, had the authority to directly investigate and take meaningful corrective action to end the hazing threatening male students within LSU Greek Life, and to provide male students equal access to those educational benefits and opportunities without facing serious risks of injury and death.  Despite this, LSU consciously, recklessly, and deliberately failed to do so.

204.     LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, had the authority to directly investigate and take meaningful corrective action to end the hazing threatening male students within LSU Greek Life, and to provide male students equal access to these educational opportunities and benefits without facing serious risks of injury and death, but instead, upon information and belief, as a matter of policy and practice, remained deliberately indifferent to the severe and pervasive risks of serious injury and death faced by male students, and treated hazing of males significantly less seriously than hazing of females, thereby permitting hazing of males in LSU Greek Life to exist and persist.

205.     Through its official policy and practice of remaining deliberately indifferent to the severe and pervasive risks of serious injury and death faced by male students, including Max, attempting to access the educational opportunities and benefits provided through LSU Greek Life, and of treating hazing of males significantly less seriously than hazing of females, LSU discriminated against male students, including Max, in violation of the requirements of Title IX.

206.     As a direct and proximate result of this discrimination, Max was denied access to the educational opportunities and benefits provided through LSU Greek Life free from the risk of serious injury and death from hazing, and he was subjected to hazing which resulted in his death.

207.     Furthermore, LSU, through the Office of the Dean of Students of LSU, made an affirmative, official institutional decision to implement a "Partnership Process" policy between LSU and Greek letter fraternity organizations which allowed Greek letter fraternity organizations and their members accused of hazing or other misconduct to conduct internal investigations of their own alleged wrongdoing.

208.     The official "Partnership Process" policy was so deficient at addressing hazing of male students at Greek letter fraternity organizations at LSU that it constituted encouragement of the hazing of male students seeking educational opportunities and benefits through LSU Greek Life, was clearly unreasonable in light of the known circumstances, and amounted to deliberate indifference to the hazing of male students at LSU.

209.     Max suffered egregious hazing, intimidation and, ultimately, death, as he sought educational opportunities and benefits through LSU Greek Life in circumstances not faced by female students seeking the same educational opportunities and benefits.

210.     As a direct and proximate result of LSU's discriminatory actions, inactions, policies and practices, and deliberate indifference, in violation of the requirements of Title IX, Max was hazed and endured great physical and mental pain and suffering until he died.

211.     Plaintiffs assert this Title IX claim against LSU, which survives Max's death under federal common law, on Max's behalf.

**COUNT II**
**Survival and Wrongful Death**
**Negligence Under Louisiana State Law**
**(Defendant Board)**

212.     Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

213.     LSU, individually and through its agents, by allowing, recognizing, and regulating fraternal organizations at LSU, including Phi Delt, undertook and owed duties to Max and his fellow Phi Delt pledges and LSU students to recognize, regulate, promote, manage, investigate, and sanction fraternities, including Phi Delt, and the activities of their members in a reasonably prudent manner to protect against illegal and proscribed hazing.  Alternatively, LSU assumed such duties.

214.     LSU breached these duties, and was negligent, by, *inter alia*:

    a.     relying on underage, untrained members, who had themselves participated in bid, pledge, and other initiation rituals involving alcohol and hazing and who had taken oaths of secrecy and loyalty to the brotherhood of their fraternity to manage Louisiana Beta, its activities, the enforcement of risk management policies and LSU and Board rules, policies and codes of conduct, and to investigate themselves and their fraternity for violations of risk management policies and LSU and Board rules, policies and codes of conduct;

    b.     failing to accurately and timely disclose all risks and incidents involving student injury, death, hazing and violation of risk management policies and LSU rules, policies, and codes of conduct to students and their families, while, on the other hand, providing only promotional, misleading materials and information dissuading students and families from considering the risks;

    c.     failing to adequately train Louisiana Beta and Louisiana Beta members and officers on risk management, alcohol policies, crisis management policies, and other management policies and procedures, and allowing them to investigate themselves and continue recruiting and pledging male students, including Max, after repeated misconduct

involving hazing and compelled alcohol consumption in the years preceding Max's hazing and death;

d. failing to provide effective supervision and control over the Louisiana Beta officers and members and the pledge activities and rituals authorized, directed, and participated in by those officers and members, despite having actual knowledge of repeated misconduct involving hazing and compelled alcohol consumption by Louisiana Beta and its members in the years preceding Max's hazing and death;

e. failing to implement or enforce reasonable measures to enforce state laws, Board and LSU policies, rules and codes of conduct, and fraternity policies prohibiting hazing and the use of alcohol during all recruitment, bid, pledge, and initiation activities at LSU-recognized fraternities;

f. failing to provide reasonable safeguards, restrictions, and controls to prevent underage drinking, excessive drinking, and compelled alcohol consumption as part of recruitment, bid, pledge, and initiation activities at LSU-recognized fraternities, as well as responsible supervision of any underage persons serving (or being served) alcohol during pledging;

g. failing to implement or enforce reasonable measures to prohibit the excessive use and consumption of alcohol during recruitment, bid, pledge, and initiation activities at Louisiana Beta including, but not limited to, the Bible Study ritual;

h. failing to implement or enforce reasonable measures to stop underage drinking and hazing activities which LSU knew, or should have known, were occurring within Louisiana Beta;

i.      failing to effectively or adequately discipline Louisiana Beta and/or Louisiana Beta members for engaging in underage drinking, hazing, and other misconduct and illegal activities in the years preceding Max's death;

j.      failing to reasonably train Louisiana Beta and/or Louisiana Beta members in student-housing management, or to reasonably enforce alcohol-free housing or other reasonable, safe student-housing management standards and practices under the circumstances;

k.      failing to ensure Phi Delt and/or Louisiana Beta had employed and adequately trained a House Director for the Phi Delt fraternity house at LSU in the fall of 2017, which LSU knew, or should have known, was necessary for the protection of fraternity pledges, including Max, during pledging activities and rituals at the Phi Delt fraternity house at LSU;

l.      despite exercising direct and ultimate control over the activities and operations in Phi Delt's fraternity house at LSU under its lease agreement with the fraternity, failing to exercise such control in a reasonable manner by, among other things, failing to terminate the lease after Phi Delt repeatedly violated LSU and Board rules, policies, and codes of conduct by engaging in dangerous and deadly activities in the fraternity house in the years preceding Max's death; and

m.      was otherwise negligent.

215.    As a direct and proximate result of LSU's negligent actions and inaction, Max was hazed and endured great physical and mental pain and suffering until he died, and his surviving parents have suffered and will suffer grief, loss of love, affection, companionship,

comfort, services, and support, and have incurred funeral and burial expenses, for which they are entitled to be compensated.

## COUNT III
### Survival and Wrongful Death
### Negligence Under Louisiana State Law
### (Defendant Phi Delt and Defendant Louisiana Beta)

216.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

217.    Phi Delt, individually and through its agent, Louisiana Beta, and its officers and members, and Louisiana Beta, individually and through its officers and members, undertook to regulate, protect against, and prevent hazing, including hazing involving compelled alcohol consumption, at Louisiana Beta.

218.    Phi Delt, individually and through its agent, Louisiana Beta, and its officers and members, and Louisiana Beta, individually and through its officers and members, accordingly each owed duties to Max to exercise reasonable care in managing, regulating, and overseeing Louisiana Beta's operations, the activities of Louisiana Beta's members, and the manner in which they generated their principal revenue, to regulate, protect against, and prevent hazing, including hazing involving compelled alcohol consumption, by Louisiana Beta and the members of the Louisiana Beta.  Alternatively, Phi Delt and Louisiana Beta each assumed such duties.

219.    Phi Delt, individually and through its agent, Louisiana Beta, and its officers and members, and Louisiana Beta, individually and through its officers and members, also owed duties to Max to exercise reasonable care in managing fraternity rituals and the provision and use of alcohol in connection with recruitment, pledge, and other initiation events and activities to protect against and prevent hazing in those fraternity rituals and recruitment, pledge, and other

initiation events and activities. Alternatively, Phi Delt and Louisiana Beta each assumed such duties.

220.    Phi Delt and Louisiana Beta each also had a legal duty not to haze Max and to comply with all applicable standards of care and expectations.

221.    Hazing is prohibited by the Louisiana Revised Statutes, and by rules, regulations, and policies of the Board and LSU, and by virtually all other states and academic institutions.

222.    Louisiana Revised Statutes 17:1801 makes hazing in any form illegal, as well as "the use of any method of initiation into fraternal organizations in any educational institution supported wholly or in part by public funds, which is likely to cause bodily danger or physical punishment to any student or other person attending such institution."

223.    Max was a student, and therefore a member of the class of persons for whose protection Louisiana Revised Statutes 17:1801 and the rules, regulations, and policies of LSU were enacted.

224.    The misconduct leading to and causing Max's incapacity and need for emergency medical care in order to save his life constituted hazing within the meaning of Louisiana Revised Statutes 17:1801 and other applicable standards of care and was a proximate cause of Max's death.

225.    The Individual Defendants who participated in, gave material support to, authorized, encouraged, and permitted the hazing and misconduct which harmed and imperiled Max, the process of pledging him, and generating revenue and other benefits for Phi Delt and Louisiana Beta, were acting as agents or officers of Phi Delt and Louisiana Beta.

226.    Before the misconduct and circumstances which are the subject of this Complaint, Phi Delt and Louisiana Beta each knew or should have known that their risk management

policies were ineffective and that it was reasonably foreseeable that members and pledges of Louisiana Beta were at risk for being hazed within the meaning of Louisiana Revised Statutes 17:1801, or left unattended while requiring medical or other responsible care following hazing or other misconduct involving alcohol.

227.     Phi Delt and Louisiana Beta each breached their duties to Max, and were negligent, by, *inter alia*:

       a.     relying on underage, untrained members, who had themselves participated in recruitment, bid, pledge, and other initiation rituals involving alcohol and hazing and who had taken oaths of secrecy and loyalty to the brotherhood of their fraternity, to manage Louisiana Beta, its activities, and the enforcement of risk management policies;

       b.     failing to accurately and timely disclose all risks and incidents involving student injury, death, hazing and violation of risk management policies and principles to students and their families, while, on the other hand, providing only promotional, misleading materials and information dissuading students and families from considering the risks;

       c.     failing to adequately train Louisiana Beta and Louisiana Beta members and officers on risk management, alcohol policies, crisis management policies, and other management policies and procedures, and allowing them to investigate themselves and continue recruiting and pledging male students, including Max, after repeated misconduct involving hazing and compelled alcohol consumption in the years preceding Max's hazing and death, and after LSU "begged for assistance" from Phi Delt in the fall of 2016 with regard to Louisiana Beta;

d.      failing to provide effective supervision and control over the Louisiana Beta officers and members and the pledge activities and rituals authorized, directed, and participated in by those officers and members, despite having actual knowledge of repeated misconduct involving hazing and compelled alcohol consumption by Louisiana Beta and its members in the years preceding Max's hazing and death;

e.      failing to implement or enforce reasonable measures to enforce state laws and their risk management policies prohibiting hazing and the use of alcohol during all recruitment, bid, and pledge activities;

f.      failing to provide reasonable safeguards, restrictions, and controls to prevent underage drinking, excessive drinking, and compelled alcohol consumption as part of recruitment, bid, pledge, and initiation activities at Louisiana Beta, as well as responsible supervision of any underage persons serving (or being served) alcohol during pledging;

g.      failing to implement or enforce reasonable measures to prohibit the excessive use and consumption of alcohol during recruitment and pledging activities at Louisiana Beta including, but not limited to, the Bible Study ritual;

h.      failing to implement or enforce reasonable measures to stop underage drinking and hazing activities which Phi Delt and Louisiana Beta each knew, or should have known, were occurring within Louisiana Beta;

i.      failing to discipline Louisiana Beta members for engaging in underage drinking, hazing, and other misconduct and illegal activities;

j.      failing to reasonably train Louisiana Beta members in student-housing management, or enforce alcohol-free housing or other reasonable, safe student-housing

management standards and practices under the circumstances, despite promoting an alcohol-free housing policy to prospective members of Phi Delt and their families; and

  k.  were otherwise negligent.

228. Phi Delt and Louisiana Beta each are liable for their own negligence and for the negligence of their agents, including the Individual Defendants, pursuant to the doctrine of *respondeat superior*, because they were acting as agents of the Phi Delt and Louisiana Beta and within the scope of their agency at all relevant times, and because the misconduct alleged is of the type to which *respondeat superior* liability attaches even if the agent was acting outside the scope of the agency, because the Phi Delt and Louisiana Beta ratified the misconduct of their agents, including the Individual Defendants.

229. As a direct and proximate result of the Phi Delt's and Louisiana Beta's negligent actions and inaction as alleged herein, Max was hazed and endured great physical and mental pain and suffering until he died, and his surviving parents have suffered and will suffer grief, loss of love, affection, companionship, comfort, services, and support, and have incurred funeral and burial expenses, for which they are entitled to be compensated.

**COUNT IV**
**Survival and Wrongful Death**
**Negligence Under Louisiana State Law**
**(Defendant Beta House Corporation)**

230. Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

231. Defendant Beta House Corporation owed duties to Max, as a pledge of Phi Delt and Louisiana Beta, as well as his fellow pledges, to exercise reasonable care in managing, regulating, and overseeing the activities at the Phi Delt fraternity house at LSU to regulate, protect against, and prevent hazing, including hazing involving compelled consumption of

alcohol, by Louisiana Beta and the members of Louisiana Beta. Alternatively, Beta House Corporation assumed such duties.

232. Before the misconduct and circumstances which are the subject of this Complaint, Beta House Corporation knew or should have known that its risk and house management policies for the Phi Delt fraternity house at LSU were ineffective and that it was reasonably foreseeable that members and pledges of Louisiana Beta were at risk for being hazed within the meaning of Louisiana Revised Statutes 17:1801 at the Phi Delt fraternity house at LSU, or left unattended at the Phi Delt fraternity house at LSU while requiring medical or other responsible care following hazing or other misconduct involving alcohol.

233. Beta House Corporation breached its duties to Max, and were negligent, by, *inter alia*:

    a. relying on underage, untrained members, who had themselves participated in bid, pledge, and other initiation rituals involving alcohol and who had taken oaths of secrecy and loyalty to the brotherhood of the fraternity, to manage and oversee activities inside the Phi Delt fraternity house at LSU and the enforcement of Beta House Corporation's risk and house management policies;

    b. failing to adequately train Louisiana Beta and Louisiana Beta members and officers on Beta House Corporation's risk and house management policies and procedures, and allowing them to hold, manage, and oversee pledge activities and rituals at the Phi Delt fraternity house at LSU even though Louisiana Beta and Louisiana Beta members and officers were not adequately trained on risk management and house management policies and procedures for the Phi Delt fraternity house at LSU;

c.      failing to provide effective supervision and control over the Louisiana Beta officers and members and the pledge activities and rituals carried out at the Phi Delt fraternity house at LSU, authorized, directed, and participated in by those officers and members;

d.      failing to implement or enforce reasonable measures to enforce risk management and house management policies prohibiting the use of alcohol during all recruitment and pledge activities at the Phi Delt fraternity house at LSU;

e.      failing to provide reasonable safeguards, restrictions, and controls to prevent underage drinking and excessive drinking at the Phi Delt fraternity house at LSU, and responsible supervision of any underage persons serving (or being served) alcohol during pledging at the Phi Delt fraternity house at LSU;

f.      failing to implement or enforce reasonable measures to prohibit the excessive use and consumption of alcohol during recruitment and pledging activities at the Phi Delt fraternity house at LSU including, but not limited to, the Bible Study ritual;

g.      failing to implement or enforce reasonable measures to stop underage drinking and hazing activities which Beta House Corporation knew, or should have known, were occurring at the Phi Delt fraternity house at LSU;

h.      failing to reasonably train Louisiana Beta members in student-housing management, or enforce alcohol-free housing or other reasonable, safe student-housing management standards and practices under the circumstances;

i.      failing to employ and adequately train a House Director for the Phi Delt fraternity house at LSU in the fall of 2017, which Beta House Corporation knew, or

should have known, was necessary for the protection of fraternity pledges, including Max, during pledging activities and rituals at the Phi Delt fraternity house at LSU; and

        j.      were otherwise negligent.

234.    As a direct and proximate result of the Beta House Corporation's negligent actions and inaction as alleged herein, Max was hazed and endured great physical and mental pain and suffering until he died, and his surviving parents have suffered and will suffer grief, loss of love, affection, companionship, comfort, services, and support, and have incurred funeral and burial expenses, for which they are entitled to be compensated.

**COUNT V**
**Survival and Wrongful Death**
**Negligence/Breach of Assumed Duties/Failure to Rescue Under Louisiana State Law**
**(Individual Defendants, Defendant Phi Delt, and Defendant Louisiana Beta)**

235.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

236.    The Individual Defendants had a general duty to act in a reasonable fashion so as to avoid harming others, including to refrain participating in, giving material support to, authorizing, encouraging, and/or permitting hazing and other misconduct involving Max and other Phi Delt pledges, which the Individual Defendants knew or should have known created an unreasonable and reasonably foreseeable risk of harm, damage, and injury to Max and his fellow pledges.

237.    In addition, through their conduct and actions as alleged herein, the Individual Defendants undertook to care for Max and to render services which were reasonably calculated to prevent Max's injuries and death. The Individual Defendants thereby assumed the duty to reasonably care for Max.

238.     The Individual Defendants were present for, encouraged, assisted, provided material support, and/or willfully participated in hazing and other misconduct which placed Max in a perilous position, rendering him helpless and in need of emergency care and/or other responsible care and rescue.

239.     At all relevant times, the Individual Defendants knew or should have known that participating in, giving material support to, authorizing, encouraging, and/or permitting the hazing and misconduct which harmed and imperiled Max, as well as their failure to obtain or provide the assistance which would have saved Max's life, created an unreasonable and reasonably foreseeable risk of harm, damage, and injury to Max.  Despite such knowledge, the Individual Defendants did not alter their behavior to avoid the unreasonable and reasonably foreseeable risk of harm, damage, and injury to Max.

240.     The individual Defendants breached these duties, and were negligent, by, *inter alia*:

> a.     participating in, giving material support to, authorizing, encouraging, and/or permitting the hazing and misconduct which harmed and imperiled Max;

> b.     permitting Defendant Naquin to participate in and direct a significant portion of Bible Study on September 13, 2017, despite knowing that Defendant Naquin's ongoing actions with the pledges were extreme and dangerous;

> c.     permitting Defendant Gott to participate in and direct a significant portion of Bible Study on September 13, 2017, despite knowing that Defendant Gott's ongoing actions with the pledges were dangerous;

d.  failing to procure or provide Max appropriate medical and other care after it became clear he was incapacitated, grossly intoxicated, imperiled, in need of medical or other reasonable attention and rescue, and unable to care for or protect himself;

e.  abandoning Max on a couch in the fraternity house without getting him reasonable assistance or medical care and attention;

f.  unreasonably failing to call to 911 or other emergency personnel, or to directly rescue Max;

g.  relegating life and death decisions concerning Max to immature, untrained, unqualified individuals, some of whom were intoxicated and had been subjected to and/or participated in rituals involving hazing in the past;

h.  preventing others from obtaining the medical and reasonable care Max needed under the circumstances by, among other ways, discouraging pledges from calling 911, and placing him on a couch in the fraternity house in an apparent sleeping position where his need for immediate medical care and rescue would neither be detected nor responded to; and

i.  were otherwise negligent.

241.  Phi Delt and Louisiana Beta each are liable for the Individual Defendants' negligent acts and omissions as alleged herein pursuant to the doctrine of *respondeat superior* because the Individual Defendants were acting as agents of the Phi Delt and Louisiana Beta and within the scope of their agency at all relevant times, and because the misconduct alleged is of the type to which *respondeat superior* liability attaches even if the agent was acting outside the scope of the agency, and because Phi Delt and Louisiana Beta ratified the Individual Defendants' misconduct.

242.     Phi Delt and Louisiana Beta are liable directly for this misconduct because they have assumed duties of care to operate student housing, adopt, implement, and oversee risk and crisis management policies and strategies, educate pledges and members on hazing, alcohol misuse, and emergency procedures, and protect pledges and members from the longstanding risks of hazing and alcohol abuse pervasive in fraternities in general and in Phi Delt specifically.

243.     As a direct and proximate result of these Defendants' breach of their duties and assumed duties, Max was hazed and endured great physical and mental pain and suffering until he died, and his surviving parents have suffered and will suffer grief, loss of love, affection, companionship, comfort, services, and support, and have incurred funeral and burial expenses, for which they are entitled to be compensated.

## COUNT VI
### Survival and Wrongful Death
### Premises Liability Under Louisiana Law
### (Defendant Beta House Corporation and Defendant Phi Delt)

244.     Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

245.     At all relevant times, Beta House Corporation was the owner of the Phi Delt fraternity house at LSU and managed the fraternity house for the mutual benefit of Phi Delt and Louisiana Beta.

246.     At all relevant times, Beta House Corporation exercised care and control over the operations and activities inside the fraternity house, including, together with Phi Delt, by exercising control over who was permitted to be a tenant in the fraternity house and what activities were permitted in the fraternity house.

247.     Beta House Corporation and Phi Delt each had a duty to exercise reasonable care to maintain the Phi Delt fraternity house at LSU in a reasonably safe condition for the use of

people whom Beta House Corporation and Phi Delt intended and permitted to use the property, including Max.

248.     Beta House Corporation and Phi Delt each had actual notice of the dangerous conditions at the Phi Delt fraternity house caused by the traditions and practices of hazing pledges of Phi Delt at the Phi Delt fraternity house at LSU, including hazing which involved compelling underage pledges to consume dangerous amounts of alcohol.

249.     Beta House Corporation and Phi Delt each possessed unique knowledge that the fraternity members posed a particular threat to Phi Delt pledges, including Max, and thereby had a duty to protect Max and his fellow pledges from, and warn them about, the dangerous conditions posed by hazing at the Phi Delt fraternity house at LSU, including hazing which involved compelling underage pledges to consume dangerous amounts of alcohol.

250.     Beta House Corporation and Phi Delt each consciously disregarded the known dangerous conditions at the Phi Delt fraternity house posed by hazing at the Phi Delt fraternity house at LSU, including hazing which involved compelling underage pledges to consume dangerous amounts of alcohol.

251.     As a direct and proximate result of these Defendants' conscious disregard of known dangerous conditions at the Phi Delt fraternity house, Max was hazed and endured great physical and mental pain and suffering until he died, and his surviving parents have suffered and will suffer grief, loss of love, affection, companionship, comfort, services, and support, and have incurred funeral and burial expenses, for which they are entitled to be compensated.

## JURY DEMAND

Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

Plaintiffs, Stephen M. Gruver and Rae Ann Gruver, individually and on behalf of their son, Maxwell R. Gruver, deceased, respectfully pray the Court for judgment against Defendants, jointly and severally, for an amount of no less than $25,000,000, together with legal interest, an award of reasonable attorneys' fees and costs against LSU, pursuant to 42 U.S.C. § 1988(b), and such other relief as the Court may deem just and proper under the circumstances.

Dated:  August 16, 2018

Respectfully submitted,

**THE FIERBERG NATIONAL**
**LAW GROUP, PLLC**
Douglas E. Fierberg – Lead Attorney
   (*pro hac vice application to be filed*)
Jonathon N. Fazzola
   (*pro hac vice application to be filed*)
161 East Front Street, Suite 200
Traverse City, MI  49684
Telephone: (231) 933-0180
Facsimile: (231) 252-8100
Email: dfierberg@tfnlgroup.com
Email: jfazzola@tfnlgroup.com

**CAZAYOUX EWING LAW FIRM**

s/ J. Lane Ewing, Jr.
Donald J. Cazayoux, Jr. (LBN 20742)
J. Lane Ewing, Jr. (LBN 29854)
257 Maximilian Street
Baton Rouge, LA  70802
Telephone: (225) 650-7400
Facsimile: (225) 650-7401
Email: don@cazayouxewing.com
Email: lane@cazayouxewing.com

*Attorneys for Plaintiffs Stephen M. Gruver*
*and Rae Ann Gruver, individually and on*
*behalf of Maxwell R. Gruver, deceased*