# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

STEPHEN M. GRUVER AND                                    CIVIL ACTION
RAE ANN GRUVER, individually and
on behalf of MAXWELL R. GRUVER,
deceased                                                 18-772-SDD-EWD

VERSUS

STATE OF LOUISIANA THROUGH THE
BOARD OF SUPERVISORS OF
LOUISIANA STATE UNIVERSITY AND
AGRICULTURAL AND MECHANICAL
COLLEGE, et al.

## RULING

This matter is before the Court on the *Motion to Dismiss*[1] filed by Defendant, State

of Louisiana through the Board of Supervisors of Louisiana State University and

Agricultural and Mechanical College ("LSU").  Plaintiffs, Stephen M. Gruver and Rae Ann

Gruver ("Plaintiffs"), individually and on behalf of their deceased son Maxwell R. Gruver

("Gruver"), filed an *Opposition*[2] to this motion, to which LSU filed a *Reply*,[3] and Plaintiffs

filed a *Sur-Reply*.[4]  For the reasons which follow, LSU's *Motion* will be granted in part and

denied in part.

## I.    FACTUAL BACKGROUND

This suit arises out of the tragic death of Maxwell R. Gruver, a student formerly

---

[1] Rec. Doc. No. 70.
[2] Rec. Doc. No. 93.
[3] Rec. Doc. No. 91.
[4] Rec. Doc. No. 95.
52482

enrolled at LSU, who died in September of 2017 following a fraternity-related hazing incident.  Plaintiffs allege that, over the summer of 2017, LSU sent a 72-page book entitled *Greek Tiger* to their son, an incoming freshman.[5]  Plaintiffs allege this book "encourage[s] [new students] to consider participating in fraternity or sorority recruitment,"[6] and served generally to tout LSU's long tradition of promoting the educational opportunities and benefits of Greek Life to its students.  Plaintiffs further allege that, although the second paragraph of *Greek Tiger* states that "[h]azing and inappropriate behavior are not tolerated by LSU[,]"[7] in reality, this statement does not apply to male students in fraternities at LSU.

Plaintiffs allege that male students involved in the Greek fraternity system at LSU face a "risk of serious injury and death" that is "far worse than the television portrayals LSU references," and that, "[b]efore Max's death, male students pledging LSU-recognized fraternities have died, been hospitalized on an emergency basis for dangerous alcohol consumption, and suffered broken ribs, cigarette burns and other serious physical injuries."[8]  Plaintiffs further allege that, "[a]s a result of LSU's policy and practice of responding differently to the hazing of male students than the hazing of female students," the hazing of female Greek students is "virtually nonexistent," while the hazing of male Greek students is "rampant."[9]  To demonstrate this claim, Plaintiffs aver as follows:

128. In addition to the death of Max, incidents of dangerous hazing, forced consumption of alcohol, deaths and fraternity injuries involving male fraternity pledges and members at LSU include:

---

[5] *Complaint*, Rec. Doc. No. 1, ¶ 46.
[6] *Id.*
[7] *Id.* at ¶ 47.
[8] *Id.* at ¶ 9.
[9] *Id.* at ¶ 13.
52482

a. 2017: Delta Chi Fraternity; hazing activities in the spring of 2017 including requiring pledges to participate in a "capture game" where pledges capture active members, transport them to an undisclosed location, and drop them off, forcing them make their way back to school on foot.

b. 2016: Kappa Sigma Fraternity; hazing of pledges including forced consumption of alcohol, sleep deprivation, forced calisthenics, branding, paddling, and personal servitude.

c. 2016: Omega Phi Psi Fraternity; hazing of pledges including an "underground" pledging process that LSU found "resulted in the endangering the safety and well-being of LSU Students."

d. 2015-2016: Lambda Chi Alpha Fraternity; hazing of pledges including sleep deprivation, forced consumption of alcohol, personal servitude, and sit-ups and push-ups on trash and broken glass (2015). After another report of hazing a year later, LSU disallowed recruitment and living in the fraternity house for a year (2016).

e. 2015: Beta Kappa Gamma Fraternity; LSU student Praneet Karki died following an evening of hazing involving extreme exercise required of fraternity pledges.

f. 2015: Sigma Chi Fraternity; after LSU student Sawyer Reed died from a drug overdose, the investigation revealed likely hazing of pledges and "rampant" drug use.

g. 2014: Acacia Fraternity; hazing of pledges including forced alcohol consumption, personal servitude, acts of physical violence and forced physical activities, and being forced to eat dog food and rotten substances.

h. 2014: Lambda Chi Alpha Fraternity; alcohol-related medical transport of pledge in conjunction with chapter's bid-day event.

i. 2014: Sigma Phi Epsilon Fraternity; hazing of pledges including pledges being driven off campus, forced to consume alcohol, and then the intoxicated pledges were taken to the Mississippi River levee, dropped off, and told to make their way back to school on foot in the night. After one fraternity event in August of 2014 where alcohol was provided to underage pledges, a pledge was found unresponsive in an LSU residence hall and transported to the hospital.

52482

j.  2013: Pi Kappa Phi Fraternity; hazing of pledges including quizzes pledges with consequences for incorrect answers, confining pledges in a small room with no light and little air, forcing pledges to kneel on broken silverware, personal servitude, and underage and excessive alcohol consumption.

k.  2011-2012: Sigma Alpha Epsilon Fraternity; an investigation revealed hazing and endangering pledges, including hazing that involved forcing pledges to perform physical activities, military style workouts and calisthenics, such as bows and tows and wall sits, throughout the night.

l.  2012: Sigma Chi Fraternity; hazing of pledges including cigarette burns and forced wrestling of one another resulting in broken ribs.

m.  2012: Acacia Fraternity; violations of LSU's rules and alcohol policies arising from an incident in which three kegs of beer were provided for all active members and pledges of the fraternity.

n.  2011: Pi Kappa Phi Fraternity; in the fall of 2011, fraternity placed on probation by LSU and fraternity's national headquarters for what the fraternity later acknowledged were "serious incidents of hazing."

o.  2011: Sigma Alpha Epsilon; hazing of pledges including forced physical activities and personal servitude.

p.  2006: Phi Gamma Delta Fraternity; pledge burned at fraternity event after falling in bonfire.

q.  1997: Sigma Alpha Epsilon Fraternity; hazing which involved forced, excessive consumption of alcohol resulted in the death of fraternity pledge Benjamin Wynn, whose blood alcohol content was measured at .588%, almost 6 times the legal limit, and the hospitalization of fraternity pledge Donald Hunt.

r.  1979: Theta Chi Fraternity; a car struck and killed a fraternity pledge who was blindfolded and participating in a ritual march along a roadside.[10]

Plaintiffs claim that, "[o]f the 27 fraternities on LSU's campus, which restrict

---

[10] *Id.* at ¶ 128.

52482

membership to male students, only four were without risk-management violations in the five years preceding Max's death," and, "during those five years, there were at least 24 formal hazing investigations involving fraternities, 20 of which led to findings of policy violations.[11]    Plaintiffs contend, "[i]n contrast, in that same period, female students participating in LSU Greek Life never risked or suffered injury or death from dangerous hazing."[12]    Plaintiffs maintain that these "stark differences" result from "LSU's policy and practice of responding differently to the hazing of male students than the hazing of female students,"[13] and further allege that,

> [Y]ear after year, LSU has remained deliberately indifferent to the serious and substantial risks male students face in seeking the educational opportunities and benefits of LSU Greek Life, and has refused and failed to make any material changes to the manner in which it recognizes, promotes, regulates, manages, and sanctions fraternities on campus, leaving them unsafe and imposing serious and substantial risk to male students seeking the educational benefits and opportunities touted by LSU.[14]

Additionally, Plaintiffs claim that, "[u]nlike LSU fraternities, LSU sororities, which restrict membership to female students, do not have a culture or long-documented history of dangerous hazing and misconduct," and "when LSU has received reports of hazing at its sororities, the sanctions LSU has imposed on the sororities have been significantly greater in length and degree than sanctions LSU generally imposes on fraternities for comparable misconduct."[15]  Plaintiffs claim that LSU's deliberate indifference to the great risk of injury and death to male Greek students demonstrates that male Greek students at LSU "have entirely different, and unequal, access to educational opportunities and

---

[11] *Id.* at ¶ 10.
[12] Rec. Doc. No. 93 at 2 (citing Rec. Doc. No. 1 at ¶ 13).
[13] Rec. Doc. No. 1 at ¶ 13.
[14] *Id.* at ¶ 138.
[15] *Id.* at ¶ 11.
52482

benefits offered by LSU Greek Life. LSU is deliberately indifferent to those risks, though quickly and decisively acts when young women face lesser risks."[16]

Plaintiffs allege that Gruver's death was caused by hazing and forced alcohol consumption while pledging Phi Delta Theta Fraternity ("Phi Delt").[17] Plaintiffs claim that Phi Delt, "unbeknownst to and kept secret from Gruver and his family, had been the subject of numerous credible complaints of hazing."[18] Plaintiffs further claim that complaints about the hazing at Phi Delt were so numerous that "the Director of LSU's Office of Greek Life 'begged for assistance' from Phi Delt's national headquarters in addressing the misconduct."[19] Yet, Plaintiffs claim, neither LSU nor Phi Delt ever addressed this issue.[20] In fact, a mere three weeks before Gruver's death, Plaintiffs allege that a "self-described 'Concerned Parent' emailed the Office of Greek Life at LSU"[21] as follows:

> The Sigma Nu pledge class was made to drink alcohol at the Sigma Nu house until each pledge member vomited. This occurred on boys bid night, August 20th, 2017. I was made aware of this yesterday, when a mother of a pledge (who has dropped out because of this) shared this information with me. As a parent of a pledge of another fraternity, I am very angry that this has occurred and I know that it will likely continue. I do not want to hear that someone's son is dead due to alcohol poisoning, and I expect someone to investigate this incident ASAP and put an end to hazing at LSU.[22]

Plaintiffs further allege that, in response to this email, "LSU's Greek Accountability team 'decided there was not enough information to investigate the case,' and closed its file on

---

[16] Rec. Doc. No. 93 at 3 (citing Rec. Doc. No. 1 at ¶¶ 9, 102, 204).
[17] Rec. Doc. No. 1 at ¶¶ 3-6.
[18] Rec. Doc. No. 93 at 3 (citing Rec. Doc. No. 1 at ¶¶ 155-182).
[19] Rec. Doc. No. 1 at ¶ 17.
[20] *Id.* at ¶¶ 18-19.
[21] *Id.* at ¶ 1.
[22] *Id.*

52482

the incident."[23]   Plaintiffs claim that "LSU's failure to even investigate this parent's ominous warning reflects its long-standing deliberate indifference to the hazing of male students in its fraternities, despite the severe, pervasive risks of serious injuries and death those students face" when they participate in Greek life at LSU.[24]

Plaintiffs have sued LSU for alleged violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX").  LSU has moved to dismiss Plaintiffs' claims under Rules 12(b)(6) and 12(b)(1) of the Federal Rules of Civil Procedure, arguing that Plaintiffs have failed to state a claim and lack standing under Title IX, and LSU is shielded from suit by Eleventh Amendment sovereign immunity.

## II.    RULE 12(B)(1) MOTION TO DISMISS

"When a motion to dismiss for lack of jurisdiction 'is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits.'"[25]  If a complaint could be dismissed for both lack of jurisdiction and for failure to state a claim, "'the court should dismiss only on the jurisdictional ground under [Rule] 12(b)(1), without reaching the question of failure to state a claim under [Rule] 12(b)(6).'"[26]  The reason for this rule is to preclude courts from issuing advisory opinions and barring courts without jurisdiction "'from prematurely dismissing a case with prejudice.'"[27]

---

[23] *Id.* at ¶ 2.
[24] *Id.*
[25] *Crenshaw–Logal v. City of Abilene, Texas*, 436 Fed. Appx. 306, 308 (5th Cir.  2011)(quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); s*ee also Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 762 (5th Cir. 2011); Fed.R.Civ.P. 12(h)(3)).
[26] *Crenshaw–Logal*, 436 Fed.Appx. at 308 (quoting *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir.1977)).
[27] *Id.* (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 101 (1998), and *Ramming*, 281 F.3d at 161).
52482

"Article III standing is a jurisdictional prerequisite."[28]  If a plaintiff lacks standing to bring a claim, the Court lacks subject matter jurisdiction over the claim, and dismissal under Rule 12(b)(1) is appropriate.[29]   The party seeking to invoke federal jurisdiction bears the burden of showing that standing existed at the time the lawsuit was filed.[30]   In reviewing a motion under 12(b)(1) for lack of subject matter jurisdiction, a court may consider (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.[31]

### A. Sovereign Immunity

LSU argues dismissal under Rule 12(b)(1) is warranted because, as an arm of the State of Louisiana, it is shielded by Eleventh Amendment sovereign immunity.  LSU asserted this defense in a case brought under Title IX in *Pederson v. Louisiana State University*.[32]  LSU makes the same arguments in the present lawsuit that were rejected by the Fifth Circuit in *Pederson*, arguing that the United States Supreme Court decision in *National Federation of Independent Business v. Sebelius*[33] effectively calls into question the Fifth Circuit's holding in *Pederson*, and this Court should reexamine the issue.  The *Pederson* court set forth the following analysis in finding that LSU was not shielded by sovereign immunity for Title IX claims:

42 U.S.C. § 2000d–7(a)(1) provides that: "[a] State shall not be immune

---

[28] *Crenshaw–Logal*, 436 Fed.Appx. at 308 (citing *Steel Co.*, 523 U.S. at 101, 118 S.Ct. 1003, and *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir.1989)).
[29] *Whitmore v. Arkansas*, 495 U.S. 149, 154–55, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d 507, 509 (5th Cir.1997).
[30] *M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001); *Ramming*, 281 F.3d at 161.
[31] *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.1981).
[32] 213 F.3d 858 (5th Cir. 2000).
[33] 567 U.S. 519 (2012).
52482

under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of ... title IX of the Education Amendments of 1972." In *Litman v. George Mason University*, 186 F.3d 544 (4th Cir.1999), *cert. denied*, 528 U.S. 1181, 120 S.Ct. 1220, 145 L.Ed.2d 1120 (2000), the Court of Appeals for the Fourth Circuit concluded that, in enacting § 2000d–7 Congress "permissibly conditioned [a state university's] receipt of Title IX funds on an unambiguous waiver of [the university's] Eleventh Amendment immunity, and that, in accepting such funding, [the university] has consented to litigate [private suits] in federal court." *Id.* at 555. The test for finding such waiver "is a stringent one," *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 119 S.Ct. 2219, 2226, 144 L.Ed.2d 605 (1999) (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171(1985)), and the Fourth Circuit in *Litman* conducted a careful analysis under the relevant inquiry. We cannot improve on the work done by the court in *Litman*, and we therefore simply adopt its holding for all the reasons supplied in its well-crafted opinion.[34]

In *Pederson*, as in the present case, LSU argued that 42 U.S.C. § 2000d–7(a)(1) did not contain the word "waiver," and the state may have logically disregarded the language of this statute as an attempt to abrogate its sovereign immunity.  LSU also argued that the Supreme Court's decision in *Seminole Tribe v. Florida*[35] rejected the idea of a state "constructively waiving" its Eleventh Amendment immunity.[36]  The Fifth Circuit rejected both arguments:

First, we will consider whether 42 U.S.C. § 2000d–7(a)(1), although it does not use the words "waiver" or "condition", unambiguously provides that a State by agreeing to receive federal educational funds under Title IX has waived sovereign immunity. A state may "waive its immunity by voluntarily participating in federal spending programs when Congress expresses 'a clear intent to condition participation in the programs ... on a State's consent to waive its constitutional immunity.'" *Litman*, 186 F.3d at 550 (quoting *Atascadero State Hosp.*, 473 U.S. at 247, 105 S.Ct. 3142). Title IX as a federal spending program "operates much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Id.* at 551; *see also Rosa H. v. San Elizario Independent School District*, 106 F.3d 648, 654 (5th Cir.1997) (stating that Title IX is Spending

---

[34] *Pederson*, 213 F.3d at 875-76.
[35] 517 U.S. 44 (1996).
[36] *Pederson*, 213 F.3d at 876.

52482

Clause legislation, and as a statute enacted under the Spending Clause, Title IX generates liability when the recipient of federal funds agrees to assume liability)[.] The Supreme Court has noted that Congress in enacting Title IX "condition[ed] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." *Gebser v. Lago Vista Indep. School Dist.*, 524 U.S. 274, 286, 118 S.Ct. 1989, 1997, 141 L.Ed.2d 277 (1998); *Litman*, 186 F.3d at 551–552. Thus, based on the above reasoning we find that in 42 U.S.C. § 2000d–7(a)(a) Congress has successfully codified a statute which clearly, unambiguously, and unequivocally conditions receipt of federal funds under Title IX on the State's waiver of Eleventh Amendment Immunity. *See Litman*, 186 F.3d at 554.

LSU argues that even if 42 U.S.C. § 2000d–7(a)(1) is intended to cause waiver of sovereign immunity, this type of "conditional waiver" argument is at odds with the Supreme Court's decision in *Seminole Tribe*. We do not find this argument persuasive. As the Fourth Circuit reasoned in *Litman*:

> We do not read *Seminole Tribe* and its progeny, including the Supreme Court's recent Eleventh Amendment decisions, to preclude Congress from conditioning federal grants on a state's consent to be sued in federal court to enforce the substantive conditions of the federal spending program. Indeed, to do so would affront the Court's acknowledgment in *Seminole Tribe* of the "unremarkable ... proposition that States may waive their sovereign immunity."

*Id.* at 556 (quoting *Seminole Tribe*, 517 U.S. at 65, 116 S.Ct. 1114). We conclude that in accepting federal funds under Title IX LSU waived its Eleventh Amendment sovereign immunity.[37]

LSU acknowledges the *Pederson* decision but argues that it should be "closely re-examined in light of" *Sebelius*, which LSU contends essentially overrules the *Pederson* holding as to sovereign immunity and based on "the unique relationship that LSU has maintained with the federal government since LSU's commencement as a land grant university in 1874."[38] LSU maintains that, "[c]onsidering LSU's historical relationship with

---

[37] *Id.*
[38] Rec. Doc. No. 70-1 at 16. LSU also argues that, in *College Savings Bank v. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666 (1999), the Supreme Court held § 2000d-7's constructive waiver unconstitutional under Congress's Article I Commerce Clause. LSU contends *College Savings* 52482

the federal government, Congress unconstitutionally exceeded its Article I Spending Power to the extent Congress coercively conditioned LSU's receipt of federal funds on waiver of its Eleventh Amendment immunity."[39]

LSU contends *Sebelius* provides two scenarios in which a constructive waiver is unconstitutionally coercive: 1) where the conditions do not govern the use of the subject funds, but threaten to terminate other independent grants, and 2) where the conditions apply retroactively.  First, LSU argues *Sebelius* allows for the requirement that LSU use Title IX funds in a nondiscriminatory manner, but it does not allow § 2000d-7 to terminate the independent grant of sovereign immunity irrespective of LSU's compliance with Title IX. Second, LSU argues it has received federal funding since 1874 pursuant to the Morrill Act.  LSU maintains that it could not have anticipated in 1874 that it would later be required to waive immunity in light of § 2000d-7's enactment in 1986.  Further, LSU avers it should not be forced to waive immunity when accepting federal funds because the United States is required to fund the ROTC program, and LSU has no choice but to accept. Thus, under *Sebelius*, LSU renews its argument that § 2000d-7 unconstitutionally forces a waiver of sovereign immunity, and LSU did not knowingly or voluntarily waive immunity.

As to abrogation, LSU contends Title IX does not abrogate immunity because it was not enacted pursuant to the Fourteenth Amendment.

Plaintiffs oppose LSU's motion and argue that LSU has validly waived Eleventh Amendment sovereign immunity.  Plaintiffs contend that the Fifth Circuit held both in

---

distinguished Congress's ability to extract waivers under the Commerce Clause and the Spending Power Clause, thus narrowing the power to extract waivers under the Spending Clause while not addressing the extent to which the power is narrowed. LSU seems to argue *Sebelius* does this narrowing.
[39] *Id.* at 16-17.
52482

*Pederson* and *Pace v. Bogalusa City Sch. Bd.*[40] that, in enacting § 2000d-7, Congress unequivocally conditioned receipt of the statute's listed funds, including Title IX, on the State's waiver of immunity, and these cases remain binding.  Further, Plaintiffs claim that the Fifth Circuit has already rejected LSU's argument that the conditional spending programs at issue therein—the IDEA and § 504 of the Rehabilitation Act—were unduly coercive, and those holdings should apply equally to Title IX funds.

Plaintiffs contend LSU is attempting to circumvent the holding of *Pederson* by citing to *College Savings* and *Sebelius*; however, Plaintiffs maintain these cases are factually inapposite and do not support LSU's argument that § 2000d-7 is unduly coercive. Plaintiffs note that four circuit courts have already found that § 2000d-7's conditions are reasonably related to the question of whether federal funds are spent in a nondiscriminatory manner, and no condition of § 2000d-7 applies retroactively.  Rather, Plaintiffs aver that LSU has voluntarily and knowingly accepted federal funding since the enactment of § 2000d-7 thirty years ago.  Thus, the spending program is not coercive.

Additionally, Plaintiffs argue that LSU is collaterally estopped from challenging *Pederson*. Plaintiffs claim that LSU asserted and fully and vigorously litigated these same sovereign immunity arguments in *Pederson*.   Further, Plaintiffs note that LSU has repeatedly made the argument that the Fifth Circuit should "re-examine" this issue in light of "new" Supreme Court jurisprudence, and the Fifth Circuit has rejected this argument every time.[41]

---

[40] 403 F.3d 272 (5th Cir. 2005).
[41] LSU relied on *Seminole Tribe v. Florida*, 528 U.S. 18 (1999), in *Pederson*; *Garcia v. S.U.N.Y. Health Sciences Center,* 280 F.3d 98 (2d Cir. 2001), in *Pace*; and *Jackson v. Birmingham Board of Education*, 544 U.S. 167 (2005), in *Miller v. Tex. Tech Univ. Health Scis. Ctr.,* 421 F.3d 342 (5th Cir. 2005). 52482

Plaintiffs contend that, in addition to § 2000d-7's valid conditional waiver of immunity, per *Lesage v. State of Texas*,[42] Congress also abrogated states' immunity to Title IX lawsuits.  The *Lesage* court found that § 2000d-7 abrogated immunity under Title VI. Plaintiff argues Title IX was modeled on Title VI, and the language parallels exactly. Title VI prevents race discrimination, Title IX prevents gender discrimination, and both invoke the Equal Protection Clause of the Fourteenth Amendment as needed to abrogate immunity. Thus, Plaintiffs maintain that LSU is still not immune from suit even if unconstitutionally coerced.

As to the state law claims, Plaintiff admits this Court lacks jurisdiction but argues their claims should be dismissed *without prejudice*.

Based on a wealth of binding jurisprudence, the Court finds that LSU is not entitled to sovereign immunity from suits brought under Title IX.  The Eleventh Amendment bars private suits against a State in federal court, but there are two exceptions to this general rule. Immunity may be abrogated when Congress acts under § 5, the Enforcement Clause of the Fourteenth Amendment,[43] or a state may consent to suit, and such consent must be both *knowing* and *voluntary*.[44]

In *South Dakota v. Dole*, the Supreme Court set forth the test that is employed in determining the validity of a conditional waiver such as § 2000d-7.[45] Under *Dole*, congressional spending programs that benefit the general welfare, contain unambiguous conditions, and contain conditions reasonably related to the purpose of the expenditure,

---

[42] 158 F.3d 213, 215-219 (5th Cir. 1998), *overruled on other grounds*, 528 U.S. 18 (1999).
[43] U.S. CONST. amend. XIV, § 5.
[44] *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 277 (5th Cir. 2005).
[45] *Id.* at 278 (citing *South Dakota v. Dole*, 483 U.S. 203 (1987)).
52482

are valid unless they are either independently prohibited or coercive.[46] *Dole*'s requirements ensure compliance with the "knowing and voluntary" requirements set forth in *College Savings*.[47]  A state knowingly waives immunity in exchange for federal funds when it has knowledge that a Spending Clause condition requires waiver of immunity.[48] Thus, Congress must make conditions on federally granted money clear and unambiguous. If Congress does so, a state's actual acceptance of funds is generally voluntary, unless the spending program is deemed coercive.[49]

Specifically, 42 U.S.C. § 2000d-7(a)(1) conditions receipt of Title IX funds on a state's waiver of immunity.  It provides that "a State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of …title IX of the Education Amendments of 1972."  The *Pace* court held that there is no independent bar to conditional-spending programs under the Spending Clause or unconstitutional-conditions doctrine.[50]  The *Pace* court also found that, because a state can avoid suits under the IDEA by rejecting IDEA funds (and to do so, a state would not have to reject all federal assistance), the conditional-spending scheme is not unduly coercive.[51]  Additionally, although this statute does not contain the words "waiver" or "condition," in the statute, Congress clearly, unambiguously, and unequivocally conditions receipt of federal funds under Title IX on the State's waiver of Eleventh Amendment immunity.[52]  Therefore, the "knowing" requirement is satisfied.  In both *Pace*

---

[46] *Id.* at 279
[47] *Id.*
[48] "That [a state] might not 'know' subjectively whether it had any immunity to waive by agreeing to conditions is wholly irrelevant." *Id.* at 284.
[49] *Id.* at 279.
[50] *Id.* at 285-286.
[51] *Id.* at 287 (citing 29 U.S.C. § 794(b)(1); *See e.g. Jim C. v. United States,* 235 F. 3d 1079 (8th Cir. 2000)).
[52] *Id.* at 280; *Pederson,* 213 F.3d at 876.
52482

and *Pederson*, the Fifth Circuit found that, in accepting federal funds under Title IX, the State waived its Eleventh Amendment sovereign immunity.[53]

In *Sebelius*, several states challenged Congress's ability to require states to comply with Medicaid expansion or potentially lose all federal Medicaid funding. The Court affirmed that Congress customarily attaches conditions to funds granted to states,[54] but the power to attach these conditions has limits.[55] The *Sebelius* Court explained that conditions must be "unambiguous so that a state at least knows what it is getting into,"[56] must be related to the federal interest in national projects or programs,[57] and must not induce the states to engage in activities that would themselves be unconstitutional.[58] And while Congress may induce the states to accept conditional grants, Congress may not cross the "point at which pressure turns into compulsion, and ceases to be inducement."[59] Where states have a real choice in accepting or declining federal aid, the federal-state relationship is much like a contract, and the legitimacy of Congress's spending power rests on whether the state *knowingly* and *voluntarily* accepts the terms of the contract.[60] If a state truly has no choice but to accept federal funding, the offer is coercive.[61]

The *Sebelius* Court compared the Medicaid expansion conditions to the conditions imposed on South Dakota in *Dole*. In *Dole*, Congress conditioned 5% of South Dakota's federal highway funds on the State's adoption of a drinking age of 21. This small

---

[53] *Id.* at 280-81.
[54] *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 675 (2012)(citing *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17 (1981); *South Dakota v. Dole,* 483 U.S. 203, 206 (1987)).
[55] *Id.* (citing *Dole, supra,* at 207, 208).
[56] *Id.* (citing *Pennhurst, supra,* at 17).
[57] *Id.* (quoting *Massachusetts v. United States,* 435 U.S. 444, 461 (1978)).
[58] *Id.* (citing *Dole, supra,* at 210).
[59] *Id.* at 675 (quoting *Steward Machine Co. v. Davis,* 301 U.S. 548, 590 (1937)).
[60] *Id.* at 676 (citing *Barnes v. Goldman,* 536 U.S. 181, 186 (2002); *Pennhurst, supra,* at 17.
[61] *Id.* at 679.

52482

percentage was deemed relatively mild encouragement rather than coercion, whereas the threat of losing all Medicaid funding was deemed coercive.[62]  Therefore, in this Court's view, *Sebelius* did not announce a new rule on conditional spending programs but simply applied *Dole* and other established precedent.  In keeping with Fifth Circuit precedent, the Court finds that LSU is not shielded from suit under Title IX by Eleventh Amendment sovereign immunity.[63]

### B.  Standing

LSU also claims that Plaintiffs lack standing to bring this suit under Title IX.  LSU argues that the mere risk of injury is insufficient to satisfy the Article III standing requirement, let alone to sustain a Title IX claim. LSU contends "Plaintiffs must allege a 'concrete and particular injury in fact' that is 'fairly traceable' to the alleged actions of [LSU]."[64]   LSU further argues that a risk of future harm only satisfies Article III standing when the harm is "certainly impending."[65]  LSU contends that Plaintiffs have not alleged that Gruver was at a unique risk to be hazed, nor that all male fraternity members are hazed, so there can be no "certainly impending" risk.

Plaintiffs argue in opposition that LSU is barred from raising its Article III standing argument in a reply memorandum. However, should the Court entertain the argument, Plaintiffs assert that an "invasion of a legally protected interest" is sufficient for Article III standing. Plaintiffs argue Gruver had a legally protected interest in not being excluded

---

[62] *Id.*
[63] Considering the Court's ruling, Plaintiffs' claim that LSU is collaterally estopped from raising this defense is moot.  Further, because the Court has determined that LSU waived its sovereign immunity, the Court need not address abrogation.  *See Pederson*, 213 F.3d at 875, n. 15.
[64] Rec. Doc. 91 at 4 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).
[65] *Id.* (citing *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013)).
52482

from participation in, or denied benefits of, an education program on the basis of sex, and the discriminatory policy denied him those benefits and caused his hazing and death. Therefore, Plaintiffs argue they have demonstrated standing under Title IX.

The Court finds that LSU is not barred from raising a challenge to standing in its *Reply*. The law is clear that "a defect in Article III standing deprives [a] federal court of subject matter jurisdiction."[66] Further, "[b]ecause standing is a necessary component of federal subject matter jurisdiction, it may be raised at any time by a party or the court."[67]

Nevertheless, the Court is unpersuaded by LSU's argument. To demonstrate Article III standing, a plaintiff must show: (1) "an injury in fact—a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical[,]" (2) "causation—a fairly traceable connection between the plaintiff's injury and the [defendant's] complained-of conduct[,]" and (3) "redressability—a likelihood that the requested relief will redress the alleged injury."[68] The invasion of a "legally protected interest" is an injury in fact.[69]

The *Pederson* court found Equal Protection jurisprudence to be instructive on the issue of when a legally protected interest is violated. In those cases, when the government erects a barrier making it more difficult for members of one group to obtain a benefit than it is for members of another group, the injury in fact is the inability to seek benefits on equal footing.[70] Therefore, to establish standing in these circumstances, a

---

[66] *Brooks v. Georgia Pacific, L.L.C.*, No. 16-0676, 2017 WL 1534219 at *2 (citing *Cadle Co. v. Neubauer*, 562 F.3d 369, 374 (5th Cir. 2009) (citation omitted)).

[67] *Id.* at *3 (citing *Sample v. Morrison*, 406 F.3d 310, 312 (5th Cir. 2005)).

[68] *Pederson*, 213 F.3d at 869 (quoting *Sierra Club v. Peterson*, 185 F.3d 349, 360 (5thCir. 1999)).

[69] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

[70] *Pederson*, 213 F.3d at 871 (citing *Northeastern Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)); (*see also Wilson v. Glenwood Intermountain Properties,* 52482

plaintiff only needs to demonstrate that he is ready and able to compete, but the discriminatory policy prevents him from doing so on an equal basis.[71]  The Court finds that Plaintiffs have sufficiently pled such an injury, as well as causation (that the injury was fairly traceable to LSU's alleged policy), and redressability, as will be demonstrated in greater detail below.

## III.    MOTION TO DISMISS UNDER RULE 12(b)(6)

When deciding a Rule 12(b)(6) motion to dismiss, "[t]he 'court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'"[72]  The Court may consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[73]  "To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"[74]  In *Twombly*, the United States Supreme Court set forth the basic criteria necessary for a complaint to survive a Rule 12(b)(6) motion to dismiss.  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."[75]  A complaint is also insufficient if it

---

*Inc.*, 98 F.3d 590, (10th Cir. 1996) (applying principles of Equal Protection standing to Fair Housing Act claim)).
[71] *Id.*
[72] *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 205 (5th Cir. 2007)(quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)).
[73] *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011).
[74] *In re Katrina Canal Breaches Litigation*, 495 F.3d at 205 (quoting *Martin v. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d at 467).
[75] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)(internal citations and brackets omitted)(hereinafter *Twombly*).
52482

merely "tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[76]  However, "[a] claim has facial plausibility when the plaintiff pleads the factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[77]  In order to satisfy the plausibility standard, the plaintiff must show "more than a sheer possibility that the defendant has acted unlawfully."[78]  "Furthermore, while the court must accept well-pleaded facts as true, it will not 'strain to find inferences favorable to the plaintiff.'"[79]  On a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation."[80]

Title IX prohibits discrimination on the basis of sex in federally-funded educational programs.[81]  It is enforceable through an individual's private right of action and allows for the recovery of damages.[82] There are two avenues to pursue a claim under Title IX: one based on an institution's official policy of intentional discrimination on the basis of sex and one that seeks to hold an institution liable for teacher-on-student or student-on-student sexual harassment.[83]  According to the Supreme Court in *Davis v. Monroe County Board of Education*,[84] to prevail on a student-to-student harassment claim, the plaintiff must prove: (1) the school acted with deliberate indifference to sexual harassment of which it

---

[76] *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)(internal citations omitted)(hereinafter "*Iqbal*").
[77] *Twombly*, 550 U.S. at 570.
[78] *Iqbal*, 556 U.S. at 678.
[79] *Taha v. William Marsh Rice University*, 2012 WL 1576099 at *2 (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)).
[80] *Twombly*, 550 U.S. at 556 (quoting *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).
[81] 20 U.S.C. § 1681(a).
[82] *Franklin v. Gwinnett Cty. Public Schs.*, 503 U.S. 60 (1992).
[83] *See Pederson*, 213 F.3d at 882; *see also Doe 1 v. Baylor University*, 240 F.Supp.3d 646, 657 (W.D. Texas 2017).
[84] 526 U.S. 629 (1999).
52482

had (2) actual knowledge, and (3) the harassment must be so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school.[85] Because the deliberate indifference must *cause* the harassment, liability is further limited to circumstances where the recipient exercises substantial control over both the harasser and the context in which the known harassment controls.[86]

LSU erroneously argues that Plaintiffs' claim must be dismissed because the implied private right of action under Title IX does not impose liability against LSU where Plaintiffs do not allege peer-on-peer sexual harassment.  Plaintiffs' Title IX claim in this case is unquestionably based on LSU's alleged policy of intentional discrimination on the basis of sex, an allowable cause of action under Title IX.  Therefore, the Court will not address LSU's arguments regarding peer-on-peer sexual harassment as they are irrelevant.

LSU claims Plaintiffs' allegations are largely conclusory and only based "upon information and belief."  LSU further argues that Plaintiffs' *Complaint* compares one instance of sorority hazing where females received the harshest available sanction to twenty-four instances of fraternity hazing where twenty policy violations were found. LSU contends these purported facts are insufficient to demonstrate a policy of discrimination.

LSU further argues that Plaintiffs are attempting to circumvent *Davis* by alleging LSU engaged in a practice of discrimination by policing sorority hazing more strictly than fraternity hazing.  LSU contends this type of claim fails as well because Plaintiffs must

---

[85] *Davis,* 526 U.S. at 650.
[86] *Id.* at 645 (emphasis added).
52482

assert that: (1) Gruver was a member of a protected class, (2) this class suffered adverse action, and (3) this class was treated less favorably than similarly situated students.[87] LSU argues that Plaintiffs have pled no facts supporting a claim that those outside of Gruver's protected class were treated more favorably than he.  Rather, LSU maintains that Plaintiffs' *Complaint* demonstrates the opposite—that those outside of Gruver's class were in fact treated worse—because females were treated more harshly when their hazing complaints were met with greater sanctions. Further, LSU contends Plaintiffs failed to claim that LSU took any adverse action against Gruver himself, or that he ever reported hazing in the first place. LSU argues that if Plaintiffs allege the hazing was the adverse action, then the claim must be analyzed under *Davis,* where it would fail.

LSU also contends that a classic intentional discrimination claim fails because the alleged intentional discrimination must cause the injury.[88]  LSU claims Plaintiffs only allege that LSU failed to prevent an injury.  Further, LSU contends a sex discrimination claim predicated on student-on-student conduct must show the school had an affirmative policy or practice that directed or encouraged misconduct on the basis of sex, not that the institution simply failed to prevent the conduct. LSU argues that Plaintiffs claim the adverse action caused by LSU was the mere risk Gruver faced, thus the policy was not an affirmative cause of hazing.

Plaintiffs assert that *Davis* is inapplicable to their claim because it is not based on peer-on-peer harassment. Rather, Plaintiffs have alleged a claim based on LSU's actions

---

[87] Rec. Doc. 70-1 at 11 (citing *Kirk v. Monroe City Sch. Bd.*, 2018 WL 4292355, at *6 (W.D. La. Aug. 24, 2018), *report and recommendation adopted*, 2018 WL 4291750 (W.D. La. Sept. 7, 2018); *Arceneaux on Behalf of Rebekka A. v. Assumption Par. Sch. Bd.*, 242 F. Supp. 3d 486, 494 (E.D. La. 2017)).
[88] Rec. Doc. 91, pg. 2 (citing *Weckhorst v. Kansas State University*, 2017 WL 3674963 (D. Kan. 2017)).
52482

in intentionally discriminating against male students seeking the benefits of Greek life as compared to female Greek students.  Plaintiffs maintain that "discrimination under Title IX should be construed broadly."[89]

Plaintiffs argue that *Pederson* is controlling as to the elements of their claim, and it provides that "the proper test for determining whether an intentional violation has occurred under Title IX is whether an institution 'intended to treat [students] differently on the basis of their sex.'"[90]  Plaintiffs allege LSU has a policy of treating sorority hazing complaints more harshly than fraternity complaints. Plaintiffs further argue that, because this practice is grounded in outdated stereotypes of men, it is intentional discrimination that forces males to seek benefits of Greek Life with greater risk of injury.

Plaintiffs also decry LSU's claim that their allegations are conclusory and direct the Court to numerous paragraphs in the *Complaint* detailing the manner in which LSU treated fraternity hazing claims.[91]  Specifically, Plaintiffs allege LSU misconstrues their allegations "to arrive at the erroneous conclusion that because at least three fraternities were punished more severely than the single sorority discussed, Plaintiffs' allegations fail to give rise to a reasonable inference that LSU treated males and females differently."[92]  Rather, Plaintiffs contend that one sorority was in fact punished more harshly than all fraternities during the same time period, and this fact supports the position that LSU treated sorority hazing complaints more severely.

To LSU's assertion that those outside of Gruver's class were not treated more

---

[89] Rec. Doc. 93 at 6 (citing *Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 174-175 (2005)(internal quotation marks omitted)).
[90] *Id.* (quoting *Pederson*, 213 F.3d at 882).
[91] *Id.* at 8 (citing *Complaint* at ¶¶ 101-103, 112-116, 125-141, 155-182).
[92] *Id.* at 9 (internal quotation marks omitted).
52482

favorably because they were met with greater sanctions, Plaintiffs counter that this argument is "completely backwards."[93]   Instead, Plaintiffs maintain that those outside of Gruver's class (female Greek students) were treated better specifically because their hazing complaints were met aggressively and appropriately by LSU with greater sanctions, thereby providing greater protection by LSU to female Greek students and reducing their risk of injury.   Plaintiffs argue that the adverse action taken against Gruver was the operation of its discriminatory policy regarding male Greek hazing which proximately caused Gruver's injury specifically and creates a heightened risk of injury to all male Greek students generally.

The Court has considered the allegations in the *Complaint* and the applicable jurisprudence, and the Court finds that LSU is not entitled to dismissal under Rule 12(b)(6).

In *Pederson*, the plaintiffs brought suit against LSU under Title IX, alleging LSU intentionally discriminated on the basis of sex by not sponsoring a women's fast-pitch softball team. In that case, the district court concluded that a Title IX claimant must prove intentional discrimination in addition to a threshold finding of a Title IX violation.[94] The Fifth Circuit found that the actual notice and deliberate indifference requirements of sexual harassment cases have "little relevance" in determining whether intentional discrimination occurred.[95] Rather, the proper test is "whether [LSU] intended to treat women differently on the basis of sex by providing them unequal athletic opportunity."[96] "[LSU] need not

---

[93] Rec. Doc. No. 93 at 8.
[94] *Pederson*, 213 F.3d at 879-880.
[95] *Id.* at 882.
[96] *Id.*

52482

have intended to violate Title IX, but need only have intended to treat women differently."[97]

Application of archaic attitudes about women constitute intentional discrimination.[98] Thus, the *Pederson* plaintiffs were required only to prove a violation of Title IX and intentional discrimination.[99]

In most Title IX cases, the threshold finding of a Title IX violation is found by a violation of the clear terms of the statute. The *Pederson* court made the threshold finding of a Title IX violation by utilizing the Policy Interpretations of Title IX, 44 Fed. Reg. at 71,413 (1979), the application of which is limited to athletics programs.[100]  Further, the Supreme Court's holding in *Gebser v. Lago Vista Independent School Dist.*,[101] the leading teacher-on-student harassment case, seems to support this approach.    *Gebser* also dispenses with the actual notice and deliberate indifference requirements where the Title IX claim alleges an official policy of discrimination.[102] This logically leaves the claimant to prove only the policy of intentional discrimination. *Davis* also seems to support this approach where it says an institution can be sued for damages "where the funding recipient engages in intentional conduct that violates the clear terms of the statute."[103]

The most factually analogous case located by the Court is *J.H. v School Town of Munster*,[104] a case decided by United States District Court for the Northern District of Indiana.  Although this ruling addressed a summary judgment motion, it is nonetheless

---

[97] *Id.* at 881 (internal citations omitted).
[98] *Id.*
[99] *See also Horner v. Kentucky High School Athletic Association*, 206 F.3d 685 (6th Cir. 2000) (alleging the same claim and proofs needed for the claim).
[100] *Id.*
[101] 524 U.S. 274 (1998).
[102] *Id.* at 290.
[103] *Davis*, 526 U.S. at 642.
[104] 160 F.Supp.3d 1079 (N.D. Ind. 2016).
52482

instructive to the present case.  In *J.H.*, a high school male brought a Title IX claim against his school alleging that it purposefully ignored complaints of hazing in the boys' swimming program due to their gender.[105]  The Court noted that "J.H.'s argument is essentially that the Defendants were willfully turning a blind eye to all of the awful things going on in the male swimming program because 'boys will be boys.'"[106] The court explained that, "[i]n essence, it's not necessary to show that Munster had a policy of forcing the boys to do or not do something that didn't apply to the girls. Instead, indifference to the boys' welfare is enough."[107]  The court continued:

> In pursuing this theory, J.H. must show a connection between Munster's alleged custom or practice and his injury. *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 670 (2012). So what all this boils down to is that J.H. must show that Munster engaged in a widespread practice of ignoring complaints of hazing from the boys' swimming program, either intentionally or with deliberate indifference to the boys' rights, simply because the complaints were coming from boys and not girls. *See e.g. Hayden*, 743 F.3d at 583 (intentional discrimination can be shown by either deliberate indifference or a discriminatory school policy). J.H. can show this based on evidence of his own treatment, in addition to the treatment of others on his team. *Bohen*, 799 F.2d at 1187 (Maj. opinion).[108]

The court relied on the same elements laid out in *Davis* and found that the school's policy alone demonstrated its intent to discriminate, suggesting that the first *Davis* prong requiring discrimination is met even if it does not demonstrate harassment.[109] Nevertheless, the court concluded that J.H. could proceed with his claim under either framework.[110]   The court reasoned that the same evidence showing a practice of

---

[105] *Id.*
[106] *Id.* at 1086.
[107] *Id.* (citation omitted).
[108] *Id.*
[109] *Id.* at 1091. The *J.H.* court did note, however, that the Seventh Circuit had not addressed whether a plaintiff needs to satisfy the three remaining prongs of *Davis* for this type of claim.
[110] *Id.*

52482

intentionally ignoring the boys' hazing complaints satisfies the deliberate indifference element in that the practice is *necessarily* deliberately indifferent, and the basis of the claim is the school's own policy which establishes the school's actual knowledge.[111] Finally, the court found that the plaintiff had submitted sufficient evidence that the alleged discrimination was sufficiently severe, pervasive, and objectively offensive such that it undermined his educational opportunities.[112] The court held that there was sufficient evidence to allow a jury to determine whether the school's failure to remedy the hazing— which was extensively reported to the school administration— caused J.H. to leave the school, experience a decline in grades, and suffer psychological effects.[113]  The court also noted that a plaintiff need not prove that the girls' team experienced no hazing, but only that the discriminatory policy applied only to the boys.[114]

Ultimately, the court denied the motion for summary judgment for this portion of J.H.'s claim, but it did not resolve the factors necessary to prove a Title IX claim because it found the claim satisfied the test for student-on-student harassment claims. While this analytical framework is not binding on this Court, the Court nevertheless finds the *J.H.* decision instructive, and it demonstrates that federal courts have allowed claims like Plaintiffs herein to proceed to trial under the same type of pleadings.

The present case alleges both an intentional policy of discrimination and student misconduct.  A similar case was presented in *Doe 1 v. Baylor University*, wherein female students asserted a claim seeking to hold the university liable for its discriminatory custom

---

[111] *Id.* (emphasis added).
[112] *Id.*
[113] *Id.*
[114] *Id.* at 1088.
52482

or policy that created a heightened risk of sexual harassment for female students.[115]
Specifically, the ten female plaintiffs in *Baylor* sued the university under Title IX and
alleged that, while they were students at Baylor University,

> they were sexually assaulted by another student, but that when they sought
> assistance and protection from Baylor, the school did nothing (or almost
> nothing) in response to their reports. Plaintiffs allege Baylor discouraged
> them from reporting their assaults, failed to adequately investigate each of
> the assaults, and failed to ensure Plaintiffs would not be subjected to
> continuing assault and harassment. Plaintiffs assert that Baylor's practices
> in handling their reports reflect the school's widespread practice of
> mishandling reports of peer sexual assault. They allege these practices
> chilled other students from reporting sexual harassment, permitted the
> creation of a campus condition "rife with sexual assault," "substantially
> increased Plaintiffs' chances of being sexually assaulted," (Third Am.
> Compl., Dkt. 56, at 1–2, ¶ 29), and ultimately created a harassing
> educational environment that deprived Plaintiffs of a normal college
> education and other educational opportunities.[116]

Notably, the *Baylor* court rejected the university's argument, on a Rule 12(b)(6)
motion to dismiss, that "evidence of a general problem of sexual violence is not
sufficient."[117]  The court explained:

> At this stage of litigation, the Court considers only whether Plaintiffs'
> Complaint contains sufficient factual matter, if accepted as true, to state a
> claim to relief that is plausible on its face. Baylor attempts to disclaim liability
> by dismissing Plaintiffs' allegations as "an amalgam of incidents that
> involved completely different contexts, offenders, and victims," (Def.'s Mot.
> Dismiss Doe 7, Dkt. 62, at 21), and arguing that "evidence of a general
> problem of sexual violence is not sufficient," (*id.* at 22). This Court
> disagrees. Plaintiffs have not alleged that Baylor had knowledge of
> accusations against their specific assailants prior to their initial assaults, **but
> what they have alleged—a widespread pattern of discriminatory
> responses to female students' reports of sexual assault—is arguably
> more egregious**. Indeed, even those Supreme Court justices who
> expressed skepticism regarding holding institutions liable for sexual
> assaults on individual students under Title IX have suggested that "a clear
> pattern of discriminatory enforcement of school rules could raise an

---

[115] 240 F.Supp.3d 646, 657-658 (W.D. Tex. 2017) (hereinafter *Baylor*).
[116] *Id.* at 652.
[117] *Id.* at 653.
52482

inference that the school itself is discriminating." *Davis v. Monroe Cty. Bd. Educ.*, 526 U.S. 629, 683, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (Kennedy, J., dissenting). In particular they noted that a "school's failure to enforce its rules when the boys target the girls on a widespread level, day after day, may support an inference that the school's decision not to respond is itself based on gender" and thereby be actionable under Title IX. *Id.*[118]

Summarizing the plaintiffs' claims, the court stated:

> Taken together, Plaintiffs allege, these facts demonstrate Baylor created a condition that substantially increased Plaintiffs' chances of being sexually assaulted, (*id.* at 1); chilled student reporting of sexual harassment, (*id.* ¶ 41); led to a sexually hostile environment at the university, (*id.* ¶ 43); caused Plaintiffs psychological damage and distress, (*id.* ¶ 48); and deprived Plaintiffs of a normal college education, (*id.* ¶ 50).[119]

Applying relevant jurisprudence, the *Baylor* court noted that the deliberate indifference and actual notice elements of *Davis* do not apply to this type of claim.[120] Rather, the court found, in evaluating a heightened risk claim, it must consider whether the alleged custom or policy inflicted the injury of which plaintiffs complain.[121] In support of their heightened risk claim, the plaintiffs alleged that "Baylor's handling of reports of sexual assaults created a heightened risk of sexual assault throughout the university's student body."[122] Specifically, the plaintiffs alleged that Baylor

> knew of and permitted a "campus condition rife with sexual assault," (Third Am. Compl., Dkt. 56, ¶ 29); that sexual assault was "rampant" on Baylor's campus, (*id.* ¶ 27); that Baylor mishandled and discouraged reports of sexual assault, (*id.* at 1, ¶ 36); and that Baylor's response to these circumstances "substantially increased" the risk that Plaintiffs and others would be sexually assaulted, (*id.* at 1).[123]

Evaluating this claim, the court noted and held as follows:

---

[118] *Id.* (emphasis added).
[119] *Id.*
[120] *Id.* at 661.
[121] *Id.*
[122] *Id.*
[123] *Id.*

52482

The Supreme Court has repeatedly explained that where the Title IX violation in question is caused by an institution's discriminatory policy or custom, courts need not apply the actual notice and deliberate indifference framework typically used in cases involving institutional liability for sexual harassment or assault. *See Gebser*, 524 U.S. at 290, 118 S.Ct. 1989 (stating that the actual notice and deliberate indifference requirements are restricted to those cases "that do not involve [an] official policy of the [funding recipient]"); *Davis*, 526 U.S. at 642, 119 S.Ct. 1661 (acknowledging that an institution cannot be liable unless it has notice that its conduct could subject it to a damages claim but providing that "this limitation ... is not a bar to liability where a funding recipient intentionally violates the statute"). Plaintiff's heightened-risk claims fit squarely within the official-policy rubric previously identified by the Court, and the Court is satisfied that Plaintiffs have met their burden under Rule 12(b)(6).[124]

The *Baylor* court found that the plaintiffs sufficiently alleged that Baylor repeatedly misinformed them of their rights under Title IX, failed to investigate sexual assaults, discouraged them from naming assailants or coming forward, and failed to report any on-campus assaults to the Department of Education.[125] Thus, the court determined that these facts, if proven, would allow a jury to infer that Baylor's policy created the heightened risk of sexual assault, thereby inflicting the plaintiffs' injuries.[126]

Similarly, in the instant case, Plaintiffs allege that LSU's purposeful disregard of Greek male hazing complaints created a greater risk of danger for males in fraternities as compared to females in sororities.  While *Baylor* is not binding, the Court finds the *Baylor* court's reasoning and analysis particularly persuasive and applicable herein because, substituting sexual assault/harassment allegations for "Greek male hazing," the allegations pled against the universities in both cases are extremely similar.  Here, Plaintiffs have clearly alleged that LSU misinformed potential male students about the risk

---

[124] *Id.*
[125] *Id.* at 662.
[126] *Id.*

52482

of hazing in fraternities, had actual notice of numerous hazing violations, and failed to address or correct the hazing issue for Greek males while aggressively and appropriately addressing and correcting hazing issues in sororities, thereby providing protection to female Greek students that was not equally provided to Greek male students. Plaintiffs' *Complaint* is replete with allegations that LSU had knowledge of the hazing problem within Greek fraternities and was deliberately indifferent to the risk this posed to male Greek students by a policy of general inaction to fraternity violations as opposed to strong corrective action taken in response to sorority violations.  The Court finds that, as in *Baylor*, if these facts are proven, a jury may infer that LSU's policy created the heightened risk to Greek male students of serious injury or death by hazing, thereby inflicting the injury alleged herein.  Accordingly, LSU's *Motion to Dismiss* shall be denied as to the Title IX claims asserted.

## IV.    CONCLUSION

For the reasons set forth above, the Court finds that LSU's *Motion to Dismiss*[127] is hereby GRANTED in part and DENIED in part.  LSU's *Motion* is GRANTED as to state law claims asserted considering Plaintiffs' concession that LSU is immune from suit in federal court as to those claims.  Plaintiffs' state law claims are hereby DISMISSED without prejudice.  LSU's *Motion* is DENIED as to Plaintiffs' Title IX claims.

**IT IS SO ORDERED.**

Baton Rouge, Louisiana, this 19th day of July, 2019.

_____
**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[127] Rec. Doc. No. 70.

52482