## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

STEPHEN M. GRUVER and RAE ANN GRUVER,
individually and on behalf of
MAXWELL R. GRUVER, deceased,

   Plaintiffs,

v.             No. 3:18-cv-00772-SDD-EWD

STATE OF LOUISIANA THROUGH THE BOARD OF
SUPERVISORS OF LOUISIANA STATE
UNIVERSITY AND AGRICULTURAL AND
MECHANICAL COLLEGE; RYAN M. ISTO; SEAN
PAUL GOTT; ZACHARY T. HALL; DALTIN W.
BABINEAUX; MICHAEL C. COMEAUX, JR; PHILIP
CLARK; LUKE ST. GERMAIN; HAIDER LAGHARI;
SEAN A. PENNISON; ALLSTATE INSURANCE
COMPANY OF CANADA, INC., a foreign corporation;
and JOHN DOES 1-10,

   Defendants.

### SECOND AMENDED COMPLAINT AND JURY DEMAND

   Plaintiffs, STEPHEN M. GRUVER and RAE ANN GRUVER, individually and on

behalf of MAXWELL R. GRUVER, deceased, through their attorneys, The Fierberg National

Law Group, PLLC, and Cazayoux Ewing Law Firm, for their Second Amended Complaint

against Defendants state:

### INTRODUCTION

   1.  On August 21, 2017, a self-described "Concerned Parent" emailed the Office of

Greek Life at Louisiana State University ("LSU") to report:

> The Sigma Nu pledge class was made to drink alcohol at the Sigma Nu house
> until each pledge member vomited.  This occurred on boys bid night, August 20th,
> 2017.  I was made aware of this yesterday, when a mother of a pledge (who has
> dropped out because of this) shared this information with me.  As a parent of a
> pledge of another fraternity, I am very angry that this has occurred and I know
> that it will likely continue.  I do not want to hear that someone's son is dead due

to alcohol poisoning, and I expect someone to investigate this incident ASAP and put an end to hazing at LSU.

2.    LSU's Greek Accountability team "decided there was not enough information to investigate the case," and closed its file on the incident.  LSU's failure to even investigate this parent's ominous warning reflects its long-standing deliberate indifference to the hazing of male students in its fraternities, despite the severe, pervasive risks of serious injuries and death those students face when they seek educational benefits and opportunities through LSU Greek Life.

3.    Less than ten days after LSU closed its file on the incident, 18-year-old LSU freshman and fraternity pledge Maxwell Gruver ("Max") died from alcohol poisoning as a result of being hazed by his LSU-recognized fraternity.  Max was the beloved oldest son of Stephen and Rae Ann Gruver and older brother to Alex and Lily Kate.

4.    On the night of September 13, 2017, Max and other fraternity pledges were summoned to the local fraternity house of Phi Delta Theta Fraternity ("Phi Delt").  Fraternity members confiscated the pledges' cell phones, marched them single file up the stairs, covered them with mustard and hot sauce, and quizzed them during a hazing ritual known as "Bible Study."  When pledges answered questions incorrectly, fraternity members ordered them to take a "pull" (a three to five second chug) from a bottle of Diesel, 190-proof liquor.

5.    Max was singled out for particularly harsh treatment by the fraternity members. While most pledges were compelled to take three or four pulls during Bible Study, Max was ordered to take at least 10 to 12 pulls.

6.    By 11:30 p.m., Max was incapacitated and in visible need of emergency medical or other responsible care.  Yet, fraternity members left Max, unconscious, on a couch.  Hours passed.  At around 9:00 a.m. on September 14, 2017, fraternity members found Max unresponsive.  Again, emergency assistance was not called, and any other responsible care was

2

withheld.  Fraternity members summoned fraternity pledges to the fraternity house and told the pledges to take Max to the hospital and to lie and tell hospital staff they had found Max in his dorm room.  Max was pronounced dead at the hospital.  His blood alcohol content was 0.495 when measured at his autopsy one-and-a-half days later.

7.      LSU has a long tradition of recognizing and expending significant resources to promote Greek Life as a valuable educational opportunity and benefit to its students.  In pages and pages of written materials and multiple web-based communications provided to students and their families, LSU states as fact only positive, promotional information about Greek life, such as:  "Greek Life can foster the education of the whole person:  intellectually, socially and spiritually."  LSU chooses not to publicize, report, or otherwise disclose numerous documented incidents of dangerous hazing and misconduct of fraternities at LSU, rendering its extolling representations about LSU Greek Life for male students false and misleading.

8.      LSU chooses to leave its prospective and current male students, as well as the university community as a whole, ignorant of the specific risks Greek Life uniquely poses to male students when they are rushing, pledging, or participating as active members of LSU fraternities.  LSU goes so far as to dissuade male students from considering the real risks known to LSU and its staff, deceptively stating:  "Hazing and inappropriate behavior are not tolerated by LSU, and today's college student may experience Greek life for the reasons intended, not the stereotypical organizations portrayed on television."

9.      In fact, the reality at LSU is that male students like Max face the risk of serious injury and death when they seek educational benefits and opportunities offered through LSU's Greek letter fraternity system, and the risk to male students at LSU is likely far worse than the television portrayals LSU references.  Before Max's death, male students pledging LSU-

recognized fraternities have died, been hospitalized on an emergency basis for dangerous alcohol consumption, and suffered broken ribs, cigarette burns and other serious physical injuries.

10.     Of the 27 fraternities on LSU's campus, which restrict membership to male students, only four were without risk-management violations in the five years preceding Max's death.  That statistic likely underreports the actual risk-management violations occurring at LSU-recognized fraternities because LSU permits its fraternities to investigate themselves when potential violations are reported to LSU.  Nonetheless, during those five years, there were at least 24 formal hazing investigations involving fraternities, 20 of which led to findings of policy violations.

11.     Unlike LSU fraternities, LSU sororities, which restrict membership to female students, do not have a culture or long-documented history of dangerous hazing and misconduct. Upon information and belief, when LSU has received reports of hazing at its sororities, the sanctions LSU has imposed on the sororities have been significantly greater in length and degree than sanctions LSU generally imposes on fraternities for comparable misconduct.

12.     Upon information and belief, LSU responds aggressively to allegations of hazing at sororities, yet with deliberate indifference to allegations of hazing at fraternities, because of long-held and outdated gender stereotypes about young men, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX").  Upon information and belief, because of those stereotypes, although LSU treats the hazing of females as unacceptable, it minimizes the hazing of males as "boys being boys" engaging in masculine rites of passage.

13.     As a result of LSU's policy and practice of responding differently to the hazing of male students than the hazing of female students, hazing of female students seeking valuable

educational opportunities and benefits through LSU Greek Life is virtually nonexistent, while the hazing of male students seeking those same opportunities and benefits is rampant.

14.    LSU has refused to timely and accurately report information about these long-known risks and dangers, leaving male students like Max seeking educational opportunities and benefits through LSU Greek Life uniquely vulnerable to hazing, and it has refused to make material changes to its policies and practices to significantly lessen those risks.

15.    Further, through its policy and practice of treating hazing of male students less seriously than hazing of female students, LSU has unlawfully persisted in a systematic, intentional, differential treatment of, and therefore discrimination against, male students seeking the educational opportunities and benefits of LSU Greek Life touted by LSU.

16.    Phi Delt, for its part, also has a long history of dangerous misconduct at universities across the country, which it chooses to omit from the promotional materials it uses to encourage students to join, including Max, and its chapter at LSU was no exception.

17.    In the years preceding Max's death, LSU received so many credible complaints of hazing and dangerous compelled consumption of alcohol against Phi Delt's LSU chapter that, in 2016, the Director of LSU's Office of Greek Life "begged for assistance" from Phi Delt's national headquarters in addressing the misconduct.

18.    Despite this plea, time and time again, Phi Delt failed to effectively intervene to address credible allegations of hazing and other misconduct at its LSU chapter.

19.    LSU knew that Phi Delt's national headquarters was not responding appropriately to allegations of hazing and other misconduct at the local chapter, yet it continued to allow the chapter to investigate itself for alleged hazing violations and permitted Phi Delt, up until Max's

death, to continue recruiting male students to join their fraternity, which enjoyed official

recognition by LSU.

20.      LSU also decided against publicly conveying information about credible

complaints of hazing and compelled alcohol consumption at Phi Delt in the years prior to Max's

death as part of the glowing promotional package and information LSU gave to students and

their families to encourage them to join Greek Life as part of LSU's educational opportunities

and benefits.  Max and his family attended incoming student orientation at LSU, and they

researched and relied on the information made available by LSU about LSU Greek Life before

Max chose to pledge Phi Delt because of its purported values.

21.      Had LSU or Phi Delt acted reasonably to address the ongoing hazing at Phi Delt's

LSU chapter, or had Max and his family been fully and fairly advised of the severe and pervasive

risks of serious injuries and death faced by male students seeking educational benefits and

opportunities through LSU Greek Life and/or the long history of dangerous misconduct at Phi

Delt chapters across the country, including Phi Delt's LSU chapter, Max would not have pledged

Phi Delt or been subjected to the hazing which caused his death.

22.      This action seeks to hold LSU accountable for the real and dangerous

consequences of discriminating against male students seeking educational opportunities and

benefits through LSU Greek Life, in violation of Title IX, and to hold all Defendants responsible

for the tortious and negligent misconduct which harmed Max and caused his wrongful death.

**PARTIES**

23.      Plaintiffs Stephen M. Gruver and Rae Ann Gruver are of full age of majority, are

domiciled in Fulton County, Georgia, and are citizens of the State of Georgia.

24.     Plaintiffs are the natural father and mother, respectively, of Maxwell Gruver, deceased.

25.     Max, born on January 27, 1999, was never married, and he did not have any children, natural or adopted.  He has two younger siblings.  He was a 2017 graduate of Blessed Trinity Catholic High School in Roswell, Georgia, where he excelled academically and was a published journalist, planning to pursue a career in political journalism.

26.     Max was an 18-year-old freshman at LSU when he died from the negligence, fault, other wrongful conduct, offenses, and/or quasi-offenses sued upon herein.

27.     As the surviving parents of Max, Plaintiffs have the right to bring survival claims for injuries caused to Max, as described herein, pursuant to LA. Civ. Code art. 2315.1 and federal common law, and wrongful death claims to recover damages sustained as a result of Max's death, pursuant to LA. Civ. Code art. 2315.2 and federal common law.

28.     Defendant Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (the "Board," "Defendant Board" or "LSU") is a public constitutional corporation organized and existing under the laws of the State of Louisiana to operate, manage, and control the LSU public university system, including its campus in Baton Rouge, with its principal place of business located at 3810 West Lakeshore Drive, Baton Rouge, Louisiana 70808.  LSU is a recipient of federal funds within the meaning of 20 U.S.C. § 1681(a).

29.     Defendant Ryan M. Isto is of full age and majority and, upon information and belief, was a citizen of the State of Montana residing, at all relevant times, in East Baton Rouge Parish, Louisiana.  Defendant Isto at all relevant times was a student of LSU and a member of Phi Delt and the Louisiana Beta Chapter of Phi Delta Theta (hereinafter, "Louisiana Beta" or "Chapter").

30.     Defendant Allstate Insurance Company of Canada, Inc. ("Allstate"), is a foreign corporation, incorporated under the laws of Canada, and having its principal place of business in Markham, Ontario, Canada.  Defendant Allstate issued a VIP Homeowner's Policy, Policy No. 151409848, that provided coverage to Defendant Isto, as an insured under the policy, for legal liability arising out of his personal actions anywhere in the world.   The VIP Homeowner's Policy covers all acts of negligence by Defendant Isto alleged herein, and the VIP Homeowner's Policy was in full force and effect at all relevant times herein.  Defendant Allstate is named as a Defendant pursuant to the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269.  As an insurer for Defendant Isto, Allstate is liable to Plaintiffs jointly and in solido with Defendant Isto.

31.     Defendant Sean Paul Gott is of full age and majority and, at all relevant times, was a citizen of the State of Louisiana, domiciled in Lafayette Parish, Louisiana, and residing in East Baton Rouge Parish, Louisiana.  Defendant Gott at all relevant times was a student of LSU and a member of Phi Delt and Louisiana Beta.

32.     Defendant Zachary T. Hall is of full age and majority and, at all relevant times, was a citizen of the State of North Carolina, domiciled in Mecklenburg County, North Carolina, and residing in East Baton Rouge Parish, Louisiana.  Defendant Hall at all relevant times was a student of LSU and a member of Phi Delt and Louisiana Beta.

33.     Defendant Daltin W. Babineaux is of full age of majority and, at all relevant times, was a citizen of the State of Louisiana, domiciled in Calcasieu Parish, Louisiana, and residing in East Baton Rouge Parish, Louisiana.  Defendant Babineaux at all relevant times was a student of LSU, a member of Phi Delt, and a member and Executive Board member of Louisiana Beta, serving as the Chapter President of Louisiana Beta in the Fall of 2017.

34.     Defendant Philip Clark is of full age of majority and, at all relevant times, was a citizen of the State of Tennessee, domiciled in Davidson County, Tennessee, and residing in East Baton Rouge Parish, Louisiana.  Defendant Clark at all relevant times was a student of LSU, a member of Phi Delt, and a member and Executive Board member of Louisiana Beta, serving as the Chapter Pledge Educator in the Fall of 2017.

35.     Defendant Michael C. Comeaux, Jr., is of full age of majority and, at all relevant times, was a citizen of the State of Louisiana, and was domiciled and residing in East Baton Rouge Parish, Louisiana.  Defendant Comeaux at all relevant times was a student of LSU, a member of Phi Delt, and a member and Executive Board member of Louisiana Beta, serving as the Chapter Vice President in the Fall of 2017.

36.     Defendant Luke St. Germain is of full age of majority and, at all relevant times, was a citizen of the State of Louisiana, domiciled in Jefferson Parish, Louisiana, and residing in East Baton Rouge Parish, Louisiana.  Defendant St. Germain at all relevant times was a student of LSU, a member of Phi Delt, and a member and Executive Board member of Louisiana Beta, serving as the Treasurer of Louisiana Beta in the Fall of 2017.

37.     Defendant Haider Laghari is of full age of majority and, at all relevant times, was a citizen of the State of Louisiana, domiciled in Webster Parish, Louisiana, and residing in East Baton Rouge Parish, Louisiana.  Defendant Laghari at all relevant times was a student of LSU, a member of Phi Delt, and a member and Executive Board member of Louisiana Beta, serving as the Secretary of Louisiana Beta in the Fall of 2017.

38.     Defendant Sean A. Pennison is of full age of majority and, at all relevant times, was a citizen of the State of Louisiana, domiciled in St. Tammany Parish, Louisiana, and

residing in East Baton Rouge Parish, Louisiana.  Defendant Pennison at all relevant times was a student of LSU and a member of Phi Delt in the Fall of 2017.

39.     Any remaining Defendants John Doe 1-10 were, at all relevant times, students at LSU and members of Phi Delt and Louisiana Beta.  Defendants Doe were present for and participated in, gave material support to, knew or should have known, authorized, encouraged, and/or permitted the hazing and misconduct described herein that harmed and imperiled Max, and they failed to obtain or provide the assistance that would have saved Max's life.  At all relevant times, Defendants Doe knew or should have known that participating in, giving material support to, authorizing, encouraging, and/or permitting the hazing and misconduct that harmed and imperiled Max, as well as their failure to obtain or provide the assistance that would have saved Max's life, created an unreasonable and reasonably foreseeable risk of harm, damage and injury to Max.  Despite such knowledge, Defendant Does did not alter their behavior to avoid the unreasonable and reasonably foreseeable risk of harm, damage, and injury to Max.

40.     Defendants Isto, Gott, Hall, Babineaux, Clark, Comeaux, St. Germain, Laghari, Pennison, and Doe are collectively referred to herein as "Individual Defendants."

**JURISDICTION AND VENUE**

41.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this litigation involves claims arising under Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, *et seq*.

42.     This Court has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367, as they are so related to Plaintiffs' claims made under Title IX, 20 U.S.C. § 1681, *et seq.*, that they form part of the same case or controversy under Article III of the United States Constitution.

43.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to this case and the damages sustained by Plaintiffs occurred in East Baton Rouge Parish, Louisiana, which is part of the United States District Court for the Middle District of Louisiana.

## FACTUAL ALLEGATIONS

### *Maxwell Gruver's Tragically Short-Lived Attendance at LSU*

44.     Max applied to LSU in the fall of 2016.  LSU extended Max an offer of admission shortly after he applied, and in February 2017, he formally accepted the offer to enroll in LSU.

45.     In or around the summer of 2017, Max, like all other incoming LSU students, was sent a 72-page color book, *Greek Tiger*, by LSU in which LSU "encourage[s] [new students] to consider participating in fraternity or sorority recruitment."

46.     The second paragraph of the *Greek Tiger* provides:  "Hazing and inappropriate behavior are not tolerated by LSU, and today's college student may experience Greek life for the reasons intended, not the stereotypical organizations portrayed on television."  According to LSU, "[a]s Greek life prepares young adults for life, membership is an investment in [their] future."

47.     LSU promotes Phi Delt in the *Greek Tiger* by stating*, inter alia*, "Phi Delta Theta allows each of its members to 'become the greatest version of himself.'"

48.     Nowhere in the *Greek Tiger*, web communications, or personal presentations to students and parents by LSU staff does LSU provide male students or their families with timely, accurate, and meaningful information about known risks to male students from hazing, self-governance, illegal drug use, alcohol abuse, and other dangerous conduct within LSU-recognized fraternities, including within Phi Delt.

11

49.     After significant research of materials provided and made available online by LSU and Phi Delt, and discussion with his parents who reviewed the materials, Max sought to join a fraternity with his parents' blessing, and specifically sought to join Phi Delt.  Upon arriving at LSU in late August 2017, Max rushed and accepted a bid to pledge Phi Delt.

50.     Phi Delt recruited new undergraduate members, specifically and exclusively male students, at LSU through its local authorized chapter, Louisiana Beta; pledges and members paid dues and fees to Phi Delt and conveyed other valuable benefits to Phi Delt.

51.     Phi Delt, like other national fraternities, knowingly permitted its name, trademarks, traditions, lore, and reputation to be advertised on LSU's website, which promotes the fraternity, fraternity membership, and associated Greek Life as valuable educational opportunities and benefits at LSU.  LSU does this without identifying known incidents of hazing, injury, death, and risk-management violations that have occurred at Phi Delt's chapter at LSU or its chapters at other universities.

52.     On the night of September 13, 2017, Max and his fellow Phi Delt pledges were summoned to the Phi Delt fraternity house.  Defendant Gott called and sent out a GroupMe message to the pledges telling them to be at the house at 9:30 for "Bible Study @ 10:00."

53.     Before sending out the GroupMe message, Defendant Gott conferred with, and sought advice from, Defendant Laghari, who was a member of the Executive Board of Louisiana Beta, to determine the date, time, and location of the Bible Study ritual.

54.     The Bible Study ritual, like many other fraternity rituals, involved the provision and compelled excessive consumption of alcohol by pledges, all of whom were under the lawful drinking age in the State of Louisiana, and many of whom had been rendered dangerously

intoxicated and injured, including in the semesters immediately preceding the death of Max Gruver.

55.     When the 20 or so pledges arrived at the Phi Delt fraternity house on September 13, 2017, fraternity members confiscated their cell phones, and the pledges each were instructed to get a cup of lemonade, which they would later learn was to be used as a chaser for almost pure alcohol.

56.     Phi Delt and Louisiana Beta member Matthew Naquin ("Naquin") and Defendants Gott and Isto came down from the second floor of the fraternity house to greet the pledges.  Naquin yelled, "Are you ready for Bible Study?  Y'all better do well; I'm already fucked up."

57.     Naquin, Forde and Defendants Isto and Gott then shepherded the pledges up the stairs of the two-story Phi Delt fraternity house in a single file line as Defendant Gott covered the pledges in mustard and hot sauce.

58.     Once upstairs, the fraternity members told the pledges to stand in the hallway with their noses and toes against the wall.  There was loud music blaring and the only light was a pulsating strobe light.

59.     Although security cameras were installed inside and outside the Phi Delt fraternity house at the direction of Beta House Corporation, the security cameras were not properly maintained and were purportedly not operational on the evening of September 13, 2017.

60.     "Bible Study" was a test of the pledges' knowledge of fraternity history and the Greek alphabet.  Pledges were singled out to answer questions, and if they answered incorrectly, they were compelled to take a pull – a three to five second chug – directly from a bottle of Diesel, 190-proof alcohol.

61.     Upon information and belief, Defendant Gott brought at least one of the bottles of Diesel to Bible Study to use in the hazing ritual.

62.     During Bible Study, fraternity members targeted Max because, upon information and belief, he had previously arrived late to pledge activities and/or because he had complained to the pledge master of his pledge class about a hazing incident in which Phi Delt and Louisiana Beta Member Hudson Kirkpatrick ("Kirkpatrick") made Max use a friend's car to pick up Kirkpatrick and two friends, who Max was led by Kirkpatrick to believe were Phi Delt members, and to then buy them approximately $60 worth of cigarettes.

63.     The week prior to Bible Study, Naquin had suggested to the fraternity members that they cut Max from the pledging process altogether.

64.     On September 11, 2017, two days before Bible Study, the Executive Board of Louisiana Beta, including Defendants Babineaux, Clark, Comeaux, St. Germain, and Laghari, met to discuss how Naquin's ongoing actions with the pledges were extreme and dangerous.

65.     As Executive Board members of Louisiana Beta, Defendants Babineaux, Clark, Comeaux, St. Germain, and Laghari had positions of authority within Louisiana Beta, and each of them had agreed to abide by, enforce, and uphold Phi Delt's and Louisiana Beta's purported prohibitions on hazing, misuse and abuse of alcohol, and other related misconduct, including Phi Delt's Risk Management Policies.

66.     At all relevant times, Phi Delt's Risk Management Policies, which were intended to provide education and guidance to chapter officers in performing their responsibilities, stated that "[i]t is not in conformity with Phi Delta Theta expectations that any member or Phikeia [i.e., pledge] would engage in abusive behavior against anyone."

67.     Phi Delt's Risk Management Polices also expressly prohibited hazing and the

14

misuse of alcohol and drugs, and mandated alcohol-free fraternity housing.  At all relevant times,

Phi Delt's Risk Management polices stated, in pertinent part:

> All chapter facilities and properties in Phi Delta Theta Fraternity shall be alcohol-free at all times and under all circumstances … No Chapter of Phi Delta Theta may purchase alcoholic beverages with Fraternity funds, nor may any member or Phikeia in the name of or on behalf of the chapter coordinate the collections of any funds for such a purchase.
>
> *****
>
> No chapter or member of Phi Delta Theta shall indulge in any physical abuse or undignified treatment (hazing).  Hazing is defined as: "any action taken or situation created, intentionally or unintentionally, whether on or off Fraternity premises, and whether with or without the consent of the persons subjected to the action, which produces mental or physical discomfort, embarrassment, harassment, or ridicule."

68.    Defendant Clark was alarmed by what he heard about Naquin's actions toward the

pledges, and he was concerned for the pledges' safety.  He knew something was going to happen

that was not going to be good, no matter what, if Naquin's behavior continued.  Defendant Clark

also knew that Naquin wanted to cut Max from the pledge class, because at a chapter meeting

Naquin told the other fraternity members that he did not like Max.

69.    The Executive Board members, including the Individual Defendants identified as

Executive Board members herein, agreed to address the issue at a Louisiana Beta chapter

meeting later that day and discussed imposing penalties on Naquin if his conduct and actions

toward the pledges continued, including possible suspension, fines, or expulsion from the

fraternity.

70.    Later, on September 11, 2017, during the Louisiana Beta chapter meeting, the

Executive Board of Louisiana Beta, including the Individual Defendants identified as Executive

Board members herein, warned Naquin that his ongoing actions with the pledges were extreme

and dangerous.  After the meeting, Defendant Clark, the Pledge Educator of Louisiana Beta, addressed Naquin individually about his conduct with the pledges, and told him that his conduct was unacceptable.  Naquin blew off Defendant Clark and told him that he would do what he wanted.

71.     The Individual Defendants were aware of the risks facing Max Gruver and other pledges, and were aware that Defendant Gott's conduct with the pledges was dangerous.  Upon information and belief, five days before the September 11, 2017, meeting, on or around September 6, 2017, Naquin and Defendant Gott, among other fraternity members, had summoned the pledges to the Phi Delt fraternity house and ordered them to clean and to take pulls from a 1.75-liter bottle of alcohol.  As a result of this compelled, excessive alcohol consumption, which was primarily instigated by Defendant Gott, at least one pledge lost consciousness and had to be monitored throughout the night.  Upon information and belief, the Individual Defendants were aware of these circumstances.

72.     Despite knowing that Naquin's ongoing actions with the pledges were extreme and dangerous, the fraternity members, including Defendants Isto, Gott, Hall, Babineaux, Clark, Comeaux, St. Germain, Laghari, Pennison, and Doe, knowingly and recklessly permitted Naquin to participate in and direct a significant portion of Bible Study on September 13, 2017.

73.     Similarly, despite knowing that Defendant Gott's ongoing actions with the pledges were dangerous, the fraternity members, including Defendants Isto, Hall, Babineaux, Clark, Comeaux, St. Germain, Laghari, Pennison, and Doe, knowingly and recklessly permitted Defendant Gott to participate in and direct a significant portion of Bible Study on September 13, 2017.

74.     On September 13, 2017, fraternity members hazed the pledges during Bible

Study, yelling at them and making them do extreme calisthenics, which included holding wall sits as members walked across their knees.  Upon information and belief, Naquin and Defendant Gott were two of the most aggressive participants in hazing Max and his fellow pledges during Bible Study.

75.    At least two fraternity members became uncomfortable with the hazing and tried, unsuccessfully, to get Naquin and Defendant Gott to "cut it out" or "slow it down."

76.    During Bible Study, Naquin, among other fraternity members and Individual Defendants herein, ordered Max to take a pull from a bottle of Diesel whenever Max answered questions about the fraternity or the Greek alphabet incorrectly.

77.    While most of the pledges were compelled by fraternity members to take three or four pulls during Bible Study, Max was compelled to take at least 10 to 12 pulls.

78.    Bible Study ended around 11:30 pm.  By that time, Max was incapacitated and in visible need of emergency medical or other responsible care.

79.    Defendants Isto, Gott, Hall, Babineaux, Clark, Comeaux, St. Germain, Laghari, Pennison, and Doe,  each:

    a.    participated in, gave material support to, authorized, encouraged, permitted and/or failed to prohibit or stop the hazing and misconduct that harmed and imperiled Max;

    b.    knew or should have known that Max had been or would be forced to consume dangerous amounts of alcohol as a result of the Bible Study hazing ritual;

    c.    knew or should have known that Max had become incapacitated, imperiled, and was unable to walk or take care of himself as a result of the compelled consumption of alcohol;

17

       d.     undertook to make and control decisions regarding Max's care, as well as whether reasonable care would be summoned or provided for him, after the hazing activities they engaged in had put Max in a position of peril and in need of immediate medical care; and

       e.     failed to obtain the medical help for Max, which was obviously required under the circumstances, or otherwise act reasonably in monitoring or providing care to Max while he was incapacitated, imperiled, and unable to walk or take care of himself.

80.     Sometime around midnight, Max was placed unconscious on a couch.  Due to his incapacitation, Max was unable to protect himself, and fraternity members were sufficiently concerned about his condition that they placed a bucket beside him to catch vomit and kept watch over him for a few hours.

81.     Despite their initial concern, the fraternity members eventually abandoned Max, alone and unconscious, on the couch.  Hours passed.

82.     Sometime after 9:00 a.m. on September 14, 2017, fraternity members summoned some of Max's pledge brothers to the fraternity house.

83.     The pledges found Max unresponsive on the couch.  They were not sure he was breathing.

84.     Max's pledge brothers wanted to immediately call 911, but they were told not to call by some of the fraternity members, including Defendant Pennison.  Certain fraternity members, including Defendants Comeaux and Pennison, deliberately decided not to call 911 or to bring Max to the hospital, and/or instructed other fraternity members not to call 911 or bring Max to the hospital, because they were worried about the fraternity and its members getting in trouble for the hazing that put Max in his incapacitated and imperiled condition.

85.    Instead, the fraternity members told two of Max's pledge brothers to take Max to the hospital and to lie to the hospital staff by telling them they had found Max in his dorm room, not at the fraternity house.

86.    Upon information and belief, the further unreasonable delay occasioned by the fraternity members' summoning of the pledges and refusal to call 911 gave the fraternity members time to clean the fraternity house and alter the scene which would later be investigated by police.

87.    Max arrived at the emergency room around 11:00 a.m. on September 14, 2017, where he was pronounced dead.  His blood alcohol content was 0.495 when it was measured during his autopsy one-and-a-half days later.  A coroner later determined that Max died from acute alcohol intoxication with aspiration.

88.    Had Max received reasonable and proper care when he lost consciousness on the evening of September 13, 2017, and/or during the hours before he was taken to the hospital in the late morning of September 14, 2017, an extended period of time during which he was suffering and slowly succumbing to alcohol poisoning, he would have survived.

89.    Plaintiffs' claims against Defendants Isto, Gott, Hall, Babineaux, Clark, Comeaux, St. Germain, Laghari, Pennison, and Doe are based solely on each of their negligence in acting, or failing to act, which constituted a legal cause of Max's injuries and death.

90.    At all relevant times, Defendants Isto, Gott, Hall, Babineaux, Clark, Comeaux, St. Germain, Laghari, Pennison, and Doe each knew or should have known that participating in, giving material support to, authorizing, encouraging,  permitting and/or failing to prohibit or stop the hazing and misconduct that harmed and imperiled Max, as well as the failure of each of them

19

to obtain or provide the assistance which would have saved Max's life, created an unreasonable and reasonably foreseeable risk of harm, damage and injury to Max.

91.     Defendants Isto, Gott, Hall, Babineaux, Clark, Comeaux, St. Germain, Laghari, Pennison, and Doe each knew or should have known that permitting Naquin to participate in and/or direct the Bible Study ritual, when they knew Naquin's actions with the pledges during the pledge process had been extreme and dangerous, created an unreasonable and reasonably foreseeable risk of harm, damage and injury to Max and the other pledges.

92.     Similarly, Defendants Isto, Hall, Babineaux, Clark, Comeaux, St. Germain, Laghari, Pennison, and Doe each knew or should have known that permitting Defendant Gott to participate in and/or direct the Bible Study ritual, when they knew Defendant Gott's actions with the pledges during the pledge process had been dangerous, created an unreasonable and reasonably foreseeable risk of harm, damage and injury to Max and the other pledges.

93.     Despite such knowledge, those Defendants did not alter their behavior to avoid the unreasonable and reasonably foreseeable risk of harm, damage, and injury to Max, and those Defendants knowingly and recklessly permitted Naquin and Defendant Gott to participate in and run a significant portion of Bible Study.

### *LSU's Partnership with and Control of Greek Life*

94.     LSU requires fraternities to register as official student organizations at LSU and to cooperate with LSU to support the improvement of education in ways that do not interfere with the administration of the University.

95.     LSU exercises substantial control over Greek Life by promoting, supporting, and undertaking other obligations to register and monitor the fraternities, including through an office of Greek Life utilizing paid staff and volunteers.

96.    As part of the substantial control LSU exercises over its registered fraternities, LSU has the ability and authority to establish rules regarding the recruitment, rush, pledge, and initiation processes of each of its registered fraternities, including which LSU students are eligible to pledge a registered fraternity, the permitted length of time for the pledge process for registered fraternities, and whether registered fraternities are permitted to require prospective members to complete a pledge process as a prerequisite for admission into the fraternities.

97.    LSU undertook and exercises direct and ultimate control over the activities and operations of Phi Delt at LSU under the terms of a ninety-nine year lease agreement with the fraternity concerning the property on LSU's campus where Phi Delt's fraternity house is located.

98.    The lease gives LSU "the power and authority at all times to make such rules and regulations and requirements as it may see fit relative to the conduct and activities of people in [the fraternity house] on the leased premises and to change or alter such rules, regulations and requirements as it may see fit; and the failure on the part of the Fraternity to conform to said rules and regulations shall cause this lease to immediately terminate, and in such event the University shall have the right … to remove any buildings on said leased premises, and the University shall be the sole judge of the rules and their interpretation and of the conformity or non-conformity therewith by the Fraternity."

99.    Despite such control, LSU disregards the dangerous and deadly activities by Phi Delt and, year after year, essentially gives this valuable property to the fraternity to support is operations and their partnership in exchange for a lease payment of $10 per year.

100.    Upon information and belief, LSU has entered into similar lease agreements with the other LSU-recognized fraternities that have houses on LSU's campus.  Upon information and

belief, those leases give LSU similar direct and ultimate control over the activities and operations of those fraternities in their fraternity houses.

101.    LSU promotes registered fraternities, and the educational benefits and opportunities they provide, on the LSU website and in written publications provided to students, prospective students, and parents.

102.    Among other promotional statements by LSU regarding Greek Life, LSU states:

a.    "Greek Life transforms lives by supporting and facilitating opportunities and experiences within the Greek community to discover, engage, and learn while fostering an environment for peer accountability based on fraternal values."

b.    "Greek Organizations offer the most successful leadership development program for college students, as well as the largest network of volunteers in the US, performing millions of hours of volunteer services a year."

c.    "LSU Greeks are known for their commitment to philanthropy and community service."

d.    "With all of the influence, leadership, and power in the following statistics, only 2% of the US population are members of Greek organizations.  Greeks have held key positions in US government and industry including:  85% of US Supreme Court Justices, 76% of Senators, 85% of Fortune 500 executives, all but two US Presidents since 1825, … 68% of physicians, 72% of lawyers, 70% of US Congressmen."

e.    "College can be so much more than just classes and homework, it is a time for growth and development.  Greek life can foster the education of the whole person: intellectually, socially and spiritually."

103.    In promoting the educational program and benefits of fraternity membership, which are only available to male students, LSU states as fact only positive, promotional information to encourage male student participation.

104.    Upon information and belief, LSU made a conscious decision to withhold from current, incoming, and prospective male students, and their families, information about severe, pervasive, and objectively offensive incidents of dangerous hazing and harm, including coerced, excessive consumption of alcohol, within LSU-recognized fraternities.

105.    LSU had actual knowledge that Phi Delt had engaged in severe, pervasive, and objectively offensive hazing, yet it acted with deliberate indifference by excluding this truthful, accurate information from its promotional materials on Greek Life to leave current, incoming, and prospective male students and their families ignorant of the known risks.

106.    Upon information and belief, as a result of long-held, outdated, and archaic gender stereotypes about men, LSU has a policy and practice of responding with deliberate indifference to allegations of hazing of male students and aggressively and appropriately to allegations of hazing of female students in LSU Greek Life.

107.    As a result of LSU's policy and practice of responding differently to reports of hazing involving male students than hazing involving female students, male students seeking educational opportunities and benefits through LSU Greek Life face a risk of serious injury and death as a result of hazing not faced by female students seeking those same educational opportunities and benefits.

108.    The serious risk of injury and death facing male students seeking educational opportunities and benefits through LSU Greek Life interferes with male students' ability to

benefit from and fully participate in the educational programs, activities, and services of LSU

Greek Life as a result of their gender.

109.    LSU's policies concerning hazing and alcohol are established by Defendant

Board.  Defendant Board defines hazing as follows:

> any intentional, knowing, or reckless act, occurring on or off campus, by one person alone or acting with others, that subjects a student to an unreasonable risk of physical, mental, emotional or academic harm for reasons related to that student's status at the University or for the purpose of pledging, being initiated into, affiliating with, holding office in, or maintaining membership in any organization whose members are or include students at the University. Hazing includes, but is not limited to, any type of physical assault or restraint; placement of an undesirable substance on or in the body; any type of physical activity, such as sleep deprivation, exposure to the elements, confinement in a small space, calisthenics, or other activity that subjects the student to an unreasonable risk of harm or that adversely affects the mental or physical health or safety of the student; any activity or expectation which is so time consuming as to significantly interfere with class work or study time; any activity involving consumption of food, liquid, alcoholic beverage, drug, or other substance that subjects the student to an unreasonable risk of harm or that is unpleasant; any activity that would subject a reasonable person to intimidation, shame, belittlement, humiliation, embarrassment or undue mental stress, including, but not limited to personal servitude, pranks, assigning or endorsing the wearing of apparel that is conspicuous and not normally in good taste, line-ups and verbal abuse; or any activity that induces, encourages, causes, or requires the student to engage in an activity that involves a violation of law or University policy.

110.    Defendant Board's policies provide specific examples of hazing, including

"[a]ctivities or events that facilitate rapid drinking, drinking games, intoxication or impairment"

and "lineups, interrogation or verbal abuse."

111.    At all relevant times, LSU developed and administered a Greek Organization

Accountability Process, under which LSU-recognized fraternities, including Phi Delt, and

sororities could elect to participate in a "Partnership Process" with LSU.

112.    As part of the "Partnership Process" between LSU and Greek letter organizations,

when LSU is notified of an incident involving a fraternity or sorority, or fraternity or sorority

member(s), the allegations are subject to a "chapter internal investigation" conducted of and by

24

the very fraternity or sorority chapter and fraternity or sorority members alleged to have committed the misconduct.

113.    Apart from Greek letter organizations, LSU does not empower or permit other students or recognized student organizations to investigate themselves following allegations of dangerous and illegal misconduct or violations of LSU rules, policies, or codes of conduct.

114.    Under the "Partnership Process," following its internal investigation, the chapter provides a written report to LSU's Office of Greek Life and Student Advocacy & Accountability ("SAA").

115.    The chapter, empowered by LSU to investigate itself and its members and to author the initial report, controls what information is reported to LSU's Office of Greek Life and SAA regarding the alleged incident(s) at issue, including the nature of the incident(s), when and where the incident(s) occurred, who was involved, how the incident(s) occurred, and why the incident(s) occurred.  If the chapter accepts responsibility for the incident(s), no further investigation is required or undertaken by LSU.

116.    Through the "Partnership Process," as matter of policy and practice, Greek letter organizations are empowered to set and determine the nature and scope of discipline for themselves and their members for violations of LSU rules, policies, or codes of conduct, including violations involving hazing and other dangerous and illegal misconduct, and to police their own compliance with the discipline they decide to impose on themselves and their members.

117.    At all relevant times, LSU had actual knowledge that the only way the "Partnership Process" would function as intended by LSU was if Greek letter organizations and

their members were willing to come forth and provide LSU with all of the relevant information they discovered during their internal investigations.

118.   At all relevant times, LSU also had actual knowledge that the "Partnership Process" was dependent on a transparent process between the Greek letter organizations and LSU, with full reports from the Greek letter organizations regarding the alleged incident(s) at issue, including the who, what, when, where, and why of each alleged incident.

119.   At all relevant times, LSU had actual knowledge that LSU-recognized sororities tended to be more compliant and agreeable to the "Partnership Process" rules than LSU-recognized fraternities.

120.   At all relevant times, LSU had actual knowledge that LSU-recognized fraternities frequently lied to LSU administrators about the information they discovered during internal investigations pursuant to the "Partnership Process," and that LSU administrators regularly had to push for more information from the LSU-recognized fraternities empowered by LSU to investigate themselves.

121.   Despite this actual knowledge, at all relevant times LSU equally trusted and relied upon fraternities and sororities to report and provide accurate and thorough information to LSU regarding alleged hazing violations.

122.   Under the "Partnership Process," after the chapter provides its written report to LSU's Office of Greek Life and SAA, the chapter's officers and advisor meet with SAA and members of LSU's Office of Greek Life to discuss the information the chapter purportedly discovered through its internal investigation.

123.   If the chapter accepts responsibility for the allegations, it prepares a draft Enhancement Plan which sets forth the actions the chapter has taken or plans to take to address

the incident(s) at issue.  There are no consequences for chapters declining to accept responsibility.  Instead, those chapters are simply required to go through the due process proceedings required for every other LSU-recognized student organization accused of violating Board and LSU policies.

### *Known, Pervasive Risks and Culture of Hazing in Fraternities*

124.    Statistics, insurance claims analysis, studies and reports, and incidents of catastrophic injury and death widely known by the fraternity industry, including Phi Delt, institutions of higher education, including LSU, and their insurance carriers, have demonstrated the foreseeable risk of dangerous injury and death from the excessive consumption of alcohol during pledge and other initiation rituals for decades.

125.    In the late 1980s, the Fraternity Insurance Purchasing Group ("FIPG"), a consortium of Greek letter organizations assembled to coordinate risk management strategies and assist each other in the purchase of insurance, widely published that "fraternities . . . were ranked by the National Association of Insurance Commissioners as the sixth worst risk for insurance companies – just behind hazardous waste disposal companies and asbestos contractors."

126.    In 1997, the National Interfraternity Council ("NIC"), then comprised of 66 Greek letter organizations with 5500 chapters on 800 campuses throughout the United States and Canada, analyzed certain risks associated with Greek letter organizations and housing and concluded that improper fraternity oversight of alcohol was "frighteningly pervasive."  The NIC passed a Resolution encouraging "its member fraternities to pursue alcohol-free chapter facilities."

127.    LSU is a partner with United Educators ("UE") in the prevention and protection against risk.  UE "extensively studies claims trends, legislative issues, and the education

environment to address evolving liability and risk management issues" and provides its members comprehensive risk management resources which address the safety, compliance, and liability risks at schools and on campuses which can lead to claims.

128.    Upon information and belief, UE has concluded and counsels its members, including LSU, that hazing is a "problem which jeopardizes the learning environment and poses serious safety risks to students."

129.    As part of its extensive studies, UE analyzed hazing claims from 2003 to 2012 and found:

      a.    more than 80% of the study's hazing claims involved male perpetrators and male victims;

      b.    a parallel 81% of the hazing claims involved acts of violence, most commonly forced consumption of alcohol or physical violence; and

      c.    nearly all hazing claims from female students involved non-violent, harassment-type hazing, like verbal abuse, forced wearing of humiliating clothing, constant monitoring of whereabouts, and personal servitude.

### *Known, Pervasive, and Disregarded Risks to Male Students at LSU Fraternities*

130.    In the five years preceding Max's death, only four of the 27 fraternities on LSU's campus were without violations of the Board's and LSU's rules, policies, and codes of conduct.

131.    In the five years preceding Max's death, there were at least 24 fraternity hazing investigations by LSU, with 20 findings of policy violations.  None of those fraternities had their charters permanently revoked by LSU; three were suspended for a period of three years.

132.    During that time period, there were at least six investigations involving fraternities for forced, excessive consumption of alcohol.  None of the fraternities investigated

for allegations that their members forced pledges to consume alcohol had their chapters permanently revoked by LSU. Sanctions for these violations imposed by LSU mostly are a letter of reprimand with no loss of privileges or placement on probationary status. Even on probationary status, fraternities are not required to give up all social events or alcohol.

133.    In addition to the death of Max, incidents of dangerous hazing, forced consumption of alcohol, deaths and fraternity injuries involving male fraternity pledges and members at LSU include:

a.    2017: Delta Chi Fraternity; hazing activities in the spring of 2017 including requiring pledges to participate in a "capture game" where pledges capture active members, transport them to an undisclosed location, and drop them off, forcing them make their way back to school on foot.

b.    2016: Kappa Sigma Fraternity; hazing of pledges including forced consumption of alcohol, sleep deprivation, forced calisthenics, branding, paddling, and personal servitude.

c.    2016: Omega Phi Psi Fraternity; hazing of pledges including an "underground" pledging process that LSU found "resulted in the endangering the safety and well-being of LSU Students."

d.    2015-2016: Lambda Chi Alpha Fraternity; hazing of pledges including sleep deprivation, forced consumption of alcohol, personal servitude, and sit-ups and push-ups on trash and broken glass (2015). After another report of hazing a year later, LSU disallowed recruitment and living in the fraternity house for a year (2016).

e.    2015: Beta Kappa Gamma Fraternity; LSU student Praneet Karki died following an evening of hazing involving extreme exercise required of fraternity pledges.

f.    2015:  Sigma Chi Fraternity; after LSU student Sawyer Reed died from a drug overdose, the investigation revealed likely hazing of pledges and "rampant" drug use.

g.    2014:  Acacia Fraternity; hazing of pledges including forced alcohol consumption, personal servitude, acts of physical violence and forced physical activities, and being forced to eat dog food and rotten substances.

h.    2014:  Lambda Chi Alpha Fraternity; alcohol-related medical transport of pledge in conjunction with chapter's bid-day event.

i.    2014:  Sigma Phi Epsilon Fraternity; hazing of pledges including pledges being driven off campus, forced to consume alcohol, and then the intoxicated pledges were taken to the Mississippi River levee, dropped off, and told to make their way back to school on foot in the night.  After one fraternity event in August of 2014 where alcohol was provided to underage pledges, a pledge was found unresponsive in an LSU residence hall and transported to the hospital.

j.    2013:  Pi Kappa Phi Fraternity; hazing of pledges including quizzes pledges with consequences for incorrect answers, confining pledges in a small room with no light and little air, forcing pledges to kneel on broken silverware, personal servitude, and underage and excessive alcohol consumption.

k.    2011-2012:  Sigma Alpha Epsilon Fraternity; an investigation revealed hazing and endangering pledges, including hazing that involved forcing pledges to perform physical activities, military style workouts and calisthenics, such as bows and tows and wall sits, throughout the night.

l.    2012:  Sigma Chi Fraternity; hazing of pledges including cigarette burns and forced wrestling of one another resulting in broken ribs.

m.    2012:  Acacia Fraternity; violations of LSU's rules and alcohol policies arising from an incident in which three kegs of beer were provided for all active members and pledges of the fraternity.

n.    2011:  Pi Kappa Phi Fraternity; in the fall of 2011, fraternity placed on probation by LSU and fraternity's national headquarters for what the fraternity later acknowledged were "serious incidents of hazing."

o.    2011:  Sigma Alpha Epsilon; hazing of pledges including forced physical activities and personal servitude.

p.    2006:  Phi Gamma Delta Fraternity; pledge burned at fraternity event after falling in bonfire.

q.    1997:  Sigma Alpha Epsilon Fraternity; hazing which involved forced, excessive consumption of alcohol resulted in the death of fraternity pledge Benjamin Wynn, whose blood alcohol content was measured at .588%, almost 6 times the legal limit, and the hospitalization of fraternity pledge Donald Hunt.

r.    1979:  Theta Chi Fraternity; a car struck and killed a fraternity pledge who was blindfolded and participating in a ritual march along a roadside.

134.    Upon information and belief, there are additional incidents of dangerous hazing, resulting in injuries and deaths to male students seeking educational benefits and opportunities through Greek Life, which are known to LSU but neither publicly disclosed nor made part of the Greek Life information LSU produces and provides current, incoming, and prospective male students and their families.

135.    Upon information and belief, sororities at LSU do not have a culture or documented history of dangerous hazing and misconduct, and female students seeking similar, valuable educational benefits through membership in LSU-recognized sororities do not face serious risks of injury or death by hazing or other misconduct.

136.    Upon information and belief, since 2012, LSU has received only one report of alleged hazing of female students seeking membership in an LSU-recognized sorority.

137.    Upon information and belief, the single alleged hazing incident since 2012 at an LSU-recognized sorority did not involve dangerous or potentially life-threatening activities or behavior.  Instead, upon information and belief, prospective sorority members were required to recite information about their sorority and its history, act out skits, sing songs, recite poems taught to them by sorority members and alumnae members in attendance, and perform calisthenics, including squat holds, sit-ups and lunges, and had whipped cream, syrup and eggs put in their hair.

138.    Despite the non-life-threatening conduct at issue in the alleged hazing at the sorority, LSU punished the sorority with significantly greater severity than, as a matter of policy and practice, LSU typically punished LSU-recognized fraternities for hazing of male students involving the risk of severe injury or death.

139.    Specifically, LSU put the sorority on "Total Probation" – the most severe sanction LSU can impose upon a student organization, short of rescinding University recognition – for approximately 10 months, and then "University Probation" for approximately one-year following the "Total Probation" period.  Upon information and belief, LSU also prohibited the sorority from recruiting and inducting new members for two academic years.

140.    Upon and information and belief, despite the non-life-threatening conduct at issue in the alleged hazing at the sorority, the sorority was the only Greek letter organization in the five years preceding Max's death that was sanctioned with "Total Probation."

141.    Upon information and belief, the severity with which LSU responded to the report of alleged hazing of female students at the sorority was the result of long-held, outdated gender stereotypes about men which have fostered a policy and practice at LSU of treating the hazing of male students differently than the hazing of female students.  In particular, under LSU's long-standing policy and practice, the hazing of females is appropriately treated as unacceptable, while the hazing of males is minimized as "boys being boys" engaged in masculine rites of passage.

142.    Upon information and belief, as a result of these long-held gender stereotypes, LSU, as a matter of policy and practice, has responded to and punished allegations of dangerous and life-threatening hazing of male students in Greek letter organizations significantly less seriously and severely than it has responded and punished non-life-threatening hazing of female students.

143.    Further, year after year, LSU has remained deliberately indifferent to the serious and substantial risks male students face in seeking the educational opportunities and benefits of LSU Greek Life, and has refused and failed to make any material changes to the manner in which it recognizes, promotes, regulates, manages, and sanctions fraternities on campus, leaving them unsafe and imposing serious and substantial risk to male students seeking the educational benefits and opportunities touted by LSU.

144.    Year after year, LSU has remained deliberately indifferent to the serious and substantial risks male students face in seeking the educational opportunities and benefits of LSU

33

Greek Life, and has decided against advising current, incoming, and prospective male students and their families of these serious and substantial risks as a means of reforming fraternities or providing male students with the information necessary to understand the serious and substantial risks and protect themselves.

145.    Year after year, LSU has refused and failed to take necessary and effective corrective action to address the serious and substantial risks faced by male students seeking educational benefits and opportunities through Greek Life, thereby permitting a hostile educational environment for male students seeking the educational benefits and opportunities of Greek Life to exist and persist.

146.    Year after year, LSU, through its official policy and practice of treating hazing of male students substantially less seriously and harshly than hazing of female students, has discriminated against male students seeking the educational opportunities and benefits of Greek Life touted by LSU, in violation of Title IX.

### *Known, Pervasive, and Disregarded Risks and Culture of Hazing in Phi Delt*

147.    Hazing and drinking alcohol in excessive and dangerous amounts have been part of Phi Delt's initiation rituals for many years, including at LSU.

148.    That such dangerous traditions, misconduct, and hazing continue in Phi Delt unabated, year after year, is the result of Phi Delt's negligent and wrongful oversight, regulation, and mismanagement of its chapters, its members' activities, and the means by which it promotes its national fraternity and obtains its principal revenue.

149.    In 2000, Phi Delt implemented alcohol-free housing and has touted (globally, on the internet, and in paper-form) statistics and extensive information regarding the purported resultant success in reducing injuries and death.

150.    In 2010, the then-General Council President of Phi Delt, Scott Mietchen, wrote about his own "journey from being hazed, to being an enthusiastic hazer" beginning in fall 1980. Mietchen suggests he helped end the hazing in his chapter after he, as an undergraduate member, found a pledge in a non-responsive catatonic state after enduring sleep deprivation and emotional stress.

151.    Notwithstanding the implementation of an alcohol-free housing policy, Phi Delt chapters have continued traditions of alcohol abuse and hazing with alcohol – with little to no meaningful management and oversight by Phi Delt – despite the direct knowledge of the dangers of hazing by the fraternity's General Council President.

152.    Though Phi Delt does not publish its infractions and incidents of hazing, injuries, and death, publicly available information identifies at least the following instances which occurred in the few years preceding Max's death, after Phi Delt publicly purported to ban alcohol in fraternity housing:

        a.     2017:  hazing including use of alcohol at University of Southern Indiana; out of control party with alcohol at Massachusetts Institute of Technology; hazing at University of Central Florida; assault and choking resulting in death of a Phi Delt member by another during a drunken fight at Indiana University of Pennsylvania;

        b.     2016:  hazing including use of illegal drugs at Middle Tennessee State University; hazing, alcohol, and allegations of two students being drugged at a party at Washington State University; alcohol violations and sexual assault of a woman who was unconscious at a chapter party at Baylor University;

        c.     2015:  hazing at Loyola Marymount University; repeated alcohol violations at Oregon State University; hazing including use of alcohol at University of

Chicago; hazing including use of alcohol at Auburn University;

d.   2014:  hazing including use of alcohol at Oklahoma State University; and

e.   2013:  hazing including use of alcohol at Emory University; hazing at

Northwestern University.

### *Phi Delt and LSU Each Empower and Permit Undergraduate Males to Control the Initiation and Membership Processes at Phi Delt*

153.   Defendants Phi Delt and LSU both establish and otherwise control the processes and procedures whereby male students become fraternity members through recruitment, pledging, and initiation, and empower chapter officers to conduct and oversee these processes and procedures.

154.   Phi Delt establishes and controls whether its local chapters, including Louisiana Beta, will be in chapter housing and, in the case of Louisiana Beta, together with LSU and Beta Housing Corporation, establishes and controls how and by whom that housing and the chapter are managed.

155.   In managing and controlling Louisiana Beta and its other chapters and members, Phi Delt, *inter alia*, promulgates risk management policies which are applicable to all chapters and members, and which purportedly prohibit hazing, alcohol in the chapter house, and underage alcohol consumption.

156.   Phi Delt and LSU each had, at all times relevant hereto, access to and specialized knowledge of information, research, campus judiciary proceedings, and other credible information confirming a staggering number of serious risk management violations, injuries, and deaths from fraternity, not sorority, activities.

157.   Fraternity members, many of whom are entirely untrained, often intoxicated, and influenced by traditions and rituals passed down by fraternity brothers, are empowered, trusted,

36

and principally relied upon by Phi Delt and LSU to implement their risk-management and anti-hazing rules and policies, promote the national fraternity and Greek Life at LSU, recruit new members and revenue for Phi Delt, and make life and death decisions.

158.    Time and time again, these Defendants have remained deliberately indifferent to the serious and substantial risks to male students seeking the educational opportunities and benefits of Greek Life touted by LSU and Phi Delt, and they have failed to act reasonably to protect life and make recruitment, pledging, initiation, and other fraternity activities safe for male students.  Time and time again, the management structures created and sanctioned by Phi Delt and LSU have proven ineffective and dangerous for male students.

159.    Despite such knowledge, Phi Delt and LSU each decided against making any material changes to the way fraternity activities, recruitment, and pledging at LSU, and at Louisiana Beta specifically, are conducted in order to render recruitment, pledging, and fraternity membership safe for male students.  Instead, Phi Delt and LSU each continued to promote and condone a structure of self-management by undergraduate fraternity members, including a policy self-investigation of alleged dangerous and illegal behavior, and to tolerate dangerous misconduct despite the long history demonstrating the dangers of these management models and the need for change.

### _Hazing and Misconduct at Louisiana Beta in the Years Prior to the Fall of 2017_

160.    LSU received multiple credible complaints of hazing and forced consumption of alcohol against Louisiana Beta in the years preceding Max's death, including in the fall of 2016, just one year before Max died.

161.    On September 21, 2013, during a judicial pre-hearing held by LSU's Interfraternity Council ("IFC"), it was confirmed that Louisiana Beta's Recruitment Chairman

had provided alcohol to underage potential new members during summer recruitment. As a result of that finding, IFC placed Louisiana Beta on probation through Bid Day of fall 2014.

162.    Just over a week later, on or around September 29, 2013, the Director of LSU's Office of Greek Life notified Louisiana Beta that LSU had received a complaint of hazing in Louisiana Beta's new member program. In particular, LSU received information that Louisiana Beta members were kidnapping pledges, requiring other pledges to rescue them, and compelling the kidnapped pledges to drink alcohol before they were released. LSU later learned this "Capture Game" had been in existence since Louisiana Beta was founded, and that the purported purpose of the hazing activity was to bring about brotherhood through competition.

163.    In response to this complaint, and despite Louisiana Beta already being on notice of probation and pursuant to its policy of self-investigation under the "Partnership Process," LSU permitted Louisiana Beta to conduct an internal investigation and report back on its findings.

164.    In its report to LSU, Louisiana Beta admitted that the chapter carried out an activity during pledging referred to as the "Capture Game," which included various incidents of compelling underage pledges to consume alcohol, yet blamed any violations of Louisiana Beta's rules arising out of the "Capture Game" on a few "rogue members."

165.    Louisiana Beta, LSU's Office of Greek Life, and SAA then developed a Chapter Enhancement Plan, pursuant to which Louisiana Beta agreed to discontinue the "Capture Game." LSU did not otherwise sanction Louisiana Beta.

166.    The following semester, in or around March 2014, while Louisiana Beta was still on probation, LSU received another report of possible violations of LSU's and Phi Delt's hazing policies, including allegations of forced servitude, compelled physical exercise, verbal abuse,

scavenger hunts, forced consumption of alcohol by the underage pledges, and coaching pledges on interactions with the staff of Phi Delt's national headquarters.

167.    LSU notified Louisiana Beta and Phi Delt's national headquarters, including Phi Delt's Executive Vice President, of these new hazing allegations and again permitted Louisiana Beta, through its chapter advisory committee, to investigate itself.  It became evident through the investigation that hazing had continued at Louisiana Beta, including hazing directed by the chapter's committee responsible for overseeing Louisiana Beta's pledge program, and that Louisiana Beta had not upheld the provision of its Fall 2013 Enhancement Plan requiring the Chapter to discontinue the "Capture Game."  Louisiana Beta also admitted to LSU that fraternity members had told pledges not to tell anyone about the hazing.

168.    As part of a resulting Chapter Enhancement Plan agreed to among Louisiana Beta, the Chapter's advisory board, LSU's Office of Greek Life, and SAA, Louisiana Beta was placed on probation through May 31, 2015 and required, *inter alia*, to:

        a.    appoint a new, permanent advisor directly responsible for oversight of the Chapter's new member – or "pledge" – education program;

        b.    restructure its new member program; and

        c.    have at least one member of its Chapter Advisory Board at all new member events through the Spring 2015 semester.

169.    Upon information and belief, Louisiana Beta, without consequence from LSU, did not comply with or fulfill all of these corrective requirements.

170.    The hazing and other misconduct and mistreatment of male student pledges by Louisiana Beta continued.

171.    In or around January 2016, a "concerned parent" reported to LSU that since LSU had been back in session, she had witnessed everyday some members of Louisiana Beta smoking marijuana in and around the house.  Upon information and belief, LSU took no action on the report.

172.    On October 14, 2016, the Director of LSU's Office of Greek Life notified Louisiana Beta of new possible risk management violations based on a report that pledges were: required to buy chewing tobacco and cigarettes to have to give to fraternity members upon request; required to be at the Phi Delt fraternity house at LSU every day at 6:00 a.m. and at tailgates starting at 1:00 a.m. the night before; required to be available to the fraternity members at any time of the day, except when they were in class, were 24 hours from a test, or had their parents in town; and called to deliver food and pick up brothers from bars at 3:00 am.  According to the report LSU had received, as a result of these requirements and compelled activities, the pledges were exhausted all of the time.

173.    Despite the nature of the allegations, and Louisiana Beta's history of hazing and other misconduct and mistreatment of pledges, LSU once again permitted Louisiana Beta to investigate itself.

174.    After its internal investigation, Louisiana Beta informed LSU that hazing had, in fact, occurred at the Chapter in the fall of 2016 but blamed the hazing on four active members of Louisiana Beta and one alumnus member.  Louisiana Beta advised LSU that the four active members would be placed on social probation.  According to the Chapter, it did not have authority to discipline the alumnus member involved in the hazing.

175.    While Louisiana Beta was investigating itself in response to the October 14, 2016, report, LSU learned that the hazing and other misconduct and mistreatment of pledges at

Louisiana Beta might be ongoing, notwithstanding the ongoing investigation and Louisiana

Beta's notice of the October 14, 2016, report.

176. On October 27, 2016, LSU received a report from a "concerned student who has

been witnessing Phi delta theta [sic] hazing during their tailgates to them continuing to harass

them back their house after the tailgate." The "concerned student" informed LSU that "[m]ost of

the time these young boys are completely intoxicated with obvious signs that they've puked

themselves many times. They're getting initiated tonight as I have heard from them at tailgates

and that they need to 'get them good' before they're initiated. I feel bad for these boys most of

these things are cerntainly [sic] cruel I understand 'right of passage' but this is just pure abuse."

177. The Director of LSU's Office of Greek Life and another Greek Life staff member

met with Louisiana Beta's Chapter Advisor concerning this new report, but again allowed the

Chapter to conduct an internal investigation into the allegations.

178. On November 4, 2016, one day after meeting with Louisiana Beta's Chapter

Advisor, LSU received yet another report of alleged hazing at Louisiana Beta.

179. A parent of an LSU student and alumna of LSU's Greek Life system wrote to

LSU officials to report disturbing behavior she had witnessed as a Phi Delt tailgate. The parent

wrote, *inter alia*:

> While at the tailgate the one next to us which I later found out to
> be the phi delta theta tailgate was a complete disgrace to this
> university. As my husband and I are bout LSU Greek alumni I
> found the acts by these boys degrading to the LSU name. We saw
> their pledges sleeping in their own puke behind the bar while
> people were pouring beer and snorting cocaine. I was so
> applauded [sic] by this I asked my son to show me their house and
> unfortunately as we were walking there I saw that the phi delta
> theta house was right next to his. After the tour of his house I was
> cooled down and on the way back we passed a group of men
> talking about and quote "Let's go mess with that passed out bitch."
> [P]lease LSU as I love this school and everything here I do not

41

> love this.  I will be at the game this Saturday and I really do hope
> to see action taken against these so called "men"[.]  I know you've
> had issues/complaints about them before as my son and his friends
> have told me but it obviously just keeps getting worse.  Please do
> something.

180.    Upon information and belief, LSU did not take any formal action on the November 4, 2016, report.

181.    On November 15, 2016, LSU placed Louisiana Beta on interim suspension as a result of the alleged activities on October 27, 2016.

182.    On November 18, 2016, the Director of LSU's Office of Greek Life and another Greek Life staff member had a conference call with Phi Delt's Director of Chapter Services and Phi Delt's consultant to Louisiana Beta.

183.    During that conference call, the Director of LSU's Office of Greek Life discussed the pattern of similar misconduct at Louisiana Beta over the previous six years, offered to provide Phi Delt all of the details LSU had regarding that misconduct, and "begged for assistance" from Phi Delt.

184.    Upon information and belief, on and after November 18, 2016, LSU knew or should have known that Phi Delt was not and would not be providing effective oversight or control over Louisiana Beta and that the hazing and other misconduct would continue without effective and immediate intervention by LSU.

185.    Despite this, on December 21, 2016, LSU notified Louisiana Beta and Phi Delt that the interim suspension LSU had imposed Louisiana Beta had been removed and that Louisiana Beta could "conduct business and resume normal activities."

186.    Further, although LSU had the power and authority under its lease with Beta House Corporation to establish rules, regulations, and requirements relative to the conduct and activities of people in Phi Delt's fraternity house at LSU, and to immediately terminate the lease

42

for violations by Phi Delt of those rules, regulations, and requirements, LSU continued to permit Phi Delt and its members to possess and operate out of the Phi Delt fraternity house despite their ongoing misconduct in the years preceding Max's death.

187.    LSU also decided against publicly conveying the information about credible complaints of hazing and forced alcohol consumption against Phi Delt in the fall of 2016 or prior years as part of the glowing promotional package and information it gave to students and families, including Max and his family who attended orientation and researched and relied on all of the information made available by LSU about the Greek letter fraternity system before he chose to pledge Phi Delt because of its purported values.

### *The Beta House Corporation Knew or Should Have Known Pledges Would Be Hazed and Compelled to Consume Alcohol at the Phi Delt Fraternity House in the Fall of 2017*

188.    At all relevant times, Beta House Corporation was governed by a board of directors comprised of individuals who were Phi Delt members, alumni of LSU, and alumni members of Louisiana Beta who, upon information and belief, had themselves been subjected to and engaged in hazing as pledges and members of the fraternity at the Phi Delt fraternity house at LSU.

189.    At all relevant times, the members of the board of directors of Beta House Corporation also had specialized knowledge of violations of Phi Delt's, Louisiana Beta's, and the Beta House Corporation's risk and house management policies, state laws, and Board and LSU rules, policies, and codes of conduct prohibiting underage drinking and hazing at the Phi Delt fraternity house at LSU.

190.    At all relevant times, Beta House Corporation also had available to it, independently and through Phi Delt, possessed, or in the absence of recklessness, should have

itself performed or commissioned, information and analyses about the risks of hazing and student-housing management, particularly regarding bid, pledge, and initiation-related activities.

191.    At all relevant times, as a result of their specialized knowledge and their experiences as fraternity members and pledges, the members of the board of directors of Beta House Corporation knew or should have known that Beta House Corporation's risk management and student-housing management policies were not working, and that it was reasonably foreseeable that hazing, including hazing which involved compelling underage male students to consume dangerous amounts of alcohol, would take place at the Phi Delt fraternity house at LSU in the fall of 2017 unless meaningful changes were made to those policies.

192.    Upon information and belief, Beta House Corporation did not make any meaningful changes to its risk management or student-housing management policies in the fall of 2017 or in the years preceding Max's death.

193.    Upon information and belief, as a result of their specialized knowledge and their experiences as fraternity members and pledges, in at least certain years before Max's death the Beta House Corporation undertook to employ "House Directors" who, in exchange for a modest annual salary and free lodging in the Phi Delt fraternity house at LSU, together with Louisiana Beta and members of Louisiana Beta, would be responsible for enforcing the risk management policies of Defendants Phi Delt, Louisiana Beta, and Beta House Corporation within the Phi Delt fraternity house at LSU, and for reporting risk management and policy violations to those Defendants.  Upon information and belief, "House Directors" employed by the Beta House Corporation were not trained or were inadequately trained on the risk management policies they were made responsible to enforce.

194.    In addition, Beta House Corporation knew or should have known that LSU required student organizations that provided student housing for its members each to employ a "House Director," that Louisiana Beta would make representations to LSU regarding the employment and presence of "House Directors" at the Phi Delt fraternity house at LSU, and that LSU would rely upon those representations in deciding whether to recognize Louisiana Beta as a registered student organization at LSU, even if it were not reasonable for LSU to do so.

195.    Upon information and belief, as a result of their specialized knowledge and their experiences as fraternity members and pledges, members of the board of directors of Beta House Corporation knew or should have known that the employment of adequately trained live-in "House Directors" at the Phi Delt fraternity house at LSU was necessary for the protection of fraternity pledges, like Max, during pledging activities and rituals at the Phi Delt fraternity house at LSU.

196.    Upon information and belief, despite such knowledge, Beta House Corporation failed to exercise reasonable care and employ an adequately trained "House Director" for the fall of 2017, when Max was pledging Phi Delt and Louisiana Beta, or otherwise ensure that an adequately trained "House Director" would be living in the Phi Delt fraternity house at LSU in the fall of 2017 to help to enforce the risk management policies of Defendants Phi Delt, Louisiana Beta, and Beta House Corporation, to report risk management and policy violations to those Defendants in the fall of 2017, or to come to the aid of pledges at the fraternity house at LSU who, like Max, had become incapacitated, imperiled, and were unable to take care of themselves as a result of the compelled consumption of alcohol.

**COUNT I**
**Violation of Title IX, 20 U.S.C. § 1681,** *et seq.*
**(Defendant Board)**

197.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

198.    At all relevant times, LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, including the Office of the Dean of Students of LSU which oversees the Division of Student Affairs and Office of Greek Life, exercised substantial control over its registered fraternities in the Greek letter fraternity system, including Phi Delt, and the recruitment, pledging, and initiation activities of its registered fraternities.

199.    For many years, LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, had actual knowledge of serious and substantial risks facing male students seeking to access the educational opportunities and benefits LSU provided through Greek Life, as a result of dangerous, repeated misconduct, including hazing involving, among other things, compelled, excessive alcohol consumption, within and exclusive to the Greek letter fraternity system, prior to Max pledging Phi Delt, the hazing of Max, and his death.

200.    LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, had actual knowledge of dangerous, repeated misconduct, including hazing of male students involving, among other things, compelled, excessive alcohol consumption, by Phi Delt and its members prior to Max pledging Phi Delt, the hazing of Max, and his death.

201.    Upon information and belief, LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, responds with deliberate

indifference to allegations of hazing of male students seeking educational benefits and opportunities through LSU Greek Life, including male students pledging Phi Delt, because of long-held and outdated gender stereotypes about young men.

202.    Upon information and belief, because of those long-held and outdated gender stereotypes about young men, LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, has a policy and practice of treating the hazing of male students significantly less seriously than the hazing of female students, minimizing the hazing of males as "boys being boys" engaged in masculine rites of passage.

203.    Through its policy and practice, LSU has persisted in a systematic, intentional, differential treatment of male students seeking educational opportunities and benefits through LSU Greek Life and, therefore, has discriminated against male students in violation of Title IX.

204.    As a result of LSU's policy and practice of treating the hazing of male students significantly less seriously than the hazing of female students, male students seeking to access the educational opportunities and benefits LSU provided through Greek Life face serious and substantial risks of injury and death as a result of hazing involving, among other things, compelled, excessive alcohol consumption, while female students seeking similar educational benefits and opportunities did not face the same serious or substantial risks.

205.    Further, LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, permitted, supported, promoted and provided funding for a Greek letter fraternity system that, without proper oversight, encouraged young men to engage in hazing, harassment and violence against male students seeking educational opportunities and benefits through Greek Life.

206.    LSU failed to provide adequate training or guidance to its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, even though LSU was on actual notice that such training and guidance were necessary to implement proper controls over the Greek Life fraternity system and to prevent and discourage hazing against male students seeking educational opportunities and benefits through LSU Greek Life.

207.    By its discriminatory policy and practice of treating hazing of male students significantly less seriously than hazing of female students, and its deliberate indifference, through conscious and reckless actions and inactions, LSU created a discriminatory, hostile environment in which hazing against male students seeking educational opportunities and benefits through LSU Greek Life was pervasive and posed serious risks of injury and death to those male students, including Max.

208.    LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, had the authority to directly investigate and take meaningful corrective action to end the hazing threatening male students within LSU Greek Life, and to provide male students equal access to those educational benefits and opportunities without facing serious risks of injury and death.  Despite this, LSU consciously, recklessly, and deliberately failed to do so.

209.    LSU, through its employees and administrators responsible for overseeing the Greek letter fraternity system at LSU, had the authority to directly investigate and take meaningful corrective action to end the hazing threatening male students within LSU Greek Life, and to provide male students equal access to these educational opportunities and benefits without facing serious risks of injury and death, but instead, upon information and belief, as a matter of policy and practice, remained deliberately indifferent to the severe and pervasive risks of serious

injury and death faced by male students, and treated hazing of males significantly less seriously than hazing of females, thereby permitting hazing of males in LSU Greek Life to exist and persist.

210.    Through its official policy and practice of remaining deliberately indifferent to the severe and pervasive risks of serious injury and death faced by male students, including Max, attempting to access the educational opportunities and benefits provided through LSU Greek Life, and of treating hazing of males significantly less seriously than hazing of females, LSU discriminated against male students, including Max, in violation of the requirements of Title IX.

211.    As a direct and proximate result of this discrimination, Max was denied access to the educational opportunities and benefits provided through LSU Greek Life free from the risk of serious injury and death from hazing, and he was subjected to hazing which resulted in his death.

212.    Furthermore, LSU, through the Office of the Dean of Students of LSU, made an affirmative, official institutional decision to implement a "Partnership Process" policy between LSU and Greek letter fraternity organizations which allowed Greek letter fraternity organizations and their members accused of hazing or other misconduct to conduct internal investigations of their own alleged wrongdoing.

213.    The official "Partnership Process" policy was so deficient at addressing hazing of male students at Greek letter fraternity organizations at LSU that it constituted encouragement of the hazing of male students seeking educational opportunities and benefits through LSU Greek Life, was clearly unreasonable in light of the known circumstances, and amounted to deliberate indifference to the hazing of male students at LSU.

214.    Max suffered egregious hazing, intimidation and, ultimately, death, as he sought educational opportunities and benefits through LSU Greek Life in circumstances not faced by female students seeking the same educational opportunities and benefits.

215.    As a direct and proximate result of LSU's discriminatory actions, inactions, policies and practices, and deliberate indifference, in violation of the requirements of Title IX, Max was hazed and endured great physical and mental pain and suffering until he died.

216.    Plaintiffs assert this Title IX claim against LSU, which survives Max's death under federal common law, on Max's behalf.

**COUNT II**
**Survival and Wrongful Death**
**Negligence/Breach of Assumed Duties/Failure to Rescue Under Louisiana State Law**
**(Individual Defendants and Defendant Allstate)**

217.    Plaintiffs incorporate all preceding paragraphs into this Count by reference as though fully restated herein.

218.    The Individual Defendants had a general duty to act in a reasonable fashion so as to avoid harming others, including to refrain from participating in, giving material support to, authorizing, encouraging, permitting and/or failing to prohibit or stop hazing and other misconduct involving Max and other Phi Delt pledges, which the Individual Defendants knew or should have known created an unreasonable and reasonably foreseeable risk of harm, damage, and injury to Max and his fellow pledges.

219.    Further, by voluntarily assuming the responsibilities of Executive Board members of Louisiana Beta, Defendants Babineaux, Clark, Comeaux, St. Germain, and Laghari had a duty to abide by, enforce, and uphold Phi Delt's and Louisiana Beta's purported prohibitions on hazing, misuse and abuse of alcohol, and other related misconduct, including Phi Delt's Risk

Management Policies, by preventing the misuse of alcohol in fraternity activities and at the fraternity house, and by preventing and not engaging in the hazing of pledges, like Max.

220.    In addition, through their conduct and actions as alleged herein, the Individual Defendants directly undertook, or negligently entrusted others, to care for Max and to render services which were reasonably calculated to prevent Max's injuries and death.  The Individual Defendants thereby assumed the duty to reasonably care for Max.

221.    The Individual Defendants were present for, encouraged, assisted, provided material support for, permitted, willfully participated in, and/or failed to prohibit or stop the hazing and other misconduct which placed Max in a perilous position, rendering him helpless and in need of emergency care and/or other responsible care and rescue.

222.    At all relevant times, the Individual Defendants knew or should have known that participating in, giving material support to, authorizing, encouraging, permitting, and/or failing to prohibit or stop the hazing and misconduct which harmed and imperiled Max, as well as their failure to obtain or provide the assistance which would have saved Max's life, created an unreasonable and reasonably foreseeable risk of harm, damage, and injury to Max.  Despite such knowledge, the Individual Defendants did not alter their behavior to avoid the unreasonable and reasonably foreseeable risk of harm, damage, and injury to Max.

223.    The individual Defendants breached these duties, and were negligent, by, *inter alia*:

        a.    participating in, giving material support to, authorizing, encouraging, permitting, and/or failing to prohibit or stop the hazing and misconduct which harmed and imperiled Max;

        b.    permitting Naquin to participate in and direct a significant portion of Bible

Study on September 13, 2017, despite knowing that Naquin's ongoing actions with the pledges were extreme and dangerous;

c.      permitting Defendant Gott to participate in and direct a significant portion of Bible Study on September 13, 2017, despite knowing that Defendant Gott's ongoing actions with the pledges were dangerous;

d.      failing to abide by, enforce, and uphold Phi Delt's and Louisiana Beta's purported prohibitions on hazing, misuse and abuse of alcohol, and other related misconduct, including Phi Delt's Risk Management Policies, including by failing to prevent the misuse of alcohol in fraternity activities and at the fraternity house and the hazing of pledges, including Max;

e.      failing to procure or provide Max appropriate medical and other care after it became clear he was incapacitated, grossly intoxicated, imperiled, in need of medical or other reasonable attention and rescue, and unable to care for or protect himself;

f.      abandoning Max on a couch in the fraternity house without getting him reasonable assistance or medical care and attention;

g.      unreasonably failing to call to 911 or other emergency personnel, or to directly rescue Max;

h.      relegating life and death decisions concerning Max to immature, untrained, unqualified individuals, some of whom were intoxicated and had been subjected to and/or participated in rituals involving hazing in the past;

i.      preventing others from obtaining the medical and reasonable care Max needed under the circumstances by, among other ways, discouraging pledges from calling 911, and placing him on a couch in the fraternity house in an apparent sleeping position

52

where his need for immediate medical care and rescue would neither be detected nor responded to; and

        j.      were otherwise negligent.

224.    Defendant Allstate, as an insurer for Defendant Isto, is liable to Plaintiffs jointly and in solido for Defendant Isto's negligent acts and omissions as alleged herein pursuant to the Louisiana Direct Action Statute, La. Rev. Stat. § 22:1269.

225.    As a direct and proximate result of these Defendants' breach of their duties and assumed duties, Max was hazed and endured great physical and mental pain and suffering until he died, and his surviving parents have suffered and will suffer grief, loss of love, affection, companionship, comfort, services, and support, and have incurred funeral and burial expenses, for which they are entitled to be compensated.

## JURY DEMAND

Plaintiffs demand trial by jury.

## PRAYER FOR RELIEF

Plaintiffs, Stephen M. Gruver and Rae Ann Gruver, individually and on behalf of their son, Maxwell R. Gruver, deceased, respectfully pray the Court for judgment against Defendants, jointly and severally, for an amount of no less than $25,000,000, together with legal interest, an award of reasonable attorneys' fees and costs against LSU, pursuant to 42 U.S.C. § 1988(b), and such other relief as the Court may deem just and proper under the circumstances.

Dated:  June 4, 2020                  Respectfully submitted,

                                        /s/ Jonathon N. Fazzola
                                        **THE FIERBERG NATIONAL**
                                        **LAW GROUP, PLLC**
                                        Douglas E. Fierberg – Lead Attorney*
                                        Jonathon N. Fazzola*

Lisa N. Cloutier*
161 East Front Street, Suite 200
Traverse City, MI  49684
Telephone: (231) 933-0180
Facsimile: (231) 252-8100
Email: dfierberg@tfnlgroup.com
Email: jfazzola@tfnlgroup.com
Email: lcloutier@tfnlgroup.com
*Admitted Pro Hac Vice

/s/ J. Lane Ewing, Jr.
**CAZAYOUX EWING LAW FIRM**
Donald J. Cazayoux, Jr. (LBN 20742)
J. Lane Ewing, Jr. (LBN 29854)
257 Maximilian Street
Baton Rouge, LA  70802
Telephone: (225) 650-7400
Facsimile: (225) 650-7401
Email: don@cazayouxewing.com
Email: lane@cazayouxewing.com

*Attorneys for Plaintiffs Stephen M. Gruver
and Rae Ann Gruver, individually and on
behalf of Maxwell R. Gruver, deceaseds*